**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, CITY OF BOSTON, CITY OF NEW YORK, MAYOR AND CITY COUNCIL OF BALTIMORE, CITY AND COUNTY OF DENVER, CITY OF MINNEAPOLIS, CITY OF NEW HAVEN, CITY OF SAINT PAUL, and RAMSEY COUNTY, | Civil Action No. 25-12765 |
| Plaintiffs, | Hon. Manish S. Shah |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, and DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of FEMA Administrator, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND STAY OF AGENCY ACTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.    Congress Has Long Funded Local Emergency Management and Preparedness. ............... 3

II.   Defendants Attached New Conditions to Plaintiffs' Awards. ............................................. 4

      A.    Discrimination Condition...................................................................................... 5

      B.    Executive Order Condition ................................................................................... 6

III.  The Department of Justice Has Threatened Civil and Criminal Penalties Against Grantees That Certify Compliance with Anti-DEI Conditions.......................................................... 7

ARGUMENT ............................................................................................................................ 8

I.    The Court Has Jurisdiction. ................................................................................................ 8

II.   Plaintiffs Will Likely Succeed on the Merits..................................................................... 10

      A.    Defendants Violated the Separation of Powers and Acted Ultra Vires. ............... 10

      B.    Defendants Violated the Spending Clause............................................................ 14

      C.    Defendants Violated the APA................................................................................ 19

III.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. ................................. 22

IV.  The Balance of Hardships and Public Interest Favor Preliminary Relief. ........................ 24

CONCLUSION......................................................................................................................... 25

## TABLE OF CASES

*American Federation of Teachers. v. Department of Education*,
2025 WL 2374697 (D. Md. Aug. 14, 2025) ……………………………………………15

*American Public Health Ass'n v. National Institutes of Health*,
2025 WL 1822487 (D. Mass. July 2, 2025) …………………………………………...15, 20

*Arlington Central School District Board of Education v. Murphy*,
548 U.S. 291 (2006) …………………………………………………………………...11, 14

*Bennett v. Spear*, 520 U.S. 154 (1997) ……………………………………………………19

*Bostock v. Clayton County*, 590 U.S. 644 (2020) …………………………………………16

*California v. Environmental Protection Agency*, 72 F.4th 308 (D.C. Cir. 2023) ………………17

*Chicago Housing Authority v. Turner*, Case No. 25-12670 (N.D. Ill. Oct. 20, 2025) …………...9

*Chicago Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025) ............................................2, 16, 18, 22, 24, 25

*City & County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) ………………………17

*City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) …………16

*City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ……………...12

*City of Arlington v. Federal Communications Commission*, 569 U.S. 290 (2013) ……………..10

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ……………………………..23

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ……………………………..20

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ………………………………9, 13, 25

*City of Chicago v. Sessions*, 2018 WL 4268817 (7th Cir. June 4, 2018) ………………………..9

*City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ……………………………...10, 24

*City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019) ………………………………..23

*City of Fresno v. Turner*, 2025 WL 2721390
(N.D. Cal. Sept. 23, 2025) …………………………………………..2, 9, 15, 17, 20, 21, 22, 23

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ………………………………………..13

*Clinton v. City of New York*, 524 U.S. 417 (1998) ……………………………………………...13

*Coalition for TJ v. Fairfax County School Board*, 68 F.4th 864 (4th Cir. 2023) ………………16

*Colorado v. U.S. Department of Health & Human Services*,
788 F. Supp. 3d 277 (D.R.I. 2025) ……………………………………………………………...25

*Cook County v. Wolf*, 962 F.3d 208 (7th Cir. 2020) …………………………………………….8

*Department of Education v. California*, 604 U.S. 650 (2025) …………………………………...9

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ………………………………………….22

*Federal Communications Commission v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ……………………………………………………………………………...21

*Illinois v. Federal Emergency Management Agency*,
2025 WL 2716277 (D.R.I. Sept. 24, 2025) ……………………………………………3, 9, 19, 20, 21, 22

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) ………………………………………..9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657, 682 (2020) ………………………………………………………………………...21

*Martin Luther King, Jr. County v. Turner*,
2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) ………………………………………...1, 20, 23

*Martin Luther King, Jr. County v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025) ………………………………………………9, 11, 13, 20

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
Insurance Co.*, 463 U.S. 29 (1983) …………………………………………………………… 21

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025) ……………………………………… 21

*National Education Ass'n v. U.S. Department of Education*,
779 F. Supp. 3d 149 (D.N.H. 2025) ……………………………………………………………...15

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ………………19

*National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) ………..9

*New York v. United States*, 505 U.S. 144 (1992) ……………………………………16, 17, 18

*Nken v. Holder*, 556 U.S. 418 (2009) ……………………………………………………………8

*Ohio v. EPA*, 603 U.S. 279 (2024) ……………………………………………………………...20

iii

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981) ……………………..14, 19

*President & Fellows of Harvard College v. U.S. Department of Health & Human Services*, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) …………………………………...10

*Rhode Island Coalition Against Domestic Violence v. Bondi*, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ……………………………………………………9, 20

*Rhode Island Coalition Against Domestic Violence v. Kennedy*, 2025 WL 2899764 (D.R.I. Oct. 10, 2025) ……………………………………………9, 17, 20

*South Dakota v. Dole*, 483 U.S. 203 (1987) …………………………………………14, 17, 19

*San Francisco Unified School District v. AmeriCorps*, 2025 WL 1713360 (N.D. Cal. June 18, 2025) …………………………………………………15

*Tootle v. Secretary of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) ………………………………10

*West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) ………………………..11

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ……………………..8, 24

**INTRODUCTION**

Congress mandates that Defendants United States Department of Homeland Security ("DHS"), DHS Secretary Kristi Noem, the Federal Emergency Management Agency ("FEMA"), and FEMA Acting Administrator David Richardson administer funds that local governments use to counter terrorism as well as to prepare for, mitigate, and alleviate damage caused by natural disasters. For years, DHS and FEMA provided that funding without controversy. Now, however, Defendants threaten to hamstring local governments' emergency-management functions unless they acquiesce to the Executive Branch's unrelated policy goals. Specifically, DHS added new conditions to its grant terms requiring grantees to certify that they do not operate programs promoting "DEI" or "discriminatory equity ideology" that Defendants deem unlawful, do not engage in "discriminatory prohibited boycott[s]," and will comply with all executive orders "related to grants," or face False Claims Act Enforcement and funding cut-offs.

Plaintiffs Chicago, Boston, New York City, Baltimore, Denver, Minneapolis, New Haven, Saint Paul, and Ramsey County move for preliminary relief because they are faced with an awful dilemma: accept DHS's unlawful terms or forego over $100 million in critical public safety funds. Plaintiffs must make this choice for some grants as soon as November 24, 2025. Plaintiffs therefore seek a preliminary injunction prohibiting DHS from imposing or enforcing the unlawful grant conditions during the pendency of this case.

Plaintiffs satisfy the requirements for preliminary relief. First, Plaintiffs are likely to succeed on the merits. Courts in this District and elsewhere have preliminarily enjoined federal agencies from enforcing substantially similar grant conditions, including in litigation filed by many of the same local governments that are Plaintiffs here. *E.g.*, *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025), *appeal docketed*, No. 25-6428 (9th Cir.);

1

*Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) ("*CWIT*"), *appeal docketed*, No. 25-2144 (7th Cir.); *City of Fresno v. Turner*, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025). The result should be the same here. Defendants violated the separation of powers and acted *ultra vires* by imposing unauthorized conditions on over $100 million of DHS grants that have been, or will be, awarded to Plaintiffs under programs and appropriations created by Congress. Defendants violated the Spending Clause by imposing ambiguous conditions about DEI and the like that are unrelated to the purpose of the public safety grants. Defendants violated the Administrative Procedure Act ("APA") in several ways, including by failing to explain how their adoption of the challenged conditions comports with the congressionally mandated security programs at issue.

Second, Plaintiffs will suffer irreparable harm absent preliminary relief. Plaintiffs must either accept DHS's unlawful conditions or forego federal funding earmarked for personal protective equipment for firefighters, counterterrorism training, radiological detection devices, critical safety infrastructure, and more. This Hobson's choice inflicts irreparable harm because it requires Plaintiffs to choose between unconstitutional conditions or losing funds for life-saving projects. It has imperiled Plaintiffs' budgets, frozen emergency-preparedness planning, and otherwise threatened Plaintiffs' ability to protect its citizens from public safety threats. Defendants further raise the stakes of the choice by threatening to pursue criminal penalties and treble damages under the False Claims Act against funding recipients who engage in DEI that Defendants claim is unlawful.

Third, the balance of the equities and the public interest favor preliminary relief. Plaintiffs' loss of vital public safety funds far outweighs any harm that Defendants would suffer from not being able to use DHS grants as a cudgel to impose the Executive Branch's political agenda.

**BACKGROUND**

I.  **Congress Has Long Funded Local Emergency Management and Preparedness.**

For decades, Congress has appropriated billions of dollars to support state and local disaster preparedness and emergency response to prevent and mitigate the harm caused by natural disasters, emergencies, and security threats. *See Illinois v. FEMA*, 2025 WL 2716277, at *1 (D.R.I. Sept. 24, 2025). Congress authorized numerous grant programs to utilize these appropriations and directed Defendants to administer the programs.[1] These programs vary in scope and purpose but are united by a common theme: providing local governments with critical financial support to protect their cities and residents.

Plaintiffs have long relied on these funds to protect their communities. Specific uses have included: providing staffing and programming which improve firefighters' response in saving lives and property (Scardigli Dec. ¶¶ 8–15); purchasing health, safety, and security equipment for first responders like self-contained breathing apparatus (SCBA) breathing air cylinders (Hand Dec. ¶¶ 7–12); protecting critical transportation infrastructure like the Port of Boston (Ciccolo Dec. ¶¶ 5-10) and the Chicago "el" (*see* Maulawin Dec. ¶ 39); preparing for hazards like dam/levee failure, drought, floods, tornados, storms, human-caused hazards, and infrastructure failure (Bacher Dec. ¶ 10; Freed Dec. ¶¶ 19–20); updating technological capabilities that increase response efficiencies and enhance cybersecurity (Maulawin Dec. ¶¶ 17–18, 22–23); and building robust regional emergency-response and -preparedness partnerships (Buhse Dec. ¶¶ 5–6; Bacher Dec. ¶ 16).

Plaintiffs continue to rely on grant funding appropriated by Congress and administered by

---

[1] 15 U.S.C. § 2229 (Assistance to Firefighters and Fire Prevention and Safety); 15 U.S.C. § 2229a (Staffing for Adequate Fire and Emergency Response); 6 U.S.C. § 604 (Urban Area Security Initiative); 6 U.S.C. § 605 (State Homeland Security Grant Program); 6 U.S.C. § 762 (Emergency Management Performance Grants); 6 U.S.C. § 1135 (Transit Security Grant Program); 46 U.S.C. § 70107 (Port Security Grant Program); 42 U.S.C. § 5170c (Hazard Mitigation Grant Program); 6 U.S.C. § 596b(a) (Securing the Cities).

Defendants to protect both the public and the first responders who risk their lives for the public. Accordingly, in 2025, Plaintiffs have applied for, will imminently apply for, anticipate receiving, or have received awards under each of the programs identified in footnote 1. *See, e.g.*, Maulawin Dec. ¶ 14; Ryan Dec. ¶ 5; Scardigli Dec. ¶ 8; Elicker Dec. ¶¶ 6, 10–11; Ochoa Dec. ¶¶ 17–20.

## II. Defendants Attached New Conditions to Plaintiffs' Awards.

Since January 2025, President Trump has issued numerous executive orders directing agency heads to impose new conditions on federal grant funding. For example, in an executive order titled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* ("DEI Order"), President Trump mandated: "The head of each agency shall include in every contract or grant award … [a] term requiring [the] counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order No. 14173 § 3(b)(iv), (B), 90 Fed. Reg. 8633 (Jan. 21, 2025). The DEI Order also required the Director of the Office of Management and Budget to "[e]xcise references to DEI and DEIA principles, under whatever name," from federal grants to (among other reasons) "comply with civil-rights laws." *Id.* § 3(c)(ii). According to Attorney General Pamela Bondi, the DEI Order "mak[es] clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws.'" Metcalf Dec., Ex. 17 at 1.

Defendants incorporated these and other new executive order mandates in the FY 2025 DHS Standard Terms and Conditions ("Standard DHS Terms"). In the final days of the 2025 federal fiscal year, Defendants began issuing awards for these grants and presenting Plaintiffs with grant agreements incorporating the Standard DHS Terms. *See* Metcalf Dec., Ex. 1.[2] The Standard

---

[2] Defendants have incorporated the Standard DHS Terms by pasting the terms into Plaintiffs' awards as "Articles" in FEMA's grant packages, by attaching the Standard DHS Terms, and by incorporating them

DHS Terms include two new categories of conditions challenged here: (1) a "Discrimination Condition" and requirements implementing that condition; and (2) an "Executive Order Condition." These conditions are collectively referred to as the "Challenged Conditions."

## A. Discrimination Condition

The Discrimination Condition requires Plaintiffs to certify that "[t]hey do not, and will not … operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Metcalf Dec., Ex. 1 § C.XVII(2)(a)(i). "DEI" and "DEIA" are defined only as "diversity, equity, and inclusion" and "diversity, equity, inclusion and accessibility." *Id.* § C.XVII(1)(a)–(b). The Discrimination Condition incorporates a definition of "discriminatory equity ideology" from an executive order identifying various beliefs the Administration disfavors. *Id.* § C.XVII(1)(c) (citing Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, § 2(b), 90 Fed. Reg. 8853 (Jan. 29, 2025)).

The Discrimination Condition also requires Plaintiffs to certify that "[t]hey do not engage in and will not … engage in, a discriminatory prohibited boycott." Metcalf Dec., Ex. 1 § C.XVII(2)(a)(ii). The Discrimination Condition does not define "discriminatory prohibited boycott."

The Standard DHS Terms broadly require recipients to comply with specified civil rights laws,[3] which have historically been part of the Standard Terms and Conditions and do not, on their face, give the Executive Branch unfettered authority to determine what constitutes a violation of the statutes. Plaintiffs have regularly agreed to comply with federal anti-discrimination laws when

---

into FY 2025 Notices of Funding Opportunity. *See, e.g.*, Hand Dec., Ex. 1. For readability, Plaintiffs cite to the Standard DHS Terms rather than the specific awards.

[3] *See, e.g.*, Metcalf Dec., Ex. 1 §§ C.III (Age Discrimination Act of 1975), C.IV (Americans with Disabilities Act of 1990), C.VII (Civil Rights Act of 1964, Title VI), C.VIII (Civil Rights Act of 1968), C.XIV (Title IX), C.XVI (Equal Treatment of Faith-Based Organizations), C.XXIV (Civil Rights Act of 1964, Title VI), C.XXXIII (Rehabilitation Act of 1973).

using federal funding in the past, but—as detailed below—the federal government has now cast doubt on the well-established meaning of those provisions.

The Standard DHS Terms threaten to use the False Claims Act to enforce the Discrimination Condition, providing that "[r]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act]." Metcalf Dec., Ex. 1 § C.XVII. The Standard DHS Terms specify that DHS may "suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated" the Discrimination Condition. *Id.* § C.XVII(3). If the DHS Secretary or her designee makes such a determination, "all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law." *Id.* § C.XVII(4).

For some grants, Defendants are implementing the Discrimination Condition by requiring recipients comply with derivative conditions in FEMA's Preparedness Grants Manual. Metcalf Dec., Ex. 2. According to the Grants Manual, "[a]ll non-disaster grant program reimbursement requests must be reviewed and approved by FEMA prior to drawdowns." *Id.* § 6.11.3. If "funding [is] provided directly or indirectly to a subrecipient," the reimbursement request must indicate "[w]hether the subrecipient has any diversity, equity, and inclusion practices." *Id.* Plaintiffs refer to this as the "DEI Disclosure Requirement," which is part of the "Challenged Conditions."

### B. Executive Order Condition

The Executive Order Condition states: "Recipients must comply with the requirements of Presidential Executive Orders related to grants … the full text of which are incorporated by reference." Metcalf Dec., Ex. 1 § C.XXXI. The Executive Order Condition neither identifies executive orders "related to grants" nor the "requirements" with which recipients must comply.

III.   **The Department of Justice Has Threatened Civil and Criminal Penalties Against Grantees That Certify Compliance with Anti-DEI Conditions.**

In a memo issued in May 2025, the Deputy Attorney General announced a "Civil Rights Fraud Initiative" that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws." Metcalf Dec., Ex. 3 at 2. The memo asserted that the False Claims Act—which permits treble damages, 31 U.S.C. § 3729(a)(1)—"is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws" while engaging in "diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." Metcalf Dec., Ex. 3 at 1. The memo explained that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division." *Id.* at 2. The Department of Justice's Civil Division later asserted that it would dedicate "all available resources" to "aggressively … pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws." *Id.*, Ex. 16 at 1.

The Department of Justice has already initiated investigations into some Plaintiffs and others for allegedly unlawful DEI practices, or even for simply highlighting existing diversity, based on the Department's new interpretation of federal civil rights law. For example, in May 2025, the Department of Justice sent a letter to Chicago Mayor Brandon Johnson announcing "an investigation to determine whether [Chicago] is engaged in a pattern or practice of discrimination based on race, in violation of Title VII." *Id.*, Ex. 13 at 1. The letter explained that the investigation "is based on" Mayor Johnson's alleged remarks highlighting the number of Black officials in the Mayor's administration. *Id.* at 1–2.

Other federal agencies have followed suit. In October 2025, White House Office of Management and Budget Director Russ Vought announced that "$18 billion in New York City

infrastructure projects have been put on hold to ensure funding is not flowing based on unconstitutional DEI principles." *Id.*, Ex. 14. The U.S. Department of Transportation has likewise withheld more than $2 billion in funding from the Chicago Transit Authority—an entity separate from Plaintiff Chicago but from which Chicago receives pass-through FEMA funding—while the Administration investigates whether the Authority violated anti-discrimination laws. *Id.*, Ex. 15 at 1. In doing so, the Department of Transportation cited allegations that the Transit Authority has "touted its DBE [Disadvantaged Business Enterprise] goals as a key part of its equity mission." *Id.*

## **ARGUMENT**

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The standard is the same for an application for a stay under section 705 of the APA." *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## I.     **The Court Has Jurisdiction.**

Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, are subject to the APA's waiver of sovereign immunity, 5 U.S.C. § 702, and thus are squarely within this Court's jurisdiction. In other federal funding cases, the Administration has argued that the Tucker Act—which confers jurisdiction on the Court of Federal Claims for damages claims founded upon a contract with the United States, 28 U.S.C. § 1491(a)(1)—precludes district-court jurisdiction. Courts have consistently held, however, that "the Tucker Act does not cover challenges to grant funding conditions." *R.I. Coal. Against Domestic Violence v.*

*Bondi*, 2025 WL 2271867, at *5 & n.7 (D.R.I. Aug. 8, 2025) (citing cases); *accord R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2899764, at *5 (D.R.I. Oct. 10, 2025);[4] *Illinois*, 2025 WL 2716277, at *9; *Fresno*, 2025 WL 2721390, at *6; *cf. City of Chi. v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018) (resolving claims challenging grant conditions without addressing the Tucker Act). For good reason: "the source of Plaintiffs' rights resides in statutes and the Constitution, not in any contractual provisions," and Plaintiffs seek a purely equitable remedy—removal of the challenged conditions—not money damages. *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 878–79 (W.D. Wash. 2025), *appeal docketed*, No. 25-3664 (9th Cir.).

A judge in the Northern District, operating under a highly compressed TRO schedule, did question whether the court had jurisdiction over a challenge to grant conditions. *See Chi. Hous. Auth. v. Turner*, Case No. 25-12670, Dkt. 16 at 4–5 (N.D. Ill. Oct. 20, 2025). However, that order did not cite, and Plaintiffs are not aware of, any case holding that the Tucker Act divests district courts of jurisdiction over challenges to grant conditions. Instead, the order relied upon decisions finding that APA claims challenging grant terminations were really breach-of-contract claims subject to the Tucker Act. *E.g.*, *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025). Unlike backward-looking grant-termination suits, grant-condition suits implicate "eligibility for future funding." *Illinois*, 2025 WL 2716277, at *9.

In any event, *NIH* and *Department of Education* did not address constitutional claims. The Court of Federal Claims lacks jurisdiction to resolve Plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and "[t]here cannot be exclusive

---

[4] On October 23, 2025, the *Rhode Island Coalition Against Domestic Violence v. Kennedy* Court issued a preliminary injunction that was amended in ways unimportant to this citation.

jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006). Moreover, the *NIH* order stated that district courts likely have jurisdiction over challenges to "policies related to grants." 145 S. Ct. at 2661 (Barrett, J., concurring). Plaintiffs challenge Defendants' policy decision to adopt the Challenged Conditions, giving the Court jurisdiction over their claim. *See President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*, 2025 WL 2528380, at *12 (D. Mass. Sept. 3, 2025).

## II. Plaintiffs Will Likely Succeed on the Merits.

### A. Defendants Violated the Separation of Powers and Acted Ultra Vires.

"The authority to pass laws and the power of the purse rest in the legislative not the executive branch." *City of Chi. v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020). Federal agencies are "charged with administering congressional statutes," so "their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). When an agency acts "beyond what Congress has permitted it to do," the action is "ultra vires." *Id.* at 297–98. Defendants violated the separation of powers and acted *ultra vires* because Congress did not authorize Defendants to impose the Challenged Conditions.

**Infrastructure Security Grants:** Defendants administer two grant programs—the Port Security and Transit Security Grant Programs—that are designed to strengthen the nation's transportation infrastructure from potential terrorist attacks. *See* Metcalf Dec., Ex. 11 at 14–16 (Port Security), Ex. 12 at 9–11 (Transit Security). For the Port Security Grant Program, Congress directed that the DHS Secretary "shall establish a grant program for the allocation of funds based on risk" to help, among others, "local government agencies required to provide port security services and to train public safety personnel." 46 U.S.C. § 70107(a). In doing so, Congress identified eligible costs as well as application, reporting, and administrative requirements. *Id.*

10

§ 70107(b), (h), (i). Nowhere did Congress mention, let alone restrict, a grantee's ability to implement DEIA or conduct boycotts. Nor did Congress require compliance with executive orders.

As for the Transit Security Grant Program, Congress directed that the DHS Secretary "shall establish a program for making grants to eligible public transportation agencies for security improvements" and enumerated permissible capital and operating uses. 6 U.S.C. § 1135(a)-(b). Although Congress authorized "other terms and conditions as are determined necessary," *id.* § 1135(e), that does not permit conditions that are unrelated to transportation security improvements. Courts are skeptical of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *see King Cnty.*, 785 F. Supp. 3d at 886–87 ("Substantive conditions implicating controversial policy matters that are unrelated to the authorizing statute, such as prohibitions on DEI initiatives … are simply not 'of the same kind' as conditions that require recipients to monitor and report the progress of their program."). That skepticism is particularly warranted here. Congress designated transit security grant funds for "security response training" to support "individuals with disabilities and the elderly." 6 U.S.C. §§ 1135(b)(1)(L), 1137(c)(5). Congress thus could not have intended Defendants to condition funding on the Discrimination Condition's anti-accessibility provision. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (plain language of the statute controls).

**Fire-Related Grants:** Congress authorized two fire-related grant programs—Assistance to Firefighters and Fire Prevention and Safety—under 15 U.S.C § 2229. *See* Metcalf Dec., Ex. 7 at 6 (Assistance to Firefighters), Ex. 9 at 3 (Fire Prevention and Safety). A third fire-related grant program—Staffing for Adequate Fire and Emergency Response—was authorized by the same enactment but is codified at 15 U.S.C. § 2229a. *See id.*, Ex. 8 at 15. Neither statute authorizes the

11

Challenged Conditions:

- With respect to Assistance to Firefighters, Congress directed FEMA to award grants "for the purpose of protecting the health and safety of the public and firefighting personnel … against fire, fire-related, and other hazards." 15 U.S.C. § 2229(c)(1). In doing so, Congress identified purposes that funding "shall" be used for, including emergency medical services and acquiring additional firefighting vehicles, equipment, and personal protective equipment. *Id.* § 2229(c)(3).

- As for Fire Prevention and Safety, Congress authorized the FEMA Administrator to award grants for the "purpose of assisting fire prevention programs and supporting firefighter health and safety research and development." *Id*. § 2229(d)(1).

- In connection with Staffing for Adequate Fire and Emergency Response, Congress required the FEMA Administrator to award grants "for the purpose of increasing the number of firefighters to help communities meet industry minimum standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards, and to fulfill traditional missions of fire departments that antedate the creation of [DHS]." *Id.* § 2229a(a)(1)(A).

Far from authorizing the Challenged Conditions, Congress directed FEMA to "educate the public and overcome public indifference as to fire, fire prevention, and individual preparedness" through "programs to provide specialized information" to "particularly vulnerable" groups, "such as the young and the elderly." *Id.* § 2205. Moreover, Congress contemplated that funds could be used to "provide specialized training … to recognize individuals who have mental illness and how to properly intervene with individuals with mental illness." *Id.* § 2229(c)(3)(N). Neither of these Congressional preferences can be reconciled with the Challenged Conditions' restrictions on inclusion and accessibility. Thus, "[n]ot only has the Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

**Homeland Security Grants:** Defendants administer numerous grant programs designed to prepare for and prevent terrorist attacks. For example, 6 U.S.C. § 603 authorizes the Homeland Security Grant Program, which includes the Urban Area Security Initiative and State Homeland Security Grant Program. *See* Metcalf Dec., Ex. 6 at 4, 27–28. These program funds help high-risk

12

urban areas or local governments with "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a); *see also id.* § 596b (Securing the Cities). Consistent with the previous grants identified, nothing in these statutes authorizes the Challenged Conditions.

**<u>Other Preparedness & Non-Disaster Grants:</u>** Congress funds Emergency Management Performance Grants under 6 U.S.C. § 762(b), which provides that the FEMA Administrator "shall continue implementation of an emergency management performance grants program, to make grants to States to assist State, local and tribal governments in preparing for all hazards." Congress funds the Hazard Mitigation Grant Program under 42 U.S.C. § 5170c, which authorizes the FEMA Administrator to award grants to "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." Again, neither of these statutes authorizes the Challenged Conditions.

As the foregoing discussion demonstrates, Defendants are conditioning Plaintiffs' receipt of appropriated funds on compliance with the President's political agenda. But Defendants lack authority "to condition the payment of such federal funds on adherence to [their] political priorities." *Sessions*, 888 F.3d at 283 (discussing DOJ grant); *see Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). By using these "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [their] policy objectives [Defendants] strike[] at the heart of [a] core value … the separation of powers." *Barr*, 961 F.3d at 892. Defendants' actions therefore usurp Congress's "power of the purse" and violate bedrock separation-of-powers principles. *Sessions*, 888 F.3d at 283; *see also King Cnty.*, 785 F. Supp. 3d at 886–88; *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020).

13

### B.     Defendants Violated the Spending Clause.

Even if Congress had delegated authority to DHS to impose the Challenged Conditions, the Conditions exceed constitutional limits on the Spending Power. Under the Spending Clause, grant conditions must be (1) unambiguous, (2) related to the subject matter of the grant program, (3) identified before a recipient enters into the grant agreement, and (4) not unduly coercive. *See South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Challenged Conditions violate these requirements.

### 1.     The Challenged Conditions are Impermissibly Ambiguous.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17; *see also Arlington Cent.*, 548 U.S. at 296 (holding that grantees must be able to "clearly understand … the obligations of the [conditions]"). The Challenged Conditions are impermissibly ambiguous.

The Discrimination Condition requires Plaintiffs to certify that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Metcalf Dec., Ex. 1 § C.XVII(2)(a)(i). The Condition does not define "DEI" or "DEIA," stating only that the terms mean the set of words for which they are acronyms. *Id.* § C.XVII(1). The Condition incorporates an executive order that vaguely defines "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations," listing various examples. Exec. Order No. 14190 § 2(b). Worse yet, the Condition does not explain what it means to "advance or promote" DEI, DEIA, or discriminatory equity ideology.

Defendants' failure to provide unambiguous definitions is critical because terms like "DEI"

and "equity" "are rife with vagueness and ambiguity, leaving grantees to speculate what is proscribed and what is permitted." *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 746 (N.D. Cal. 2025). Indeed, "DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice." *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 188 (D.N.H. 2025). Because these terms "are so broad and involve inherent value judgments, they leave regulated persons without proper notice of what conduct they must certify they are not engaging in, and they empower the government to enforce the [c]ertification [r]equirement arbitrarily." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 2025 WL 2374697, at \*31 (D. Md. Aug. 14, 2025); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 1822487, at \*17 (D. Mass. July 2, 2025) (calling the President's "rudderless EOs concerning DEI" a "fool's errand resulting in arbitrary and capricious action" because "they do not even attempt to define DEI").

Nor does the Discrimination Condition's reference to unspecified "Federal anti-discrimination laws" eliminate the ambiguity. One court understood the reference to "Federal anti-discrimination laws" as a "polic[y]" announcement "rather than as limits to the scope of the new conditions." *Fresno*, 2025 WL 2721390, at \*8. That understanding is consistent with the Standard DHS Terms' retention of longstanding conditions requiring grantees to comply with numerous specified federal anti-discrimination laws. *See supra* note 3; Compl. ¶ 151. There should be no need to add the Discrimination Condition's anti-DEI clause if programs that "advance or promote DEI, DEIA, or discriminatory equity ideology" also violate the federal anti-discrimination laws identified in the Standard DHS Terms.

In any case, in the eyes of the federal government "what might make any given 'DEI' program violate Federal anti-discrimination laws … is left entirely to the grantee's imagination."

*CWIT*, 778 F. Supp. 3d at 984. "The answer is anything but obvious." *Id.*

To be sure, the Attorney General recently offered "guidance" that purports to "clarif[y] the application of federal antidiscrimination laws to [DEI] programs." Metcalf Dec., Ex. 4 at 1. But that guidance is itself vague and at times contradicts established federal law. For example, the Attorney General asserted that the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 2. That assertion is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up). Similarly, the Attorney General stated that funding recipients "should affirm sex-based boundaries rooted in biological differences," Metcalf Dec., Ex. 4 at 6, contrary to Supreme Court precedent applying Title VII sex-based protections to trans people. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 662, 670 (2020). FEMA recently advised grantees to "review and adhere to the Attorney General's [guidance]." Hand Dec., Ex. 3 at 1.

Plaintiffs thus reasonably fear that unless they adopt the federal government's ambiguous and incorrect interpretations of federal anti-discrimination laws, they risk treble-damages suits under the False Claims Act and even criminal prosecution. The federal government's evolving interpretations of the law only "further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation.'" *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds sub nom. City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

16

In addition to its anti-DEI clause, the Discrimination Condition requires recipients to certify that they will not engage in a "discriminatory prohibited boycott." Metcalf Dec., Ex. 1 § C.XVII(2)(a)(ii). But the Discrimination Condition fails to define "discriminatory prohibited boycott," once again leaving recipients to guess what they can and cannot do.

The Executive Order Condition is equally ambiguous. As an initial matter, "an executive order is not 'law,' within the meaning of the Constitution," *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023), and none of President Trump's executive orders impose direct obligations on grantees. Defendants presumably intend that the Executive Order Condition have some effect, but Plaintiffs cannot ascertain what it means to comply with all executive orders "related to grants" that have been or even might be issued in the future. Metcalf Dec., Ex. 1 § C.XXXI. Defendants could have easily clarified this; the Standard DHS Terms elsewhere identify specific executive orders with which grantees must comply. *See id.* §§ C.XI, C.XLI. Accordingly, courts have repeatedly enjoined similar conditions as "impermissibly vague because they incorporate the equally vague language of the EOs themselves and because in some cases they do not specify *which* EOs are 'applicable to grantees' and in all cases they do not explain *how* the EOs are applicable to grantees." *Fresno*, 2025 WL 2721390, at *15 (emphasis in original); *accord R.I. Coal.*, 2025 WL 2899764, at *13.

### 2. The Challenged Conditions Are Unrelated to the Grants' Purposes.

Defendants' application of the Challenged Conditions to Plaintiffs' awards also violates the Spending Clause's requirement that grant conditions be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citation omitted); *see Dole*, 483 U.S. at 207–09 ("[C]onditions on federal grants" must be "reasonably calculated to address th[e] particular … purpose … for which the funds are expended."). This requirement is crucial.

17

Without "some relationship" between spending conditions and "the purpose of the federal spending," "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

Nothing in the statutes authorizing the grant programs at issue here nor in the emergency management purposes for which Congress appropriated the grant funds suggests a relationship between the Challenged Conditions and the purpose of the federal spending. On the contrary, the Challenged Conditions are antithetical to Congress's express purpose in enacting the grant programs—to enhance public safety, community preparedness, and security of critical infrastructure. The conditions contravene Congress's mandate that agencies consider equity and accessibility in carrying out these programs. There is no conceivable relationship between these programs and the Challenged Conditions' prohibition on boycotts, existing executive orders that (for example) prohibit the use of federal funds "to promote gender ideology,"[5] or similar grant-related executive orders that the President may sign in the future.

The Discrimination Condition's anti-DEI provision is divorced from Congress's purpose in funding DHS grants for yet another reason: the provision applies to "any" programs that Plaintiffs operate, even programs that Plaintiffs operate using non-federal funds. The federal government acknowledged as much in litigation challenging a similar anti-DEI provision, stating that the provision applies "irrespective of whether the program is federally funded." *CWIT*, 778 F. Supp. 3d at 984. There is no relationship between the purposes behind Congress's appropriation of federal funding for DHS grants and programs that Plaintiffs operate using other funding sources. *Cf.* 6 C.F.R. § 21.1 (prohibiting specified discrimination in carrying out programs that "receiv[e] Federal financial assistance from [DHS]").

---

[5] Exec. Order No. 14168 § 3(g), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

18

### 3. The EO Condition is Not Expressly Limited to Existing EOs.

The Spending Clause prohibits Defendants from imposing "retroactive conditions." *Pennhurst*, 451 U.S. at 25. The Executive Order Condition does not, however, expressly limit its applicability to existing executive orders. Plaintiffs cannot know and understand their obligations if those obligations are imposed after Plaintiffs sign a grant agreement.

### 4. The Challenged Conditions are Unduly Coercive.

Congress cannot compel Plaintiffs to adopt policies by offering a "financial inducement … so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (cleaned up). Defendants have applied the Challenged Conditions to all of their grants. With local governments already struggling, the potential elimination of all DHS funding "is much more than 'relatively mild encouragement'—it is a gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). Defendants' threats to pursue treble damages under the False Claims Act only heighten the risk, leaving local governments "with no real option but to acquiesce." *Id.* at 582. This coercion is "even more pronounced because the threatened funds involve essential public safety responsibilities." *Illinois*, 2025 WL 2716277, at *14.[6]

### C. Defendants Violated the APA.

The APA permits judicial review of "final agency action." 5 U.S.C. § 704. An agency action is "final" if it marks "the 'consummation' of the agency's decision-making process," from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). In this case, Plaintiffs challenge (a) Defendants' adoption of the Challenged Conditions as a matter of policy and (b) Defendants' attachment of the Challenged Conditions to every grant agreement through

---

[6] The Challenged Conditions also violate the Spending Clause's "independent constitutional bar" rule, *Dole*, 483 U.S. at 210, including by requiring Plaintiffs to violate the First Amendment rights of third parties. *See* Compl. ¶¶ 240–41; *see also* Metcalf Dec., Ex. 4 at 9 (instructing grantees to "[m]onitor third parties that receive federal funds to ensure ongoing compliance").

which Plaintiffs would receive funding. *See* Compl. ¶¶ 242–62.

Courts have consistently held that an agency's adoption of grant conditions and application of those conditions to specific awards constitute final agency action. *E.g.*, *City of Chi. v. Sessions*, 321 F. Supp. 3d 855, 865–66 (N.D. Ill. 2018); *R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2899764, at \*\*5–6; *Illinois*, 2025 WL 2716277, at \*8; *Fresno*, 2025 WL 2721390, at \*7; *R.I. Coal. Against Domestic Violence v. Bondi*, 2025 WL 2271867, at \*6; *King Cnty.*, 785 F. Supp. 3d at 884 n.18. Such conditions mark the consummation of an agency's process both "at the macro-level" when the agency adopts grant-wide conditions and at the "individual" level when the agency applies those conditions to specific awards. *Am. Pub. Health Ass'n*, 2025 WL 1822487, at \*14. The conditions also "trigger important legal and practical consequences" because they "force" Plaintiffs "to choose between accepting the award with the Conditions or forgoing the award." *Sessions*, 321 F. Supp. 3d at 866. The actions challenged here are therefore final.

### 1.     Defendants Exceeded Their Authority and Acted Contrary to Law.

The APA prohibits agency actions that are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory … authority." 5 U.S.C. § 706(2)(A)–(C). Courts have repeatedly held that federal agencies likely violated these prohibitions in implementing conditions similar to the Challenged Conditions. *E.g.*, *Fresno*, 2025 WL 2721390, at \*\*10–18; *King Cnty.*, 2025 WL 2322763, at \*\*11–15. For the reasons explained above, the result should be the same here.

### 2.     Defendants' Actions are Arbitrary and Capricious.

Agency action is arbitrary and capricious where the action is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). An agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not

intended it to consider" nor simply ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies may change existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have considered "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Defendants acted arbitrarily and capriciously in three principal ways. First, in categorically applying the Challenged Conditions to all grants, Defendants neither "look[ed] to" nor "discuss[ed]" individual statutory "requirements." *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 591 U.S. 657, 682 (2020); *see New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025) (failing to consider if agency action "fell within the bounds of their statutory authority" was arbitrary and capricious), *appeal docketed*, No. 25-1236 (1st Cir.). The anti-DEI provision underscores that Defendants failed to consider statutes that require DHS to "ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland," 6 U.S.C. § 111(b)(1)(G), as well as statutory terms authorizing actions readily described as "DEI" or "DEIA." "The indiscriminate application of these conditions across the entire spectrum of DHS-administered grants demonstrates the absence of tailoring and the failure to consider whether such conditions are appropriate for particular programs." *Illinois*, 2025 WL 2716277, at *12.

Second, the Challenged Conditions "reflect changes in agency position which require … an explanation of reasoning." *Fresno*, 2025 WL 2721390, at *8; *see also* 2 C.F.R. § 200.208(d)(2). Defendants have offered no explanation for how the Challenged Conditions are consistent with the congressionally mandated security programs at issue. Nor did Defendants explain why they applied the Discrimination Condition's anti-DEI provision to "any programs" operated by funding

recipients, regardless of whether those programs are DHS-funded. And to the extent that Defendants adopted the Challenged Conditions "to fulfill a presidential directive," that would not "exempt" Defendants "from arbitrary-and-capricious review." *Fresno*, 2025 WL 2721390, at *8 (internal quotation omitted) (collecting cases).

Third, Defendants ignored longstanding reliance interests. Before Defendants imposed the Challenged Conditions, "grant recipients were not subject—at least as a matter of agency policy—to conditions prohibiting the promotion of DEI" and requiring executive order compliance. *Id.* The Challenged Conditions therefore "require … consideration of reliance interests among other important factors." *Id.* But nothing in the Standard DHS Terms or elsewhere reflects any effort by Defendants to consider Plaintiffs' reliance interests in programs that have implemented DHS grants for years. This "failure to even consider reasons to not impose the contested conditions highlights the arbitrariness of the process." *Illinois*, 2025 WL 2716277, at *12.

## III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

The Challenged Conditions irreparably harm Plaintiffs in two principal ways. First, "irreparable harm is presumed" when defendants violate constitutional provisions that protect "intangible and unquantifiable interests." *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011). "The separation of powers is one such interest." *CWIT*, 778 F. Supp. 3d at 993. "By protecting against 'the concentration of power' that 'would allow tyranny to flourish,' it is 'one of the most vital of the procedural protections of individual liberty found in our Constitution.'" *Id.* (quoting *Barr*, 961 F.3d at 892). Defendants have violated "Congress's express direction" and committed "a clear separation of powers violation" while also violating the Spending Clause. *Id.* "Thus, no further showing of irreparable injury or inadequacy of legal remedies is required." *Id.*

Second, Defendants have required Plaintiffs—some as early as November 24, 2025—to

either accept the Challenged Conditions or lose funding earmarked for vital public safety services.[7] This "Hobson's choice" is irreparable injury. *City of Chi. v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017). "Even if Plaintiffs chose to try to comply with the Grant Conditions," the "uncertainty as to whether the Defendant agencies will consider [the] conditions satisfied creates irreparable injury not just in the form of constitutional injury." *Fresno*, 2025 WL 2721390, at *19. Rather, "the uncertainty also interferes with Plaintiffs' ability to budget, plan for the future, and properly serve their residents." *Id.* (cleaned up); *see also City of Evanston v. Barr*, 412 F. Supp. 3d 873, 886–87 (N.D. Ill. 2019).

Plaintiffs "have submitted substantive and detailed evidence illustrating the ways in which a loss of grant funds would be devastating and irreparable." *King Cnty.*, 785 F. Supp. 3d at 890 (internal quotations omitted). A loss of funds would upend budgets, sacrifice critical staffing and public safety upgrades intended to protect communities and first responders, and make these cities less safe. *See, e.g.*, Maulawin Dec. ¶¶ 44–51; Freed Dec. ¶¶ 25–29; Leach Dec. ¶ 30; Scardigli Dec. ¶ 15. Some Plaintiffs' emergency management agencies would be cut by a third or more. *See, e.g.*, Buhse Dec. ¶ 19; Freed Dec. ¶ 26. These risks are not hypothetical; even a temporary interruption in funding disrupts procurement and management of programs that help prevent the loss of life and property during natural disasters and man-made threats. *See, e.g.*, Buhse Dec. ¶ 25; Bacher Dec. ¶¶ 51–56.

Loss of funds would harm programs that protect Plaintiffs' residents from worst-case scenarios like terrorist and cyber-attacks, fires, floods, and earthquakes. *See, e.g.*, Hand Dec.

---

[7] While Defendants extended the deadlines for Plaintiffs to accept grant awards earlier this week, *see* ECF No. 23, many of the declarations were prepared before that extension and thus reflect the earlier deadlines. For that same reason, the declarations attach the award documents available at the time. While Plaintiffs have since learned that Defendants have issued some new award documents, the new award documents contain the Challenged Conditions.

¶¶ 17–18; Jordon Dec. ¶¶ 24–25; Bacher Dec. ¶¶ 10, 51–56. And many Plaintiffs face strained budgets already, such that using other funds to replace these grants is not feasible. *See, e.g.*, Buhse Dec. ¶¶ 22–23; Bacher Dec. ¶ 52. The uncertainty created by the Challenged Conditions undermines Plaintiffs' ability to do long-term planning: without reliable and stable funding, they cannot responsibly commit to multi-year projects, leaving them less prepared to address current and emerging threats. *See, e.g.*, Maulawin Dec. ¶ 46; Sayre Dec. ¶¶ 23–24; Ciccolo Dec. ¶ 19. The threats to public safety and emergency management are particularly significant because Plaintiffs' diverse, urban, and metropolitan areas include streets, railways, advanced telecommunications and power systems, and other critical infrastructure that support large scale events vulnerable to public safety threats. *See, e.g.*, Maulawin Dec. ¶¶ 4–13; Jordon Dec. ¶¶ 3–6.

## IV. The Balance of Hardships and Public Interest Favor Preliminary Relief.

When deciding whether to grant an injunction, courts "balance the competing claims of injury … the effect on each party of the granting or withholding of the requested relief … [and] pay particular regard [to] the public consequences." *Winter*, 555 U.S. at 24 (cleaned up). Injunctions "protecting the separation of powers … are always in the public interest." *CWIT*, 778 F. Supp. 3d at 993 (internal quotations omitted); *see Barr*, 961 F.3d at 918 (affirming the district court's ruling that "the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers"). And where, as here, the movant establishes a likelihood of success on a separation-of-powers claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *CWIT*, 778 F. Supp. 3d at 993 (quoting *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012)).

24

Beyond this, Defendants' actions force Plaintiffs to either (a) accept conditions that Plaintiffs believe to be unlawful, risking treble-damages suits and even criminal penalties if Defendants disagree with Plaintiffs' certifications, or (b) forego critical funding, impairing Plaintiffs' budgets and undermining public safety in the ways described above. By contrast, "a preliminary injunction will not prevent the government from enforcing existing anti-discrimination laws" or any other existing laws. *CWIT*, 778 F. Supp. 3d at 993. Even if a preliminary injunction requires Defendants "to spend money inconsistent with the Executive's agenda," that would not outweigh the public interest in maintaining lifesaving programs. *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277, 314 (D.R.I. 2025). "[W]hen the Court weighs an agency's unreasoned, unsubstantiated, and likely unlawful" decision to impose new funding conditions against the interests of grant applicants and the public benefits those grants serve, "the balance of the equities and public interest are undeniably in [Plaintiffs'] favor." *Id.*

Moreover, other federal agencies have complied with court orders preliminarily enjoining those agencies from enforcing similar grant conditions on Plaintiffs and others, undercutting the notion that a preliminary injunction would cause any significant hardship to Defendants here. Defendants can simply "distribute the funds without mandating the conditions—as has been done for[ever]." *Sessions*, 888 F.3d at 291. In fact, awarding the funding that Plaintiffs seek to protect in this case would *benefit* Defendants by enabling Plaintiffs to better prevent and respond to terrorism and other disasters. Accordingly, the public interest and balance of equities plainly tilt in favor of providing Plaintiffs interim relief.

## **CONCLUSION**

Plaintiffs request that the Court grant Plaintiffs' motion for a preliminary injunction and a stay pursuant to 5 U.S.C. § 705.

Dated: October 24, 2025        Respectfully submitted,

Mary B. Richardson-Lowry
Corporation Counsel of the City of Chicago

By: /s/ *Stephen Kane*
Stephen Kane (IL Bar No. 6272490)
Chelsey Metcalf (IL Bar No. 6337233)
Rebecca Hirsch (IL Bar No. 6279592)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-9484
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org
rebecca.hirsch2@cityofchicago.org


ADAM CEDERBAUM
Corporation Counsel, City of Boston

By: /s/ *Samuel B. Dinning*
SAMUEL B. DINNING, MA BBO 704304**
Chief of Staff & Policy
TERESA K. ANDERSON, MA BBO 669985*
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4034
E-Mail: samuel.dinning@boston.gov
teresa.anderson@pd.boston.gov
*Attorneys for Plaintiff City of Boston*


MICHIKO (MIKO) ANDO BROWN
City Attorney, City and County of Denver

By: /s/ *Katie McLoughlin*
Katie McLoughlin (CO Bar No. 51980)*
Matthew J. Mulbarger (CO Bar No. 51918)**
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202
Tel: 720-913-8050
katie.mcloughlin@denvergov.org
matthew.mulbarger@denvergov.org

*Attorneys for Plaintiff City and County of Denver*

EBONY M. THOMPSON
Baltimore City Solicitor

By: /s/ *Sara Gross*
Sara Gross (MD 0412140305)*
Chief, Affirmative Litigation Division
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Telephone: (410) 396-3947
E-Mail: sara.gross@baltimorecity.gov
*Attorneys for Plaintiff*
*Mayor & City Council of Baltimore*

LYNDSEY OLSON
Saint Paul City Attorney

By: /s/ *Kelsey McElveen*
KELSEY MCELVEEN **
Assistant City Attorney
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone:     (651) 266-8710
Facsimile:      (651) 298-5619
E-Mail:         Kelsey.McElveen@ci.stpaul.mn.us
*Attorneys for Plaintiff City of Saint Paul*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

By: /s/ *Doris Bernhardt*
Doris Bernhardt (NY Bar No. 4449385)**
Hope Lu (NY Bar No. 5606934)*
100 Church Street
New York, NY 10007
Tel: (212) 356-1000
*Attorneys for Plaintiff City of New York*
*CITY OF NEW YORK*

27

KRISTYN ANDERSON
Minneapolis City Attorney

By: /s/ *Kristyn Anderson*
Kristyn Anderson, MN Lic. 0267752**
City Attorney
Sara J. Lathrop, MN Lic. 0310232**
Munazza Humayun, MN Lic. 0390788*
Heather P. Robertson, MN Lic. 0390470**
Assistant City Attorneys
350 South Fifth Street
Minneapolis MN 55415
612-299-2716
612-431-1826
612-299-2742
612-431-2468
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
munazza.humayun@minneapolismn.gov
heather.robertson@minneapolismn.gov
*Attorneys for Plaintiff City of Minneapolis*


By: /s/ *Bradley Cousins*
Bradley Cousins, MN Bar #0400463 **
Assistant Ramsey County Attorney
Stacey D'Andrea, MN Bar #0388320 **
Assistant Ramsey County Attorney
Jada Lewis, MN Bar #0391287 **
Assistant Ramsey County Attorney
Ramsey County Attorney's Office
360 Wabasha St. N., Suite 100
Saint Paul, MN 55102
Telephone: 651-266-3081 (Cousins)
651-266-3051 (D'Andrea)
651-266-3149 (Lewis)
E-mail: Bradley.cousins@co.ramsey.mn.us
Stacey.dandrea@co.ramsey.mn.us
Jada.lewis@co.ramsey.mn.us
*Attorneys for Plaintiff Ramsey County*


PATRICIA KING
Corporation Counsel for the City of New Haven

By: /s/ *Michael P. Bowler*

28

Michael P. Bowler, CT Bar #407379*
City of New Haven
Office of the Corporation Counsel
165 Church Street, 4th Floor
New Haven, CT 06510
475-331-3244
mbowler@newhavenct.gov
*Attorneys for Plaintiff City of New Haven*


By: */s/ Toby Merrill*
Toby Merrill (MA Bar #601071)**
Litigation Director, Public Rights Project
Sai Mohan (CA Bar #350675)**
Erin Monju (DC Bar #90036952)**
490 43rd St., Unit # 115
Oakland, CA 94609
707-297-3837
Toby@publicrightsproject.org
Sai@publicrightsproject.org
Erin@publicrightsproject.org
*Counsel for all Plaintiffs*


* Application forthcoming for admission pro hac vice
** Admitted pro hac vice