**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, CITY OF BOSTON, CITY OF NEW YORK, MAYOR AND CITY COUNCIL OF BALTIMORE, CITY AND COUNTY OF DENVER, CITY OF MINNEAPOLIS, CITY OF NEW HAVEN, CITY OF SAINT PAUL, and RAMSEY COUNTY, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, and DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of FEMA Administrator, <br><br> Defendants. | No. 25-cv-12765 <br><br> Hon. Manish S. Shah |

## PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO SUBMIT NOTICE OF SUPPLEMENTAL AUTHORITY

1.      Plaintiffs move for leave to submit as supplemental authority the Order Granting Preliminary Injunction in *Housing Authority of the City and County of San Francisco, et al. v. Scott Turner, et al.* Case No. 25-cv-08859-JST (N.D. Cal., Nov. 14, 2025), attached as Exhibit A.

2.      This order was issued on November 14, 2025, after Plaintiffs filed their Reply in Support of Motion for Preliminary Injunction and Stay of Agency Action.

3.      The order addresses many of the same issues raised in the parties' briefing before this Court.

4.      Defendants do not oppose this motion.

Dated: November 15, 2025      Respectfully submitted,

Mary B. Richardson-Lowry
Corporation Counsel of the City of Chicago

By: /s/ *Stephen Kane*
Stephen Kane
Rebecca Hirsch
Chelsey Metcalf
Rachel Zemke
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-9484
stephen.kane@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org
Rachel.zemke@cityofchicago.org

ADAM CEDERBAUM
Corporation Counsel, City of Boston

By: /s/ *Samuel B. Dinning*
SAMUEL B. DINNING, MA BBO 704304**
Chief of Staff & Policy
TERESA K. ANDERSON, MA BBO 669985*
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4034
E-Mail: samuel.dinning@boston.gov
teresa.anderson@pd.boston.gov
*Attorneys for Plaintiff City of Boston*

MICHIKO (MIKO) ANDO BROWN
City Attorney, City and County of Denver

By: /s/ *Katie McLoughlin*
Katie McLoughlin (CO Bar No. 51980)*
Matthew J. Mulbarger (CO Bar No. 51918)**
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202
Tel: 720-913-8050

katie.mcloughlin@denvergov.org
matthew.mulbarger@denvergov.org
*Attorneys for Plaintiff City and County of Denver*


EBONY M. THOMPSON
Baltimore City Solicitor

By: /s/ *Sara Gross*
Sara Gross (MD 0412140305)*
Chief, Affirmative Litigation Division
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Telephone: (410) 396-3947
E-Mail: sara.gross@baltimorecity.gov
*Attorneys for Plaintiff*
*Mayor & City Council of Baltimore*



LYNDSEY OLSON
Saint Paul City Attorney

By: /s/ *Kelsey McElveen*
KELSEY MCELVEEN **
Assistant City Attorney
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone:    (651) 266-8710
Facsimile:    (651) 298-5619
E-Mail:       Kelsey.McElveen@ci.stpaul.mn.us
*Attorneys for Plaintiff City of Saint Paul*



MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

By: /s/ *Doris Bernhardt*
Doris Bernhardt (NY Bar No. 4449385)**
Hope Lu (NY Bar No. 5606934)*
100 Church Street
New York, NY 10007
Tel: (212) 356-1000
*Attorneys for Plaintiff City of New York*

*CITY OF NEW YORK*

KRISTYN ANDERSON
Minneapolis City Attorney

By: /s/ *Kristyn Anderson*
Kristyn Anderson, MN Lic. 0267752**
City Attorney
Sara J. Lathrop, MN Lic. 0310232**
Munazza Humayun, MN Lic. 0390788*
Heather P. Robertson, MN Lic. 0390470**
Assistant City Attorneys
350 South Fifth Street
Minneapolis MN 55415
612-299-2716
612-431-1826
612-299-2742
612-431-2468
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
munazza.humayun@minneapolismn.gov
heather.robertson@minneapolismn.gov
*Attorneys for Plaintiff City of Minneapolis*

By: /s/ *Bradley Cousins*
Bradley Cousins, MN Bar #0400463 **
Assistant Ramsey County Attorney
Stacey D'Andrea, MN Bar #0388320 **
Assistant Ramsey County Attorney
Jada Lewis, MN Bar #0391287 **
Assistant Ramsey County Attorney
Ramsey County Attorney's Office
360 Wabasha St. N., Suite 100
Saint Paul, MN 55102
Telephone: 651-266-3081 (Cousins)
651-266-3051 (D'Andrea)
651-266-3149 (Lewis)
E-mail: Bradley.cousins@co.ramsey.mn.us
Stacey.dandrea@co.ramsey.mn.us
Jada.lewis@co.ramsey.mn.us
*Attorneys for Plaintiff Ramsey County*

PATRICIA KING
Corporation Counsel for the City of New Haven

By: /s/ Michael P. Bowler
Michael P. Bowler, CT Bar #407379*
City of New Haven
Office of the Corporation Counsel
165 Church Street, 4th Floor
New Haven, CT 06510
475-331-3244
mbowler@newhavenct.gov
Attorneys for Plaintiff City of New Haven


By: /s/ Toby Merrill
Toby Merrill (MA Bar #601071)**
Litigation Director, Public Rights Project
Sai Mohan (CA Bar #350675)**
Erin Monju (DC Bar #90036952)**
490 43rd St., Unit # 115
Oakland, CA 94609
707-297-3837
Toby@publicrightsproject.org
Sai@publicrightsproject.org
Erin@publicrightsproject.org
Counsel for all Plaintiffs


* Application forthcoming for admission pro hac vice
** Admitted pro hac vice

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HOUSING AUTHORITY OF THE CITY
AND COUNTY OF SAN FRANCISCO, et
al.,

          Plaintiffs,

     v.

SCOTT TURNER, et al.,

          Defendants.

Case No. 25-cv-08859-JST

**ORDER GRANTING PRELIMINARY
INJUNCTION**

Re: ECF No. 19

Shortly after taking office this January, President Trump began issuing Executive Orders ("EOs") in furtherance of his policy agenda, many of which purport to expressly undo or radically reverse the policy choices of the prior administration. Pursuant to another EO directing them to do so, federal agencies began requiring grant recipients to "comply" with these EOs as a condition of receiving funding. Federal agencies also imposed other conditions that do not reference the EOs specifically but address similar themes, including "diversity, equity, and inclusion (DEI)," "gender ideology," "illegal immigration," and "elective abortion." Beyond referencing the executive orders themselves, these new grant conditions were unaccompanied by justification or reasoning.

HUD is one such agency. Plaintiffs, city and county public housing agencies ("PHAs") from around the country, challenge HUD's imposition of certain new grant conditions on four categories of HUD grants. They argue that the challenged conditions violate constitutional Separation of Powers, the Due Process Clause, and the Spending Clause. They also argue that the conditions exceed statutory authority and are arbitrary and capricious under the APA. Concluding that Plaintiffs are likely to succeed on the merits and have satisfied the other conditions for emergency relief, the Court joins many of its peer district courts and grants a preliminary

injunction against the challenged grant conditions.

## I.      BACKGROUND

### A.      Executive Orders Targeting Federal Grants

Soon after his second inauguration, President Trump issued a series of EOs directing executive agencies to impose new conditions on federal grants.  These include Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("Ending Radical and Wasteful Government DEI Programs and Preferencing"); Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"); Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Defending Women from Gender Ideology Extremism"); Executive Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) ("Enforcing the Hyde Amendment"); Executive Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ("Ending Taxpayer Subsidization of Open Borders"); Executive Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ("Protecting American Communities From Criminal Aliens"); and Executive Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ("Improving Oversight of Federal Grantmaking").  The EOs contain clauses requiring them to be "implemented consistent with applicable law."  *See* EO No. 14151 § 4(b); EO No. 14173 § 8(b); EO No. 14168 § 8(b); EO No. 14182 § 4(b); EO No. 14218 § 3(b); EO No. 14287 § 6(b); EO No. 14332 § 7(b).

Executive Order No. 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," calls for agencies to "terminate, to the maximum extent allowed by law, all DEI, [diversity, equity, inclusion and accessibility, or 'DEIA'], and 'environmental justice' offices and positions . . . ; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  EO No. 14151 § 2, 90 Fed. Reg. 8339 ("DEI Executive Order").  EO No. 14151 also requires OPM, OMB, and DOJ to "coordinate the termination of all discriminatory programs, including illegal DEI and [DEIA] mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  *Id.*

In a similar vein, Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," "order[s] all executive departments and agencies . . . to

United States District Court
Northern District of California

terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." EO No. 14173 § 2, 90 Fed. Reg. 8633 ("Discrimination Executive Order"). It further orders "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

The DOJ has issued departmental memos relevant to understanding these EOs. In a memo dated February 5, 2025, Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex." ECF No. 9-11 at 124, 124 n.1.[1] A second memo from Attorney General Bondi to grant recipients, dated July 29, 2025, purports to clarify the application of federal antidiscrimination laws to entities receiving federal funds. ECF No. 9-11 at 127. It suggests that DEI training programs that include discussions of inherent bias, white privilege, or toxic masculinity violate federal law. *Id.* at 134. It also states that targeting "underserved geographic areas," for instance, "risks violating federal law." *Id.* The letter instructs recipients to "[m]onitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials." *Id.* at 135.

Executive Order No. 14168, "Defending Women from Gender Ideology Extremism," calls on agencies to "remove" and "cease issuing" "all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology." EO No. 14168 § 3(e), 90 Fed. Reg. 8615 ("Gender Ideology Executive Order"). "Agency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* "Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* Agencies must also "enforce laws governing sex-based

---

[1] Plaintiffs' request for judicial notice, ECF No. 9-11, is granted. The Court finds that the noticed documents are "not subject to reasonable dispute," Fed. R. Evid. 201(b), and are properly subject to judicial notice because they are "matters of public record" and official acts of the executive branch. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758, 765 (E.D. Cal. 2020); *Pratap v. Wells Fargo Bank, N.A.*, 63 F. Supp. 3d 1101, 1104 n.1 (N.D. Cal. 2014); *Nat. Res. Def. Council v. McCarthy*, No. 16-CV-02184-JST, 2016 WL 6520170, at *2 (N.D. Cal. Nov. 3, 2016).

rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id*. § 3(b). The EO further requires each federal agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. § 3(g).

Executive Order No. 14182, "Enforcing the Hyde Amendment," states that "[i]t is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." EO No. 14182 § 1, 90 Fed. Reg. 8751 ("Elective Abortion Executive Order").

Executive Order No. 14218, "Ending Taxpayer Subsidization of Open Borders," requires each agency to ensure "that no taxpayer-funded benefits go to unqualified aliens" and to "align" federally funded programs with applicable federal law including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). EO No. 14218 § 2, 90 Fed. Reg. 10581 ("Immigration Status Executive Order").

Executive Order No. 14287, "Protecting American Communities From Criminal Aliens," tasks agencies with "restor[ing] the enforcement of United States [immigration] law" and suspending or terminating federal funds used by "sanctuary" jurisdictions. 90 Fed. Reg. 18761 ("Sanctuary Jurisdictions Executive Order").

Executive Order No. 14332, "Improving Oversight of Federal Grantmaking," provides that discretionary federal funding awards "must, where applicable, demonstrably advance the President's policy priorities" and must not "fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation"; "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic"; "illegal immigration"; or "any other initiatives that compromise public safety or promote anti-American values." EO No. 14332 § 4, 90 Fed. Reg. 38929. Additionally, "[e]ach agency head shall, to the maximum extent permitted by law and consistent with relevant Executive Orders or other Presidential directives, take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination

for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest."  *Id*. § 6.

### B.  Challenged Grant Conditions

Pursuant to the EOs described above, HUD incorporated new conditions into its grant programs' terms and conditions.  HUD imposed the first of these conditions in April 2025.  It revised its General Administrative, National, and Departmental Policy Requirements and Terms for its Financial Assistance Programs ("HUD Policy Terms") to require recipients of HUD grants to comply with all existing and future EOs ("HUD EO Condition").  ECF No. 9-11 at 8, 16–17.  The HUD Policy Terms also prohibited state and local government units receiving HUD funding from "us[ing] that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" ("HUD Immigration Enforcement Condition").  *Id*. at 9.  In addition to the changes to the HUD Policy Terms, Defendants imposed specific grant conditions on four categories of HUD grants.  All four categories of grants are awarded according to a noncompetitive process that takes into account eligibility criteria and available Congressional appropriations.  Moreover, three out of the four categories of grants are awarded according to formulas—mandated by Congress and specified by HUD—determining the grant amount to which each eligible PHA is entitled.

### 1.  Operating Subsidy Grant Conditions

The first category of grants subject to conditions challenged by Plaintiffs are Operating Fund grants, also known as Operating Subsidy grants, which fund public housing maintenance, support services for residents, and work programs.  ECF No. 9-1 at 14; ECF No. 9-5 at 16; ECF No. 1 at 10; 42 U.S.C. § 1437g(e)(1).  The Housing Act directs the HUD Secretary to establish a formula to determine grant amounts for each fiscal year from the Operating Fund.  *Id*. § 1437g(e)(2).  A PHA is eligible to receive Operating Fund grants in an amount equal to the difference between its "formula expense" (an estimate of a PHA's operating expense) and its "formula income" (an estimate of the PHA's non-operating subsidy revenue), subject to congressional appropriations.  24 C.F.R. § 990.110(a)(2)–(3), (b)(3).

On July 17, 2025, HUD issued Notice PIH 2025-22 entitled "Public Housing Operating

United States District Court
Northern District of California

Subsidy Grant Eligibility Calculations and Processing for Calendar Year 2026." ECF No. 9-5 at 15. The notice requires public housing agencies to make several certifications in completing Form SF-424, the standard application form for federal assistance. *Id*. at 21–24.

First, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and that it "[i]s in compliance, in all respects, with all applicable Federal anti-discrimination laws is [sic] material to the U.S. Government's payment decisions for purposes of [the False Claims Act]" ("Operating Subsidy Discrimination Conditions"). ECF No. 9-5 at 56. Although these terms and conditions do not explicitly address DEI programs, the DEI-related EOs and the Bondi memos described above strongly suggest that these new "discrimination" conditions are intended to discourage recipients from adopting any policies or programs that the current Administration might label as "DEI."

Second, Plaintiffs must certify that they will not use grant funding "in a manner that . . . facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" ("Operating Subsidy Immigration Enforcement Condition"). ECF No. 9-5 at 56.

Third, Plaintiffs must certify they will "administer [their] grant[s] in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under [T]itle IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996" ("PRWORA"). ECF No. 9-5 at 56. Further, the Plaintiffs must certify that they will comply with any future restrictions or requirements "that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws." *Id*. Additionally, Plaintiffs must certify that they will "use SAVE [the Systematic Alien Verification for Entitlements Program], or an equivalent verification system approved by the Federal Government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present." *Id*. Plaintiffs refer to these conditions together as the "Operating Subsidy Immigration Status Conditions." ECF

6

No. 9-1 at 15.

Fourth, recipients are required to agree not to "use grant funds to promote 'gender ideology,' as defined in [EO No.] 14168" (the "Operating Subsidy Gender Ideology Condition"). ECF No. 9-5 at 56.

Fifth, recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as required by" EO No. 14182 (the "Operating Subsidy Abortion Condition"). *Id.*

Notice PIH 2025-22 warns that any Plaintiff "who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil administrative penalties" under the False Claims Act ("FCA") and similar statutes, 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; 31 U.S.C. §§ 3729 & 3802. ECF No. 9-11 at 35.

### 2.    Capital Fund Grant Conditions

Plaintiffs also challenge conditions attached to Capital Fund Program ("CFP") grants, which fund "development, financing, and modernization of public housing facilities, services supporting the safety and security of residents, as well as services promoting the economic self-sufficiency of residents." ECF No. 1 at 9. The Housing Act directs the HUD Secretary to establish a formula to determine Capital Fund grant amounts for each fiscal year and enumerates nonexhaustive factors that may be taken into account. 42 U.S.C. § 1437g(d)(2). A PHA is eligible to receive a CFP grant in accordance with the Capital Fund formula, which measures the existing modernization needs and accrual needs of PHAs, subject to congressional appropriations. 24 C.F.R. § 905.400(a), (b).

On May 23, 2025, HUD published "Capital Fund Processing Guidance for FY 2025 Grant Awards," which requires public housing agencies to sign an Annual Contributions Contract ("ACC") Amendment to accept their Capital Fund award and receive the funding. ECF No. 9-11 at 65. The amendment states that FY 2025 Capital Fund Grant Awards are "subject to Executive Order 14218, Ending Taxpayer Subsidization of Open Borders and applicable law" and that "HUD will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State

7

and local jurisdictions that actively prevent federal authorities from deporting illegal aliens" ("CFP Immigration Enforcement Condition").  *Id*. at 68.

### 3.    Multifamily Housing Service Coordinator Program Grant Conditions

Multifamily Housing Program ("MFSC") grants fund social service staff for elderly and disabled individuals.  The authorizing statute provides for HUD to determine the form and manner of applications for MFSC grants.  42 U.S.C. § 13632(b).  However, the Act specifies the activities eligible for funding under the MFSC program and the eligibility requirements participants must meet to receive funds.  *Id*. § 13682(a).  In early 2025, HUD published Annual Renewal Guidance, ECF No. 9-11 at 74, and Terms and Conditions, ECF No. 9-11 at 96, for Service Coordinator in MFSC grants for calendar year 2025.  These documents, which describe the criteria for the noncompetitive grant awards, include several conditions challenged by Plaintiffs.

First is the requirement that grantees "carry out grant activities in compliance with" "any applicable" EOs, including those outlined by the Court above.[2]  ECF No. 9-11 at 97; *see also* ECF No. 9-11 at 107 (requiring the grantee to "certif[y] that it shall comply" with the same EOs, among other EOs and statutes) (MFSC EO Condition).  It also requires grantees to ensure "compliance [with the EOs] by any other entity(ies) to which it makes grant funds available."  ECF No. 9-11 at 97.  The Guidance warns that "[f]ailure to comply will be a basis for denial of any additional grant funds."  *Id*.

Second, the Annual Renewal Guidance requires grantees to certify that they do not "operate any programs promoting Diversity, Equity, and Inclusion (DEI) that violate any applicable Federal anti-discrimination laws" and to agree that "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" ("MFSC Discrimination Conditions").  ECF No. 9-11 at 97.

Third, the Annual Renewal Guidance states that "grantees have an obligation to ensure that grant monies and benefits do not go to unqualified aliens" (the "MFSC Immigration Status

---

[2] All of the EOs described by the Court above are enumerated explicitly here with the exceptions of EO No. 14287 ("Protecting American Communities From Criminal Aliens") and EO No. 14332 ("Improving Oversight of Federal Grantmaking").  ECF No. 9-11 at 97.

United States District Court
Northern District of California

Condition"). *Id.*

### 4. Family Self-Sufficiency Program Conditions

The Family Self-Sufficiency Program ("FSSP") funds services to enable low-income families to achieve economic independence. 42 U.S.C. § 1437u. The Housing Act provides for the HUD Secretary to establish a formula to determine FSSP funding amounts and sets forth eligibility criteria that HUD must consider to determine awards. *Id.* § 1437u(i)(1)–(2). The statute prioritizes renewals over new funding recipients. *Id.* § 1437u(i)(3)(A). On September 26, 2025, HUD issued Notice PIH 2025-24, concerning the FY 2025 FSSP annual funding notification and application process. ECF No. 9-11 at 111. The Notice states that grantees must ensure grant-funded activities "comply with applicable existing and future executive orders and other Presidential Actions," listing the same EOs discussed above (the "FSSP EO Condition"). *Id.* at 121.

### C. False Claims Act

On May 19, 2025, Deputy Attorney General Todd Blanche issued a memo indicating that the DOJ will invoke the False Claims Act ("FCA") to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives and "allow[ing] men to intrude into women's bathrooms." ECF No. 9-11 at 137–38. The memo announces a DOJ initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," and also states that DOJ "strongly encourages" private FCA lawsuits against funding recipients. *Id.* at 138.

### D. Plaintiffs' Receipt of Federal Grants

Plaintiffs are public housing agencies ("PHAs") and recipients of the grant programs listed above. ECF No. 1 at 4–7. They assert that the grant conditions identified above require them to "either risk legal liability for accepting the vague and unlawful requirements or forfeit" millions of dollars in "crucial funds which sustain affordable and dignified housing for low-income families, individuals with disabilities, and the elderly." ECF No. 9-1 at 17. They argue that losing the funds would cause "immediate, irreparable, and far-reaching" harm to their ability to provide housing but that agreeing to the unclear conditions "would leave them exposed to arbitrary

1    enforcement, unpredictable penalties, and legal liability." *Id*.  Plaintiffs' uses of grant funds

2    include the following.

3         Plaintiffs use Operating Subsidy funds for essential repairs and maintenance of housing

4    units and to pay case management, maintenance, and administrative staff.  ECF No. 9-1 at 18.

5    Plaintiffs Housing Authority of the County of San Diego ("HACSD"), Housing Authority of

6    Baltimore City ("HABC"), Housing Authority of the City and County of San Francisco ("SFHA"),

7    Home Forward, formerly the Housing Authority of Portland, and Los Angeles County

8    Development Authority ("LACDA") receive annual operating funds ranging from hundreds of

9    thousands of dollars to almost one hundred million dollars.  *Id*.  Had the Court not issued the TRO

10   in this case, these Plaintiffs would have been required to certify to the challenged Operating Funds

11   conditions on October 21, 2025 to apply for 2026 Operating Fund grants.  ECF No. 9-1 at 18.

12        Plaintiffs HACSD, SFHA, Home Forward, HABC, Housing Authority of the City of Los

13   Angeles ("HACLA"), LACDA were awarded substantial Capital Funds grants for 2025 and were

14   required to certify to a challenged condition to access those funds.  Plaintiffs use Capital Funds to

15   rehabilitate and modernize their public housing units, including upgrading elevators, appliances,

16   flooring, plumbing, and roofing.  ECF No. 9-1 at 18.  They use Capital Fund Emergency Safety

17   and Security funds for projects such as upgrading and replacing fire alarms at public housing

18   units.  *Id*.  Absent an injunction, Plaintiffs will be unable to access Capital Funds without first

19   submitting the ACC Amendment containing the challenged Capital Fund condition.  *Id*.

20        Plaintiffs Home Forward, Housing Authority of the City of Salem, and HACLA all receive

21   Multifamily Housing Services Coordinators grants.  *Id*.  On September 19, 2025, Home Forward

22   received a Notice of Award for FY2025, authorizing the remaining $448,831 (out of an original

23   award of $2,814,587) for services rendered in 2025, but only if it certified the new unlawful terms

24   and conditions within 14 days.  *Id*. at 19.  As of October 2025, Home Forward has expended most

25   of this amount but has yet to be reimbursed.  *Id*.

26        Plaintiffs use FSSP funds to provide case management, training, and referrals to supportive

27   social services to help families achieve self-sufficiency.  Home Forward, LACDA, HABC,

28   HACLA, and SFHA each received hundreds of thousands of dollars of FSSP funding in 2025.  *Id*.

United States District Court
Northern District of California

10

The application deadline for FY2025 funding passed on October 29, 2025. *Id.* As with the Operating Subsidy funds deadline, Defendants were temporarily restrained from imposing the challenged conditions at that time.

As the discussion above illustrates, the circumstances of each grant award vary. In some cases, Plaintiffs have already been awarded the funds and must certify to challenged conditions to receive them (or a balance thereof). In other cases, Plaintiffs challenge the application of conditions to 2026 grants, which have not yet been awarded but which Plaintiffs expect to receive based on past allocations and the noncompetitive statutory and regulatory framework governing future allocations.

### E.    Procedural History

Plaintiff PHAs bring this case against the U.S. Department of Housing and Urban Development ("HUD") and HUD Secretary Scott Turner challenging the grant conditions outlined above. ECF No. 1 at 7, 13. Plaintiffs filed their complaint on October 15, 2025. ECF No. 1. They filed a motion for a temporary restraining order on October 16, 2025, requesting relief by 5:00 p.m. Eastern Daylight Time on October 21, 2025—the first deadline by which HUD required them to certify to challenged grant conditions. ECF No. 9 at 12. The case was assigned to the undersigned on the morning of Friday, October 17, 2025. ECF No. 12. The Court held a hearing on the afternoon of October 17, 2025 to discuss the parties' positions and establish a briefing and hearing timeline. At that hearing, the government stated that it opposed the motion for the same reasons it opposed relief in the recent case of *City of Fresno et al. v. Turner et al.* ("*Fresno*"), No. 3:25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. 2025). The government also stated that rather than file an opposition to Plaintiffs' motion, it would request the Court consider the government's arguments in opposition to the motion for a preliminary injunction in *Fresno* as having also been made in the present case, and rule on that basis. The Plaintiffs' motion for TRO demonstrated that they would suffer irreparable harm unless the Court issued a TRO, and the government was unable to identify any prejudice from an order maintaining the status quo while the Court fully considered the parties' arguments. The Court therefore granted Plaintiffs' application for a TRO.

The TRO enjoined HUD from imposing the challenged conditions on Plaintiffs at any

stage of the grantmaking process.  ECF NO. 19 at 4.  The Court also ordered Defendants to "show cause why a preliminary injunction should not issue enjoining Defendants during the pendency of this action from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions on any federal funds received by or awarded, directly or indirectly, to Plaintiffs."  *Id.* at 4–5.  After holding a further hearing on November 12, 2025, the Court now grants a preliminary injunction extending the terms of the Temporary Restraining Order during the pendency of these proceedings.

## II.    JURISDICTION

### A.    Standing

To establish standing, a plaintiff must show it has suffered or will suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).  Courts have repeatedly recognized that the imposition of unlawful conditions on federal grants satisfies Article III standing.  *See City & Cnty. of San Francisco v. Trump* ("*San Francisco*"), 897 F.3d 1225, 1235–36 (9th Cir. 2018) (finding that plaintiff counties had standing to challenge imposition of grant conditions which conflicted with their immigration "sanctuary" policies); *Arizona v. Yellen*, 34 F.4th 841, 849–51 (9th Cir. 2022) (finding that the plaintiff state had standing to challenge the imposition of conditions on federal COVID recovery funds, even though those conditions had not yet been enforced against the state).

Here, Plaintiffs have been or expect to be awarded millions of dollars in federal grant funding to provide public housing and related services.  Plaintiffs must now either accept the allegedly unlawful and ambiguous conditions and the legal liability attached to them or suffer the loss of funding that, in many cases, has been budgeted for or already spent.  This imminent harm is redressable by injunctive relief prohibiting Defendants from enforcing the challenged grant conditions against Plaintiffs.  Plaintiffs have established Article III standing.

### B.    Statutory Jurisdiction and the Tucker Act

Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, are subject to the APA's waiver of sovereign immunity, 5 U.S.C. § 702, and

United States District Court
Northern District of California

1    therefore are within this Court's jurisdiction.

2          Defendants argue that this Court lacks jurisdiction because Plaintiffs' claims fall within the

3    Tucker Act.  The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over

4    "any claim against the United States founded either upon the Constitution, or any Act of Congress

5    or any regulation of an executive department, or upon any express or implied contract with the

6    United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C.

7    § 1491(a)(1).  In other words, claims seeking money damages under a "contract or contract-like

8    agreement with the federal government can be heard only in the Court of Federal Claims."

9    *Fresno*, 2025 WL 2721390, at *5.  Defendants characterize Plaintiffs as "seek[ing] funding that

10   [they] believe[] the federal government is obligated to pay under" the contracts with HUD setting

11   the grant terms.  *Fresno*, ECF No. 40 at 19.

12         That mischaracterizes Plaintiffs' complaint.  Plaintiffs seek injunctive relief, not money

13   damages.  To determine whether an APA action for injunctive relief is actually a "'disguised'

14   breach-of-contract claim" and thus subject to the Tucker Act, courts consider "(1) 'the source of

15   the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or

16   appropriate).'"  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023)

17   (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).  "If rights and remedies

18   are statutorily or constitutionally based, then districts courts have jurisdiction; if rights and

19   remedies are contractually based then only the Court of Federal Claims does, even if the plaintiff

20   formally seeks injunctive relief."  *Id*.  "[A] district court's jurisdiction 'is not barred by the

21   possibility' that an order setting aside an agency's action may result in the disbursement of funds."

22   *Dep't of Ed. v. California*, 604 U.S. 650, 651 (2025) (quoting *Bowen v. Massachusetts*, 487 U.S.

23   879, 910 (1988)); *see also Kidwell v. Dep't of Army, Bd. for Correction of Military Records*, 56

24   F.3d 279, 284 (D.C. Cir. 1995).

25         Here, Plaintiffs allege not that the government has breached any grant contracts, but that

26   the conditions the government seeks to impose on Plaintiffs through those grant contracts violate

27   the Constitution and the APA.  Plaintiffs do not seek damages for the breach of contractual rights,

28   but rather "seek to vindicate their rights to participate in congressionally authorized grant

13

programs pursuant to the eligibility criteria Congress authorized, free from unlawful conditions that violate the separation of powers, the Fifth Amendment, the Spending Clause, and the APA." ECF No. 9-1 at 21. They challenge HUD's "policies and guidance" imposing the grant conditions "on statutory, namely APA, and constitutional grounds, and they seek injunctive relief barring Defendants' imposition of the conditions and setting aside related internal agency directives." *Fresno*, 2025 WL 2721390, at *6.

Defendants make much of the fact that Plaintiffs seek to block them from "pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning" grant funds because of the challenged conditions. *Fresno*, ECF No. 40 at 21. Critically, however, the relief Plaintiffs seek is limited to those challenged conditions. Plaintiffs do not seek to require the agency to pay funds under the terms of the grant agreement, but only ask the Court to enjoin the agency from applying the challenged conditions. ECF No. 9-1 at 36. The Court can do so, and therefore prevent Defendants from refusing to pay funds on the basis of the conditions, without having any other effect on the HUD's funding decisions and without adjudicating any rights under the grant contracts. The "source of the rights" is the statutory and constitutional prohibitions on the challenged conditions, and the "type of relief sought" is an injunction against the application of those challenged conditions. *United Aeronautical Corp*, 80 F.4th at 1026.

In the cases that Defendants marshal to argue that the Tucker Act governs Plaintiffs' claims, the plaintiffs alleged that the government had violated the terms of the grant contract and sought performance of that contract. *See California*, 604 U.S. at 651 (challenging termination of education grants as arbitrary); *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1362–63 (Fed. Cir. 2021) (challenging HUD's reduction of operating subsidy grants as violating the terms of the Annual Contributions Contracts governing the grants).

On the record presented here, involving constitutional and APA claims seeking an injunction against the imposition of allegedly unlawful grant conditions, courts have found with near or total uniformity that the district courts have jurisdiction over claims such as these. *See, e.g.*, *San Francisco Unified Sch. Dist. v. AmeriCorps* ("*SFUSD I*"), 784 F. Supp. 3d 1280, 1291–97 (N.D. Cal. 2025); *Martin Luther King, Jr. Cnty. v. Turner* ("*King Cnty.*"), 785 F. Supp. 3d 863,

14

877–82 (W.D. Wash. 2025); *Fresno*, 2025 WL 2721390, at *5–6; *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1201 n.12 (N.D. Cal. 2025); *Illinois v. Federal Emergency Mgmt. Agency*, --- F. Supp. 3d ----, 2025 WL 2716277, at *9 (D.R.I. Sept. 24, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2025 WL 2528380, at *10–14 (D. Mass. Sept. 3, 2025); *see also Thakur v. Trump*, 148 F.4th 1096, 1103–04 (9th Cir. 2025).

The Supreme Court's recent order in *National Institutes of Health v. American Public Health Association*, cited by both sets of parties, warrants discussion. In that case, the district court had vacated NIH's decision to terminate certain research-related grants. The Supreme Court partially stayed the district court's vacatur on the grounds that the district court lacked jurisdiction "to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. 2658 (2025). Writing separately, Justice Barrett concurred in the Court's conclusion that the district court lacked jurisdiction to hear challenges to the grant *terminations*. *Id*. at 2661 (Barrett, J., concurring in partial grant of application for stay). However, she also explained that the district court retained jurisdiction over the claims challenging—and seeking to vacate—the guidance documents that imposed the funding conditions. *Id*. In Justice Barrett's view, "[t]hat the agency guidance discusses internal policies *related to* grants does not transform a challenge to that guidance into a claim *'founded . . . upon'* contract that only the [Court of Federal Claims] can hear." *Id*. (quoting 28 U.S.C. § 1491(a)(1)) (emphasis added). Contrary to Defendants' assertion, *Fresno*, ECF No. 40 at 22, the "vacatur of internal agency guidance" is exactly what Plaintiffs seek. *Id*. The majority opinion therefore does not contradict the Court's conclusion here, and Justice Barrett's concurrence supports it.

The Tucker Act does not bar this Court from hearing Plaintiffs' claims.

## III.   LEGAL STANDARD

"To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo*

United States District Court
Northern District of California

*Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Where "the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

#### 1.    Separation of Powers

The Court agrees with Plaintiffs that HUD likely violated Separation of Powers doctrine by imposing grant conditions that exceed the authority delegated by Congress.  *See* ECF No. 9-1 at 23–24, 30–31.

"Congress's power to spend is directly linked to its power to legislate" and the spending power contemplates the imposition of conditions to further Congressional policy objectives.  *San Francisco*, 897 F.3d at 1231.  That power is exclusive to Congress.   Our constitutional system does not authorize the President to enact legislation, cancel Congressional appropriations, refuse to spend appropriated funds, or otherwise "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 1232.  "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)).

More generally, "[t]he President's authority to act 'must stem either from an act of Congress or from the Constitution itself.'" *San Francisco*, 897 F.3d at 1233 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id.* (quoting *Youngstown*, 343 U.S. at 637).

Analyzing these principles, courts invalidate grant conditions that exceed Congress's delegation of authority to the executive branch. *See San Francisco*, 897 F.3d at 1234–35

(invalidating an executive order tying funding to 8 U.S.C. § 1373, which prohibits government entities from themselves prohibiting the sharing of noncitizens' immigration status information, because Congress appropriated the funds without tying them to Section 1373); *City of Los Angeles v. Barr*, 941 F.3d 931, 935, 945 (9th Cir. 2019) (invalidating as "ultra vires" conditions imposed on a grant program for which Congress specified eligibility criteria and allocation methodology).

Defendants argue that the Supreme Court's decision in *Dalton v. Specter* forecloses Plaintiffs' separation of power claims by "reject[ing] the notion that 'every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the constitution.'" *Fresno*, ECF No. 40 at 26 (quoting 511 U.S. 462, 472 (1994)). But as *San Francisco* and *City of Los Angeles* demonstrate, the Ninth Circuit interprets *Dalton* to hold only that "'an action taken by the President in excess of his statutory authority [does not] *necessarily* violate[ ] the Constitution.'" *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1111 (2024) (quoting *Dalton*, 511 U.S. at 473) (emphasis added). "[S]pecific allegations regarding separation of powers may suffice." *Id.*; *see also Sierra Club v. Trump*, 963 F.3d 874, 889–90 (9th Cir. 2020), *vacated and remanded on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (holding that claims alleging the President violated the Constitution by exceeding statutory authority are justiciable constitutional claims). Indeed, "[c]ontemporary Ninth Circuit jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton.*" *Murphy Co.*, 65 F.4th at 1130.

Congress has enumerated various certifications and requirements that public housing agencies must adhere to as a condition of receiving funds, and has clearly laid out the permissible uses and purposes of each program. *See* 42 U.S.C. § 1437g(e) (establishing the Operating Fund for "operation and management of public housing" including "anticrime and antidrug activities," "systems to ensure efficient management and operation of public housing units," insurance costs, and energy costs); *id.* § 1437g(d) (establishing the Capital Fund for "capital and management activities" including redesign, construction, and reconfiguration of sites and buildings); *id.* § 8011(d)(4) (providing funding under the Multifamily Services Coordinator program for personnel to "assess the service needs of eligible residents," "mobiliz[e] public and private

17

resources" to fund services, and "monitor[] and evaluat[e] the impact and effectiveness" of services); *id.* § 1437u (g), (h) (establishing the FSS program to "enable eligible families to achieve economic independence and self-sufficiency"). None of these statutes authorizes HUD to condition PIH grant funding on eliminating of all forms of DEI, facilitating enforcement of federal immigration laws, verifying of immigration status, or prohibiting "promot[ion]" of "gender ideology" or "elective abortion."

The HUD, MFSC, and FSSP EO Conditions and the Operating Subsidy and the MFSC Discrimination Conditions attempt to prohibit the use of funds for "DEI" or "equity" even though Congress has never enacted legislation barring grantees from supporting such initiatives. In fact, in some cases Congress *requires* consideration of diversity when allocating HUD funds. For instance, one of the purposes of the MFSC program is to fund employment of service coordinators in insured and assisted multifamily housing designed for the elderly and persons with disabilities. 42 U.S.C. § 8011(a). Further, HUD requires PHAs to certify they "will affirmatively further fair housing." 42 U.S.C. § 1437c-1(d)(16). The distribution of services to members of protected classes—residents with disabilities with disabilities and the elderly—as well as "affirmative[ly]" furthering "fair" housing are both potentially prohibited by the Administration's DEI orders, conditions, and guidance.

Similarly, the HUD, Operating Subsidy, and CFP Immigration Enforcement Conditions purport to require cooperation with federal immigration enforcement activities and prohibit policies that "facilitate" or "promote" "illegal immigration," even though Congress has repeatedly declined to enact legislation cutting off federal funds for so-called "sanctuary jurisdictions." *See San Francisco*, 897 F.3d at 1231 (holding that Executive Branch may not withhold federal grants from sanctuary cities without congressional authorization).

Additionally, the Operating Subsidy Immigration Status Conditions, the MFSC Immigration Status Condition, and the EO Conditions conflict with section 214 of the Housing and Community Development Act of 1980—which specifically provides public housing eligibility for mixed-status households, *see* 42 U.S.C. § 1436a(b)(2). These conditions also exceed the authority created by PRWORA in requiring use of the SAVE verification system, 42 U.S.C. § 1320b-7, because PRWORA explicitly does not require states to have an immigration status

18

verification system until twenty-four months after the Attorney General promulgates final regulations and the AG has not yet promulgated regulations requiring the use of SAVE. 8 U.S.C. § 1642(b). Instead, interim guidance from 1997 remains in place. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998).

The Gender Ideology Condition attempts to bind recipients to the policy dictates of EO 14168, yet Congress has never authorized the Executive to use Title IX or Title VI as vehicles for prohibiting "gender ideology." In fact, courts have recognized that transgender individuals are a protected category under provisions of the Civil Rights Act. *See, e.g.*, *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020); *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023). The Gender Ideology Condition likely facially discriminates based on transgender status, violating the Separation of Powers by contravening federal antidiscrimination law. *See San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1232 (N.D. Cal. 2025).

The same is true of the Abortion Condition, which purports to "enforce" the Hyde Amendment. The Abortion Condition prohibits grantees from using federal grants to "fund or promote elective abortions" in all contexts, extending the restriction far beyond the prohibitions of the Hyde Amendment, which says nothing about the "promotion" of abortion and includes exceptions in cases of rape, incest, or where the life of the mother is at risk. *See* 42 U.S.C. § 300a–6 (and related appropriations provisions); Pub. L. No. 117-103, 136 Stat. 49. These conditions impose broader restrictions on recipients than those required or authorized by existing law. *See Martin Luther King, Jr. Cnty. v. Turner*, --- F. Supp. 3d ----, 2025 WL 2322763 at *13 n.9 (W.D. Wash. Aug. 12, 2025).

Defendants attempt to characterize the grant conditions as permissible exercises of the power delegated by Congress. *Fresno*, ECF No. 40 at 32. But Defendants must identify specific legislation authorizing the challenged conditions or conferring on the executive branch the power to impose them, which they have failed to do. Defendants point to two statutory provisions

19

governing HUD grants. *Id.* The first provides that "[a]ny Community Development Block [("CDBG")] grant . . . shall be made only if the grantee certifies to the satisfaction of the Secretary that . . . the grantee will comply with the other provisions of this chapter and with other applicable laws." 42 U.S.C. § 5304(b)(6). CBDG grants are not at issue here. Moreover, while this provision requires the Secretary to satisfy himself that the grantee complies with applicable laws, it says nothing about the Secretary's authority to impose additional conditions. *Id.* The second provision identified by Defendants prohibits HUD from providing Continuum of Care ("CoC") program grants unless the applicant agrees "to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). CoC grants are also not at issue here. And regardless, this language too appears to be cabined to the enumerated goals and methods of the statute, suggesting that the Secretary may establish conditions to "carry out" the statute "in an effective and efficient manner." *Id.*

Finally, Defendants repeatedly argue that the challenged conditions are generally permissible because they only prohibit activities that violate preexisting federal laws.[3] *Fresno*, ECF No. 40 at 34. The Court is not persuaded by this argument. All federal grant recipients were already prohibited from violating applicable federal laws by operation of those laws themselves. Moreover, the executive orders repeatedly cast themselves as departing drastically from the practices of prior administrations. *See, e.g.*, 90 Fed. Reg. 8339 ("The Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government," causing "immense public waste and shameful discrimination. That ends today."); 90 Fed. Reg. 8615 ("The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women."); 90 Fed Reg. 10581 ("Over the last 4 years, in particular, the prior

---

[3] Defendants also suggest that the Grant Conditions are permissible because they implement preexisting regulations, executive orders, or Presidential directives. *Fresno*, ECF No. 40 at 32. This argument is circular. A grant condition cannot be within statutory authority because it complies with executive edicts; one must then determine whether those executive edicts are themselves within the scope of the statutory grant of power.

administration repeatedly undercut the goals of [PRWORA], resulting in the improper expenditure of significant taxpayer resources.").  Given these self-professedly radical departures from a longstanding status quo, the Court cannot credit Defendants' position that the executive orders and other challenged grant conditions do no more than reiterate the importance of complying with the law.

Defendants insist that the challenged EO Conditions are saved by provisions requiring them to be implemented "consistent with applicable law."  *Fresno*, ECF No. 40 at 34.  But "savings clauses such as . . . 'to the maximum extent permitted by law' do not magically ensure that the conditions incorporating that language only operate in so far as they are within Congress's grant of authority."  Fresno, 2025 WL 2721390, at *10.  Rather, "[s]avings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the [lawfulness] of a measure, would override clear and specific language."  *San Francisco*, 897 F.3d at 1239.  For the reasons stated above, the Court concludes that the executive orders exceed statutory authority and conflict with preexisting statutory obligations, notwithstanding their savings clauses.

The challenged conditions far exceed the authority delegated to HUD by Congress and contradict a variety of federal laws in meaningful and consequential ways.  Plaintiffs are likely to succeed on the merits of their claim that the challenged grant conditions violate the Separation of Powers.

### 2. Due Process Clause Vagueness

Plaintiffs next argue that the challenged grant conditions are unconstitutionally vague.  A requirement imposed by the government violates the Due Process Clause for impermissible vagueness if it fails to either (1) give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or (2) "provide explicit standards for those who apply" the requirement, thereby encouraging "arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972).  "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

The Court agrees that the challenged grant conditions are unconstitutionally vague in

United States District Court
Northern District of California

21

numerous respects. With respect to the EO Conditions, a central issue is the mismatch between the identity of Plaintiffs and the nature of the executive orders. Plaintiffs are local government agencies that provide public housing to vulnerable individuals, while the executive orders regulate the conduct of federal agencies and require those agencies to advance ill-defined policy objectives. Yet every HUD grant recipient must "comply" with any applicable EOs. *See* ECF No. 9-11 at 16–17 (all HUD grants); ECF No. 9-11 at 97, 107 (MHSC grants); ECF No. 9-11 at 111 (FSSP grants); *see also* ECF No. 9-11 at 65 (making Capital Fund grants "subject to" EO No. 14218). Worse, recipients of the MFSC funds must ensure that "any other entity to which it makes grant funds available" complies with the EOs. ECF No. 9-11 at 97. These EOs set requirements and policy priorities for federal agencies and do not provide a clear action-guiding directive for grant recipients. As Plaintiffs argue, "[a] recipient is left to guess whether, and how, a particular EO applies to its conduct and risks loss of critical federal funding and FCA liability if it guesses incorrectly." ECF No. 9-1 at 25. While the HUD Policy Terms use the word "comply" many times, the other instances pertain to rules clearly governing the conduct of PHAs. *See* ECF No. 9-11 at 8 ("Recipients must comply with all applicable fair housing and civil rights requirements . . . ."); *id.* at 12 ("Recipients must comply with the drug-free workplace laws . . . ."); *id.* ("All recipients must comply with the award terms . . . .").

Moreover, many of the challenged grant conditions and underlying EOs prohibit grantees from "promoting" "DEI," "illegal immigration," "gender ideology," or "elective abortions," or some combination of the above. *See* ECF No. 9-11 at 9 (HUD Policy Terms, prohibiting use of HUD funding to "promot[e] illegal immigration"); ECF No. 9-5 at 56 (operating subsidy grants, prohibiting promotion of illegal immigration, gender ideology, or elective abortions); ECF No. 9-11 at 97 (MFSC grants, prohibiting promotion of DEI). Others require "support" or "furtherance" of certain agendas. It is not clear what meaning these words might carry in the context of public housing services. Would referring undocumented noncitizens to other public services, for example, violate the Immigration Status Executive Order and Conditions? Would housing someone who has an "elective abortion" while living in the housing violate the Elective Abortion Executive Order? Would referring to a housing applicant or tenant by their chosen pronouns,

asking them for their gender identities, or providing housing to them violate the Gender Ideology Executive Order?

The Court notes that its prior decision in *San Francisco A.I.D.S. Foundation* concluded that the Gender Ideology EO grant condition was not likely to be unconstitutionally vague. 786 F. Supp. 3d at 1227. In doing so, it relied heavily on the EO's clear definition of "gender ideology." *Id.* at 1226–27. Here, Plaintiffs do not contend that the meaning of "gender ideology" is a source of impermissible vagueness. In *San Francisco A.I.D.S. Foundation*, the Court also determined that Plaintiffs were able to understand the meaning of "promoting" gender ideology. *Id.* at 1227. This was so, however, because of the distinct nature of the Plaintiffs in that case, who were "nonprofit organizations that provide healthcare, social services, and advocacy for LGBTQ communities—many specifically serving transgender individuals." *Id.* at 1200. The meaning of "promoting" gender ideology is clear in the context of the provision of services targeting the distinct needs of transgender persons. It becomes incoherent in the context of housing services, which may have no particular nexus to "gender ideology," other than perhaps the identity of residents who use those services.

The challenged conditions are also problematic in requiring compliance with all future executive orders. The HUD, MFSC, and FSSP EO Conditions ambiguously incorporate a non-exhaustive list of "applicable existing and future Executive Orders" and require recipients to "comply" with them. "A condition that directs compliance with 'applicable existing and future Executive Orders' provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited." ECF No. 9-1 at 25. "Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to executive branch actors." *Id.*

The Court also agrees with Plaintiffs that the EOs introduce ambiguity by purporting to reverse existing law. ECF No. 9-1 at 25–26. For instance, the Gender Ideology Executive Order instructs that Title VII as interpreted in *Bostock* does not protect the rights of transgender persons. 90 Fed. Reg. 8615. But many courts, including this one, have concluded the opposite. *See San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1231. At the same time, the Discrimination Executive Order directs Plaintiffs to comply with antidiscrimination law. 90 Fed. Reg. 8633.

23

Similarly, the Trump Administration's guidance concerning DEI, captured in the Bondi Memos described above, is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria— even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)).  Plaintiffs, caught between the statutes promulgated by Congress and interpreted by the Courts, and the Administration's attempts to overwrite those interpretations by fiat, are left in an impossible position.

Finally, the Court agrees that the Abortion Conditions are impermissibly vague because the Elective Abortion Executive Order suggests that the Hyde Amendment prohibits elective abortion in all cases when in fact its prohibition expressly excludes cases of rape, incest, and where the life of the mother is at risk.  *See* EO No. 14182, 90 Fed. Reg. 8751.  The Order leaves open questions about whether an abortion following rape is "elective" and the degree of harm that an individual must face from carrying a pregnancy in order for the abortion not to be "elective."  ECF No. 9-1 at 27.

Rather than engaging with Plaintiffs' arguments about vagueness, Defendants respond that due process simply does not apply.  First, they assert that due process does not apply because plaintiffs challenge conditions applied to federal funding conditions rather than statutory prohibitions on certain conduct.  *Fresno*, ECF No. 40 at 23 (citing *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018)).  The argument has no basis in law and relies on a gross misreading of *Dimaya*.  *Dimaya* does state that "[t]he void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes."  *Id.* (emphasis added).  But *Dimaya* used the word "statute" not because it was limiting the right to due process only to statutes—as the government argues—but because a statute was at issue in that case.  In fact, "[t]he Supreme Court has long recognized that the 'liberty' or 'property' interests protected by the Due Process Clause contemplate a variety of protected interests, and '[t]he procedural guarantees of the Fourteenth Amendment apply *whenever* the State seeks to remove or

United States District Court
Northern District of California

significantly alter that protected status.'" *Moody v. Cnty. of Santa Clara*, No. 5:15-CV-04378-EJD, 2017 WL 2903159, at *3 (N.D. Cal. July 7, 2017) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976) (emphasis added)); *Hall v. Childers*, No. 2:16-CV-00106-REB, 2017 WL 8944051, at *3 (D. Idaho Feb. 6, 2017) (noting that "the procedural due process protections of the Fifth and Fourteenth Amendments apply whenever a constitutionally protected liberty or property interest is at stake"), *report and recommendation adopted*, No. 2:16-CV-00106-EJL(REB), 2017 WL 878231 (D. Idaho Mar. 6, 2017).  And several courts—including this one—have applied the Due Process Clause's vagueness doctrine to federal grant funding.  *See, e.g., Fresno*, 2025 WL 2721390, at *12–18; *San Francisco Unified Sch. Dist. v. AmeriCorps* ("*SFUSD II*"), 789 F. Supp. 3d 716, 745–50 & n.12 (N.D. Cal. 2025); *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1224–26; *Gay Men's Health Crisis v. Sullivan*, 792 F. Supp. 278, 292–304 (S.D.N.Y. 1992).

Defendants next argue that Plaintiffs cannot show a protected liberty interest because due process protects only "entitlement-like benefits" and not "ordinary" or "routine" government contracts like those at issue here.  *Fresno*, ECF No. 40 at 24.  This argument, too, is contrary to the law and the facts.  Plaintiffs challenge conditions applied to "formula and non-competitive federal funding designed to support housing for the most vulnerable populations nationwide." ECF No. 30 at 13.  They have a legitimate property interest in funds that they have already been awarded or are entitled to receive under statutory or regulatory award formulas.  *Cf. Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (holding that individuals with a property interest in a benefit must have "a legitimate claim of entitlement to it").  The statutes which create the noncompetitive grants direct HUD to award them according to certain criteria and HUD has promulgated regulations and guidance implementing those directives.  "Where such law or mutually explicit rule gives people 'a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement.'"  *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) (quoting *Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 713 (7th Cir. 2014)). The grants at issue in this case are therefore far more like public benefits than the regular procurement or construction contracts to which Defendants analogize them.  *See Perry v.*

25

*Sindermann*, 408 U.S. 593 (1972) (property interest in a teaching position that was "de facto" tenured); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (property interest in welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). *Eloyan v. United States*, cited by Defendants, does not hold otherwise. That court dismissed plaintiffs' due process claim, not because it involved government contracts, but because plaintiffs had no "legitimate claim of entitlement" to the procurement contracts in question, which they had never been awarded and which were entirely within government officials' discretion. No. 2:19-CV-09565-CBM(MRW), 2020 WL 7382316, at *5 (C.D. Cal. Oct. 21, 2020).

Moreover, the challenged Discrimination Conditions state that Plaintiffs are subject to the False Claims Act ("FCA"). Each violation of the FCA is punishable by mandatory treble damages plus civil penalties. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Moreover, DOJ has formed a nationwide task force to target grantees that sign these certifications and employ potential FCA liability as a "weapon," and has "strongly encourag[ed]" private parties to bring civil suits against grant recipients. ECF No. 9-11 at 137–38. The threat of civil and criminal liability under the FCA resulting from potential misinterpretation of Defendants' vague grant conditions further threatens Plaintiffs' property and liberty interests and exacerbates the due process problems with these conditions.

Finally, at the hearing on the Order to Show Cause, the government repeatedly argued that the challenged conditions pose no Due Process problem because Plaintiffs can resolve any ambiguity by asking their local HUD office for advice when a question arises. This solution, which does not appear in the government's brief, does not address either of the concerns raised in *Grayned*. First, case-by-case clarification from the government does nothing to give Plaintiffs a "reasonable opportunity to know what is prohibited" at the point in time when they must decide whether to subject themselves to the challenged conditions. 408 U.S. at 108–109. Second, such clarification does nothing to "provide explicit standards for those who apply" the challenged conditions and therefore encourages "arbitrary and discriminatory application"—the exact harm that vagueness doctrine seeks to avoid. *Id.*

Plaintiffs have established that the challenged grant conditions are likely to violate the Due

26

Process Clause of the Fifth Amendment of the U.S. Constitution because they are impermissibly vague.

### 3. Spending Clause

Plaintiffs assert that the challenged conditions violate the Spending Clause of the U.S. Constitution. ECF No. 9-1 at 27–28. The Spending Clause authorizes Congress to legislate via expenditures of funds—here, to authorize agencies to impose conditions on grant monies—but sets limits on that power. *See S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). Most saliently, if Congress places conditions on the receipt of federal funds, "it must do so unambiguously" before a recipient enters into a grant agreement. *Id.* at 206–07. This way, the grant recipient can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207. The recipient's knowing and voluntary acceptance of the conditions is what legitimates Congress' power to legislate. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "By insisting that Congress speak with a clear voice, [courts] enable the [recipients] to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Because the challenged conditions are unconstitutionally vague, they also likely violate the Spending Power. To the extent that the Grant Conditions do not provide Defendants fair notice from a Due Process perspective, they also fail to enable Plaintiffs to "knowingly accept" them under the Spending Power. *Id.*

### 4. APA

The Administrative Procedure Act permits judicial review of a "final agency action" that is not "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(2), 704. The APA authorizes courts to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2). The Court concludes that the challenged grant conditions are "final agency actions" that are not "committed to agency discretion by law" and are therefore reviewable under the APA. The Court further agrees with Plaintiffs that the challenged grant conditions are arbitrary and capricious as well as unlawful for the reasons the Court has explained

United States District Court
Northern District of California

1  above.

2  ### a. Final Agency Action

3  The challenged grant conditions are "final agency actions" subject to review under the

4  APA.  *See* 5 U.S.C. § 704.  Final agency actions "mark the consummation of the agency's

5  decisionmaking process" and are those "by which rights or obligations have been determined, or

6  from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)

7  (cleaned up).  Final agency action must be a "discrete" act that causes the plaintiff harm rather

8  than a "broad programmatic attack."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

9  "[C]ertain factors provide an indici[um] of finality, such as 'whether the [action] amounts to a

10  definitive statement of the agency's position, whether the [action] has a direct and immediate

11  effect on the day-to-day operations of the party seeking review, and whether immediate

12  compliance [with the terms] is expected.'"  *Indus. Customers of Nw. Utilities v. Bonneville Power

13  Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d

14  906, 909 (9th Cir. 2003)).  Courts "focus on the practical and legal effects of the agency action."

15  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

16  Defendants argue that the challenged conditions do not constitute final agency action

17  because "Plaintiffs here seek to enjoin the imposition of a vast swath of grant conditions, loosely

18  defined as any that 'embrac[e] the series of Executive Orders and agency policies issued between

19  January and August 2025, directing executive agencies to impose new conditions on federal

20  grants.'"  ECF No. 40 at 30.  They further contend that "[t]he APA forbids this kind of broad

21  programmatic attack against agency grant conditions writ large."[4]  But the quoted language is

22  from a proposed order in *Fresno*, not this case.  And rather than a "vast swath" of "agency grant

23  conditions writ large," Plaintiffs here identify specific grants they expect to receive subject to

24  specified challenged conditions.  These grant conditions have been enacted via the April 2025

25  amendments to the HUD Policy Terms; the July 17, 2025, Notice PIH 2025-22; the May 23, 2025,

26  FY2025 Capital Fund Processing Guidance for PHAs; the CY 2025 Annual Renewal Guidance

27  ───────────────────

28  [4] Because the government relies here on its opposition in *Fresno*, it is possible that the government does not actually dispute—or has no means to dispute—that the conditions challenged in this case constitute final agency action.  The Court can only consider the arguments placed before it.

United States District Court
Northern District of California

1    and the applicable CY 2025 Terms and Conditions for Multifamily Housing Service Coordinators

2    Program grants; and the September 26, 2025, Notice PIH 2025-24.  They are implemented in the

3    SF-424 and ACC forms that Plaintiffs must sign to apply for or receive funding.  In no sense is

4    Plaintiffs' challenge overly broad, unspecified, or programmatic.

5          Rather, the grant conditions easily satisfy each of the three indicia of finality described in

6    *Indus. Customers.*  They represent a definite statement of the agency's position, placing certain

7    requirements on organizations that receive HUD grants.  *See Fresno*, 2025 WL 2721390, at *7

8    (finding that grant conditions nearly identical to those at issue here constituted "final agency

9    action" because they "take [the] 'definitive' legal position" that the Executive Orders and Grant

10   Conditions are authorized and enforceable against Plaintiffs" (quoting *CSI Aviation Servs., Inc. v.*

11   *U.S. Dep't of Transp.*, 637 F.3d 408, 412, 414 (D.C. Cir. 2011))).  Courts have found much

12   broader challenges to similar grant conditions to still constitute final agency action.  *See Fresno*,

13   2025 WL 2721390, at *7.

14         The grant conditions also pose an "immediate and significant practical burden" to

15   Plaintiffs by barring them from receiving funds or governing their conduct if they do.  *Id.*; *see*

16   *Rhode Island Coal. Against Domestic Violence v. Bondi*, No. 25-cv-279-WES, 2025 WL 2271867,

17   at *6 (D.R.I. Aug. 8, 2025) ("Without agreeing to the challenged conditions, the Coalitions are

18   effectively barred from applying for and receiving funds which they are legally entitled to seek.").

19         Lastly, HUD expects immediate compliance because it plans to deny grants unless the

20   plaintiffs certify their compliance with the challenged conditions.  "[T]he challenged conditions

21   will potentially change the lawful scope of activities permitted with grant funds, lead to the

22   termination of grant awards, and require the Coalitions to 'subject themselves to potential criminal

23   and civil liability under the False Claims Act.'"  *Id*.

24         This Court joins many others in declining to find that binding conditions imposed on

25   federal grant recipients, which meaningfully restrain recipients' conduct and impose penalties

26   under the FCA, are not "final agency action."  *King Cnty.*, 785 F. Supp. 3d at 884 n.18; *Rhode*

27   *Island Coal. Against Domestic Violence*, 2025 WL 2271867, at *6; *SFUSD II*, 789 F. Supp. 3d at

28   749–42; *Fresno*, 2025 WL 2721390, at *5–6.

United States District Court
Northern District of California

### b.  Not Committed to Agency Discretion

An action is "committed to agency discretion by law" only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which [a] court may review its exercise of discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021) (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015)).

Defendants argue that "an agency's determination of how to allocate and condition appropriated funds among competing priorities is classic discretionary action" under *Lincoln* and therefore not subject to judicial review.  *Fresno*, ECF No. 40 at 31.  Agencies do sometimes have absolute control over the allocation of funds and the prioritization of projects.  But here, the operative prioritization is performed by statutory and regulatory frameworks governing the allocation of noncompetitive and formula grants.  This is not, as in *Lincoln*, a case involving "an agency's allocation of funds from a lump-sum appropriation" with no conditions attached.  508 U.S. at 193; *see also King Cnty.*, 785 F. Supp. 3d at 884 (contrasting the statute at issue in *Lincoln* with enabling statutes like those at issue here which "provide[] substantial guidance as to how the agencies' discretion should be exercised in implementing these programs, and for the Court to evaluate whether that discretion is being exercised in a reasonable manner").  And even if HUD were allocating funds based on competing priorities, it may not do so based on unlawful criteria.  For instance, an agency may not "prioritize" between grant recipients on the basis of race.  *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497 (1954).  Thus, adjudicating the Plaintiffs' claims does not require the Court to wade into the "complicated balancing of a number of factors which are peculiarly within [agency] expertise." *Lincoln*, 508 U.S. at 193.

Nor may HUD may evade review of any unlawful grant conditions by recasting them as an exercise in prioritization.  To review the challenged conditions, the Court need only apply the laws identified by Plaintiffs—the Separation of Powers doctrine, the Fifth Amendment vagueness doctrine, and the Spending Clause.  The statutes authorizing and governing the grantmaking,

which Plaintiffs argue that Defendants have exceeded, also provide law to apply. *See, e.g.*, 42
U.S.C. § 1437u (governing the Family Self-Sufficiency program); 42 U.S.C. § 8011(b) (governing
the Multifamily Services Coordinator program).

Plaintiffs' challenge does not concern agency action solely committed to HUD's discretion
by law.

### c. Contrary to the Constitution and In Excess of Statutory Authority

As just explained, the challenged grant conditions are likely unconstitutional because they
are impermissibly vague and ambiguous in violation of the Due Process Clause and the Spending
Clause.

They are also likely unconstitutional because they exceed the Congressional delegation of
spending authority and thus violate the separation of powers. These constitutional violations
provide a standalone basis for enjoining the challenged conditions. *See San Francisco*, 897 F.3d
at 1235 (holding that "the district court properly entered summary judgment" in favor of the
plaintiffs because the challenged EO violated "the constitutional principle of the Separation of
Powers").

For the same reason, the challenged conditions are also in excess of statutory authority
under APA Section 706(2)(C). *See King Cnty.*, 785 F. Supp. 3d at 885 ("[T]he Separation of
Powers doctrine and the APA's 'in excess of statutory authority' standard both turn on the same
essential question—whether the agency acted within the bounds of its authority, either as
conferred by the Constitution or delegated by Congress.").

The Court concludes that the challenged grant conditions likely violate both APA Section
706(2)(B) because they are unconstitutional and Section 706(2)(C) because they exceed statutory
authority.

### d. Arbitrary and Capricious

Plaintiffs argue that the imposition of the Grant Conditions was arbitrary and capricious
under Section 706(2)(A) of the APA. ECF No. 9-1 at 33. Agency action is arbitrary and
capricious if it is not "reasonable and reasonably explained." *Ohio v. Environmental Protection*

United States District Court
Northern District of California

*Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  Courts look to see whether the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  An action may be arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Id.*  The court may not "infer an agency's reasoning from mere silence."  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (cleaned up).

Furthermore, the standard is more exacting when an agency changes positions or is "not writing on a blank slate."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) (citation omitted).  When changing its position, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.*  "It would be arbitrary and capricious to ignore such matters."  *Id.*

Plaintiffs do not argue that the agency's reasoning was irrational or omitted relevant considerations.  Rather, they argue that the agency erred by providing no reasoning at all to support the imposition of the challenged grant conditions.  In a letter to grantees and stakeholders, HUD Secretary Turner explained that the challenged conditions were imposed to "effectively implement" and "ensure . . . complian[ce]" with the President's executive orders.  *See* HUD, Ltr. to Grantees and Stakeholders (Apr. 4, 2025).[5]  But this is no explanation at all.  Executive orders are not "law," but "presidential directives to agency officials to consider certain policies when making regulatory decisions" that "do not create freestanding private rights to enforce such policies."  *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023).  An agency cannot change position solely based on compliance with an EO without further explanation.  *See*

---

[5] https://www.hud.gov/sites/default/files/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf.

*California by & through Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1169–70 (N.D. Cal. 2019) ("conclusory assertions" regarding compliance with Executive Order were inadequate "given that [the agency] failed to provide any data or analysis to support them"). Otherwise, any decision made pursuant to an EO would be exempt from judicial review under the APA. *See California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration.").

Finally, as a sort of catch-all, Defendants argue that "given the agencies' significant discretion to impose appropriate terms and conditions on the receipt of federal funds, and general grantmaking requirements that the recipients of such funds follow federal law, the adoption of grant conditions that require recipients to certify their compliance with executive orders, federal anti-discrimination laws, and other restrictions on the use of federal funds, such as the Hyde Amendment, can hardly be considered arbitrary or capricious." *Fresno*, ECF No. 40 at 35. Other than citations to cases about the deferential standard of review under the APA, the government cites no authority. Nor could it, since the argument asks the Court to ignore the many problems with the challenged conditions discussed at length above. The Court has identified numerous conflicts between the challenged EOs and preexisting federal law, including the laws governing the grants themselves. The Court has also concluded that the challenged conditions are impermissibly vague, and in that sense they also diverge from existing laws.

The government's implication is that an agency acts lawfully any time it orders its grantees to certify compliance with Executive Orders. As the discussion above makes clear, that isn't true. And even if imposing grant conditions to certify compliance with Executive Orders were an unremarkable aspect of agency practice—which is not the Court's conclusion—those agencies would still be required to explain themselves. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of*

*Com. v. New York*, 588 U.S. 752, 785 (2019).  Defendants have failed in that task.[6]

The challenged grant conditions are arbitrary and capricious.

## B.     Irreparable Harm

Plaintiffs seeking the extraordinary remedy of a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.

The Court finds that Plaintiffs face immediate and irreparable harm because HUD requires them to either certify compliance with unconstitutional grant conditions—by deadlines which have now passed—or lose hundreds of millions of dollars in funding.  Plaintiffs have been coerced into accepting conditions that are contrary to law.  *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 536–37 (holding that the challenged executive order, which conditioned federal funds on compliance with 8 U.S.C. § 1373, caused irreparable harm because it "improperly seeks to coerce [the plaintiffs] into changing their policies in violation of the Tenth Amendment").  And if they accept the challenged conditions and become subject to policies that violate the law or the Constitution, they experience a constitutional injury.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

On the other hand, if Plaintiffs reject the conditions, they experience a loss of funding and the budgetary clarity "which is essential to their ability to preserve and increase the availability of affordable housing to meet critical needs."  ECF No. 30 at 20.  This, too, is constitutes irreparable injury.  *Cnty. of Santa Clara*, 250 F. Supp. 3d at 536–37 ("The Order's uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents.  Without clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services."); *see also King Cnty.*, 785 F. Supp. at 890–91 (explaining

---

[6] While some of the EOs contain preambles explaining their purpose and reasoning, the agencies still need to justify the application of those general principles and policy objectives to specific grants.  HUD has not purported to incorporate the EO preambles by reference or in any other manner explained its decision to require grant recipients to comply with EOs setting broad policy priorities and agendas for federal agencies.

United States District Court
Northern District of California

that the risk of lost funding because of unconstitutional grant conditions, with its attendant mitigation costs and budgetary uncertainty, is a distinct source of irreparable injury).  While the restoration of funding at the conclusion of litigation may remediate Plaintiff's direct economic loss, it will not compensate Plaintiffs for the additional costs of accommodating and mitigating that potential loss of funds.  It will also not compensate for the constitutional injury of, again, being subjected to and harmed by unconstitutional grant conditions.

Defendants assert that Plaintiff's economic harm is fundamentally reparable because the funds can be restored at a later date.  *Fresno*, ECF No. 40 at 326.  But Plaintiffs have presented ample evidence of budgetary harms that restoration of funding would not undo.  For instance, their declarants attest that delays in facility repairs and maintenance will snowball into more expensive repairs.  ECF No. 9-1 at 34.  They also attest that lost funds would hinder their ability to provide childcare, transportation assistance, vocational training, and other critical services—potentially driving families who rely on those services further into poverty.  *Id*. at 35.

Defendants also suggest that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."  *Fresno*, ECF No. 40 at 37 (quoting *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)).  But Defendants cite *Agency for International Development* selectively.  The Court in that case immediately distinguished the general case as described by Defendants, from the situation where the government "den[ies] a benefit to a person on a basis that infringes his constitutionally protected [interests], even if he has no entitlement to that benefit," which is impermissible.  570 U.S. at 214.

The Court finds that Plaintiffs have established the requisite risk of immediate and irreparable harm.

### C.  Balance of Equities and Public Interest

The third and fourth factors for a preliminary injunction—the balance of equities and the public interest—merge when the government is a party.  *Wolford v. Lopez,* 116 F.4th 959, 976 (9th Cir. 2024); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the government's interest in imposing the challenged grant conditions sooner rather than later is minimal.  If this Court revisits the merits determination on summary judgment or is

35

overturned on appeal, Plaintiffs will then be subject to the challenged grant conditions. Defendants have identified no harm that would result from the attendant delay in enforcing the grant conditions.

Defendants assert that they will be harmed by granting funds to Plaintiffs that they will be unable to recover. As a colleague court said, however, "these concerns cut both ways since Plaintiffs may be forced to divert and spend unplanned sources of public money to keep afloat projects that the Grant Conditions jeopardize. In fact, since Plaintiffs have shown a likelihood of success on the merits, this concern cuts in their favor." *Fresno*, 2025 WL 2721390, at \*19.

Courts have repeatedly held that injunctions are in the public interest because they prevent the government from taking potentially unconstitutional actions. *See Melendres*, 695 F.3d at 1002; *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The Court concludes that the balance of the equities and the public interest support a preliminary injunction.

### D.     Bond

Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a . . . preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (cleaned up). "[T]he court may waive the bond requirement if 'there is a high probability of success that equity compels waiving the bond, the balance of the equities overwhelmingly favors the movant . . . or the requirement of a bond would negatively impact the movant's constitutional rights.'" *SFUSD II*, 789 F. Supp. 3d at 755 (quoting *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389 CW, 2014 WL 3749984, at \*6 (N.D. Cal. July 29, 2014)).

Because Defendants have not made a particular showing as to Plaintiffs' risk of non-repayment and Plaintiffs are likely to succeed on the merits of their claims, a preliminary injunction is not likely to pose any harm to Defendants. *See King Cnty.*, 785 F. Supp. 3d at 893 (reaching the same conclusion concerning a challenge to similar grant conditions); *SFUSD II*, 789

1    F. Supp. 3d at 755 (same)

2         Further, a bond in a substantial amount would deprive Plaintiffs and the public they serve

3    of the very funds the preliminary injunction seeks to protect.  Accordingly, Plaintiffs shall be

4    required to pay only a nominal bond of $100.

5         **E.    Stay**

6         Finally, Defendants request that any relief ordered by the Court "be stayed pending the

7    disposition of any appeal that is authorized by the Solicitor General, or at a minimum,

8    administratively stayed for a period of seven days to allow the United States to consider whether

9    to seek an emergency, expedited stay from the Court of Appeals."  *Fresno*, ECF No. 40 at 39.

10   "The party requesting a stay bears the burden of showing that the circumstances justify an exercise

11   of [judicial] discretion."  *Nken*, 556 U.S. at 433–34.  The four relevant factors are: "(1) whether

12   the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether

13   the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

14   substantially injure the other parties interested in the proceeding; and (4) where the public interest

15   lies."  *Id*. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  "It is generally

16   logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order,

17   as the findings on which those decisions are premised are almost perfect opposites."  *Maryland v.*

18   *Dep't of Agriculture*, JKB-25-0748, 770 F. Supp. 3d 779, 820, (D. Md. Mar. 13, 2025).

19        A stay is not appropriate here because Plaintiffs are likely to succeed on the merits of their

20   claims and, as the Court has explained, any harm resulting from the payment or nonpayment of

21   grant funds favors the Plaintiffs.  Accordingly, Defendants' request for a stay is denied.

22   **V.    CONCLUSION**

23        The Court grants a preliminary injunction extending the terms of the temporary restraining

24   order granted on October 18, 2025.  ECF No. 19.

25        Defendants argue that the Court should tailor relief to the reach only those grant conditions

26   and plaintiffs for which all of the emergency relief requirements are satisfied.  *Fresno*, ECF No.

27   40 at 38.  However, the Court has concluded that each of the challenged grant conditions is

28   unlawful.  HUD provided no rationale in support of any of the grant conditions, which are

therefore arbitrary and capricious.  And all of the challenged grant conditions are both unconstitutionally vague and in excess of the authority delegated to HUD, violating the separation of powers.  All Plaintiffs face immediate and irreparable constitutional harm.  No further tailoring of the preliminary injunction is warranted.

Defendants also suggest that the Court should enjoin the challenged conditions only to the extent they create requirements beyond those imposed by existing federal law.  This would compound, not cure, the vagueness defects in the challenged conditions.  Moreover, Plaintiffs are already required to comply with federal law.  The Court will not restrict its order in such a way.

**IT IS SO ORDERED.**

Dated: November 14, 2025



_____
JON S. TIGAR
United States District Judge