**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, CITY OF BOSTON, CITY OF NEW YORK, MAYOR AND CITY COUNCIL OF BALTIMORE, CITY AND COUNTY OF DENVER, CITY OF MINNEAPOLIS, CITY OF NEW HAVEN, CITY OF SAINT PAUL, RAMSEY COUNTY, COUNTY OF HENNEPIN, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, COUNTY OF ALAMEDA, ALAMEDA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT, and ALAMEDA COUNTY FIRE DEPARTMENT, | Civil Action No. 25-cv-12765 |
| Plaintiffs, | Hon. Manish S. Shah |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, and KAREN S. EVANS, in her official capacity as Senior Deputy Administrator of FEMA, | |
| Defendants. | |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs City of Chicago, City of Boston, City and County of Denver, City of Minneapolis, City of New Haven, City of New York, City of Saint Paul, Mayor and City Council of Baltimore, Ramsey County, County of Hennepin, Metropolitan Government of Nashville and Davidson County, County of Alameda, Alameda County Flood Control and Water Conservation District, and Alameda County Fire Department file this Complaint to enjoin Defendants from imposing unlawful conditions in Department of Homeland Security grants that keep our Cities

1

safe. In support of this Complaint, Plaintiffs allege as follows:

1.     For three quarters of a century, it has been "the intent of the Congress . . . to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage" resulting from disasters. 42 U.S.C. § 5121(b); Federal Disaster Relief Act of 1950, Pub. L. No. 81-875, § 1, 64 Stat. 1109. As a result, Congress has long directed the federal government to provide funding to help States and local governments prepare for, reduce the risk of, and recover from "loss of life, human suffering, loss of income, and property loss and damage" from disasters, as well as the "disrupt[ion] [of] the normal functioning of governments and communities" and severe adverse effects on "individuals and families" that disasters cause. 42 U.S.C. § 5121(a); *see generally* Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. ch. 68.

2.     Pursuant to these and related authorities, Congress has established the framework for a complex, multi-layered emergency-management infrastructure to prepare for, mitigate, and recover from the harms caused by unpredictable disasters and emergencies; encouraged States and local governments to co-create that infrastructure with the federal government; and directed the federal government to collaborate with willing States and local governments in that undertaking.

3.     In support of that system, Congress appropriates billions of dollars each year to grant programs that financially support state and local governments in preparing for, responding to, and recovering from disasters. State and local governments rely heavily on this grant funding to perform a wide array of functions essential to the safety of the residents and communities they serve. These functions include supporting first responders' salaries and training, purchasing hazmat equipment, and preparing for and mitigating the risks of earthquakes, floods, and fires. They also include training public employees on how to serve the public during natural disasters,

funding search and rescue efforts, and strengthening computer systems with cybersecurity tools.

4.     In short, Congress has made federal funding of state and local governments' emergency-management operations an essential linchpin in the systems that secure the Nation. Without that funding, people across the country will face greater risk of suffering and death from disasters; homes and businesses will face greater risk of destruction; and state and local governments will suffer significant economic consequences to their budgets and workforces as well as their ability to best address their communities' unique needs.

5.     Congress has largely assigned the duty to distribute these federal funds to the Department of Homeland Security (DHS) and the Federal Emergency Management Agency (FEMA), a component agency of DHS. While DHS and FEMA retain limited discretion over the allocation of some of that funding, much of the funding is allocated to state and local governments by formulas that Congress has set out by statute.

6.     Plaintiffs in this case are local governments that are collectively responsible for the safety and well-being of millions of people. Their responsibilities include preventing and responding to acts of terrorism, mass shootings, cyber incidents, and other complex emergencies. To carry out these duties, Plaintiffs rely on congressionally appropriated DHS and FEMA grant funding to train first responders, deploy radiation and chemical detection networks, support interoperable communications, sustain Fusion Centers (hubs where federal, state, and local officials and private sector partners work together to share information and combat threats),  and prepare for high-risk events such as political conventions, concerts, parades, and major sporting events.

7.     For the first time in the 75-year history of Congress's financial support for local governments' disaster preparedness, mitigation, and recovery, the Executive Branch has now

determined to use this critical federal funding as a cudgel, threatening to hamstring local governments' emergency-management functions unless they acquiesce to unrelated Executive domestic policy goals. Specifically, DHS has adopted unlawful new conditions in its "Standard Terms and Conditions" that require adherence to the Executive Branch's domestic political agenda and imposed those new conditions as barriers to Plaintiffs' acceptance of grants administered by DHS and FEMA.

8.  As relevant here, the new conditions could be read to require grant recipients and subrecipients to (a) agree not to "operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology" that Defendants deem unlawful (the "Discrimination Condition," described in paragraph 177 below); and (b) agree in advance to comply with all executive orders the President has issued *and* might in the future issue to advance and impose his domestic political agenda (the "Executive Order Condition," described in paragraph 178 below) (together, the "Challenged DHS Conditions").

9.  Conditioning funding on new, unrelated, policy-driven conditions undermines the purposes for which Congress established and appropriated funding to these grant programs in the first place: strengthening community resiliency and alleviating the suffering and damage caused by natural and human-made disasters. Indeed, the Executive's imposition of the Challenged DHS Conditions causes budgetary uncertainty and jeopardizes funds that support emergency-management capacity across the country. What is more, the Challenged DHS Conditions are inscrutably vague, subjective, and overbroad, and the Executive's imposition of the conditions on Plaintiffs' grants upsets the separation of powers, exceeds the federal government's authority to place conditions on federal funding, and flouts bedrock limits on how federal agencies must consider, reach, and implement their decisions. Neither the Constitution nor Congress empowers

the Executive to hold federal emergency-management funding hostage to the Administration's political agenda by adopting and imposing the Challenged DHS Conditions on the grants at issue in this action.

10.     The result is that local governments in line to receive federal funding from DHS for emergency-management activities now face a choice that is not only untenable and unlawful, but also urgent: either accept conditions that are unconstitutional and contrary to law, or lose millions of dollars in federal grant funding used to keep their residents safe and ensure continuity of government. That quandary is itself unconstitutional, and it inflicts substantial budget uncertainty on Plaintiffs in this action, which must now choose between acceding to these unlawful and unconstitutional conditions and losing hundreds of millions of dollars in critical federal disaster funding.

11.     Plaintiffs bring this suit to challenge the imposition of the Challenged DHS Conditions on their DHS- and FEMA-administered grants. Plaintiffs seek and are entitled to a declaratory judgment that Defendants' adoption and application of the Challenged DHS Conditions are unlawful, as well as injunctive relief barring Defendants from applying or enforcing the Challenged DHS Conditions or any materially similar conditions in connection with Plaintiffs' DHS grants.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and other laws of the United States.

13.     In addition to its other remedial authorities, this Court has authority to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

14.     Venue properly lies within the Northern District of Illinois under 28 U.S.C.

§§ 1391(b)(2) and 1391(e)(1) because Plaintiff City of Chicago is in this judicial district; no real property is involved in this action; and a substantial part of the events or omissions giving rise to this action occurred in this District.

**PARTIES**

I.    **Plaintiffs**

15.    Plaintiff City of Chicago (Chicago) is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

16.    Plaintiff City of Boston (Boston) is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

17.    Plaintiff City of New York (NYC) is a municipal corporation organized and existing under the laws of the State of New York.

18.    Plaintiff Mayor & City Council of Baltimore (Baltimore) is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, and entrusted with all the power of local self-government and home rule afforded by those articles.

19.    Plaintiff City and County of Denver (Denver) is a home rule municipality organized and existing under the laws of the State of Colorado.

20.    Plaintiff City of Minneapolis (Minneapolis) is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

21.    Plaintiff City of New Haven (New Haven) is a municipal corporation organized and existing under the laws of the State of Connecticut.

22.    Plaintiff City of Saint Paul (Saint Paul) is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

6

23.     Plaintiff Ramsey County (Ramsey) is a political subdivision of the State of Minnesota with its county seat in Saint Paul.

24.     Plaintiff County of Hennepin (Hennepin County) is a political subdivision of the State of Minnesota.

25.     Plaintiff Metropolitan Government of Nashville and Davidson County (Nashville) is a combined municipal corporation and county government organized and existing under Tennessee law.

26.     Plaintiff County of Alameda (Alameda County) is a charter county and political subdivision of the State of California.

27.     Plaintiff Alameda County Fire Department is a dependent special district, organized under the laws of the State of California with the Alameda County Board of Supervisors as its governing body.

28.     Plaintiff Alameda County Flood Control and Water Conservation District (Alameda County Flood Control District) is a dependent special district, organized under the laws of the State of California with the Alameda County Board of Supervisors as its governing body.

29.     Plaintiffs Alameda County, Alameda County Fire Department, and Alameda County Flood Control District are all governed by the Alameda County Board of Supervisors and shall be referred to collectively as the "Alameda County Entities."

## II.     Defendants

30.     Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of DHS, and in which capacity she executed a document purporting to delegate to Defendant Karen S. Evans all functions and duties of the FEMA Administrator except to the extent

such functions and duties are nondelegable by law. Congress has prohibited the Secretary of Homeland Security from changing FEMA's mission, including by "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, [or] responsibilities," except to the extent Congress expressly authorizes the Secretary to do so. 6 U.S.C. § 316(c)(1).

31.     Defendant United States Department of Homeland Security is an agency and executive department of the United States government. DHS has responsibility for implementing the federal grant programs at issue in this action. DHS is an "agency" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 701(b)(1).

32.     Defendant Federal Emergency Management Agency is an agency of the federal government within DHS. FEMA coordinates operational and logistical disaster relief and oversees the administration of most of the federal grant programs at issue in this action. Congress has directed that FEMA is and must "be maintained as a distinct entity within" DHS. 6 U.S.C. § 316(a). FEMA is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).

33.     Defendant Karen Evans is the Senior Official Performing the Duties of Administrator of the Federal Emergency Management Agency. She is sued in her official capacity, in which capacity she claims to be responsible for overseeing and administering all duties and programs of FEMA, except to the extent the functions and duties of the FEMA Administrator are nondelegable by law.[1]

## ALLEGATIONS

### I.     Federal Funding for Countering Terrorism, Disaster Preparedness, and More

34.     Plaintiffs are major population centers and smaller communities that are

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Karen Evans is automatically substituted for her predecessor, David Richardson.

collectively responsible for the safety and well-being of millions of people. Part of that responsibility is preparing for potential disasters and responding to emergencies in an almost untold number of scenarios—from acts of terrorism and threats of physical attacks to airports, mass-transit systems, large-scale special events, and international ports to floods, severe weather events, infectious diseases, and more.

35.     Each year Congress appropriates billions of dollars for DHS, and primarily FEMA, to distribute as grants to state and local governments to support counter terrorism, public safety, disaster mitigation, and recovery efforts throughout the Nation.

36.     Plaintiffs, like virtually every local government across the country, rely on these federal grants to support their emergency-management functions. Plaintiffs receive this grant funding directly, by executing grant agreements with FEMA or other components of DHS, and indirectly, as subgrantees of funding from the States.

37.     Specifically, while FEMA makes some of its emergency-management grant funding available directly to local governments, it disburses most of the funding to the States, which are then authorized or required to execute subgrants to distribute the funding to local governments. This is known as "pass-through" grant funding. When it distributes such funding to States, FEMA typically disburses funds to the agencies within each State that FEMA refers to as the State Administrative Agency, or "SAA," or the State Emergency Management Agency, or "EMA."  FEMA grants contemplate this multi-layered, pass-through structure.

     a.   The SAA and EMA for Massachusetts is the Executive Office of Public Safety and Security (EOPSS), Office of Grants and Research (OGR).

     b.   The SAA and EMA for Illinois is the Illinois Emergency Management Agency and Office of Homeland Security (IEMA).

    c.   The SAA and EMA for New York is the New York Division of Homeland Security and Emergency Services (DHSES).

    d.   The SAA and EMA for Maryland is the Maryland Department of Emergency Management. The SAA and EMA for Colorado is the State of Colorado Department of Public Safety.

    e.   The SAA and EMA for Minnesota is the Minnesota Department of Public Safety Homeland Security and Emergency Management.

    f.   The SAA and EMA for Connecticut is the Connecticut Division of Emergency Management & Homeland Security.

    g.   The SAA and EMA for Tennessee is the Tennessee Emergency Management Agency.

    h.   The SAA and EMA for California is the California Governor's Office of Emergency Services (CalOES).

38.    Once this federal funding is distributed to Plaintiffs, whether directly or indirectly, Plaintiffs use the funding for a wide range of activities that directly advance the purposes for which Congress established the grant programs at issue in this action. These purposes include emergency management training and enhancing the technology on which emergency operation centers operate, and building out public-alert communications systems and supporting community preparedness. They also include purchasing equipment—like portable generators and medical technology, satellite phones, bomb squad hazmat suits and bomb-defusing equipment, thermal binoculars, and temporary barriers—on which first responders and other emergency response operations rely.

39.    These programs are far more valuable to Plaintiffs and their communities than just

the dollar value of their grants. Under longstanding multi-jurisdictional agreements and by daily practice, Plaintiffs realize the benefits, savings, and force multiplication of mutual aid and protection.

40.     In Boston, for example, the Metro Boston Homeland Security Region, which includes Boston and neighboring jurisdictions, fields six Special Weapons and Tactics teams. Federal funding provides the ability for these teams to train together according to Federal Standards and to purchase similar equipment to ensure maximum interoperability.

41.     Funding from the federal government has gone great lengths in supporting the critical work accomplished through this inter-connected system. Plaintiffs have collectively received hundreds of millions of dollars from the grant programs at issue in this action in recent years, and have applied for and expect to receive tens of millions of dollars under Fiscal Year 2025 DHS grant programs, both directly from DHS and also indirectly as subgrantees of their States.

## II.     Plaintiffs Have Received and Expect to Receive Federal Funding from Many DHS Grant Programs.

42.     Plaintiffs have received or been awarded, or anticipate receiving or being awarded, grants or subgrants under one or more of the following grant programs administered by FEMA:

  a.     Emergency Management Performance Grant Program (EMPG);

  b.     Homeland Security Grant Program (HSGP), including the following four components of that program: State Homeland Security Program (SHSP), Urban Areas Security Initiative (UASI), FIFA World Cup Grant Program, and World Cup-related Counter Unmanned Aircraft Systems Grant Program;

  c.     Hazard Mitigation Assistance Program (HMA), including Hazard Mitigation Grant Program and Flood Mitigation Assistance;

  d.     Disaster Relief Public Assistance Program;

  e.     Transit Security Grant Program (TSGP);

11

      f.      Staffing for Adequate Fire and Emergency Response (SAFER);

      g.      Assistance to Firefighters Grant Program (AFGP);

      h.      Fire Prevention and Safety Grants (FP&S); and

      i.      Port Security Grant Program (PSGP).

43. Plaintiffs Boston, Chicago, Denver, and NYC have received, and anticipate receiving, grants under the Securing the Cities Grant Program (STC), which is administered by an office within DHS called the Countering Weapons of Mass Destruction Office.

### a. Emergency Management Performance Grant Program (EMPG)

44. The Emergency Management Performance Grant Program (EMPG) provides federal funding, passed through the States, to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System—a systematic process for developing national preparedness. This assistance helps grantees build continuity-of-government capabilities to ensure essential functions in a catastrophic disaster and otherwise work toward the National Preparedness Goal, which FEMA has articulated as "[a] secure and resilient nation with the capabilities required across the whole community to prevent, protect against, mitigate, respond to, and recover from the threats and hazards that pose the greatest risk."

45. EMPG funding supports States and local governments in developing or enhancing emergency management planning activities, emergency operations plans, public alerts and warning systems, emergency response coordination among agencies, mutual aid systems, shelter and evacuation preparedness, and disaster recovery. EMPG funding also supports the purchase of certain forms of equipment as well as day-to-day activities in support of emergency management.

46. EMPG funds have been made available to States since an initial appropriation for the program in 2003. *See* Pub. L. No. 108-7, 117 Stat. 11, 516. Congress has since made the program permanent and codified it at 6 U.S.C. § 762.

47. FEMA's allocation of EMPG funds among the States is set by statutory formula. For each year's apportioned amount of EMPG funding, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to the States a baseline amount of 0.75 percent of the appropriated funds. 6 U.S.C. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id*. § 762(d)(2).

48. The EMPG permits States to allow subrecipients to apply for a share of the EMPG funding that they receive from FEMA. Plaintiffs Alameda County, Baltimore, Chicago, Denver, Hennepin County, Minneapolis, New York City, New Haven, Saint Paul, and Ramsey have received or been awarded, or anticipate receiving or being awarded, FY 2025 EMPG pass-through funding. Numerous Plaintiffs also anticipate applying for future EMPG pass-through funding.

49. Local governments use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of many Plaintiffs' employees, including emergency managers who lead coordination efforts to prepare for and respond to natural disasters or mass casualty events.

50. The EMPG program also funds communications and facilities for many Plaintiffs' emergency response; training programs for staff members playing central roles in disaster response; and costs for software that is critical to the proper functioning of Plaintiffs' emergency operations centers—which are physical and electronic locations from which Plaintiffs often conduct their responsibilities as lead agencies for their operational areas in the event of a disaster or public health emergency.

51. EMPG funds allow many Plaintiffs to advance their emergency management preparedness in ways they otherwise could not. Many Plaintiffs would otherwise not be able to employ, equip, or train the emergency management staff funded by EMPG, severely diminishing

many Plaintiffs' ability to coordinate emergency response and disaster relief and recovery.

52. For example, Chicago uses EMPG funding to plan and train for incidents and special events. The EMPG funds have empowered Chicago's Office of Emergency Management & Communications (OEMC) to support a comprehensive, all-hazards emergency preparedness system by sustaining and building the core capabilities contained in FEMA's National Preparedness Goal: "A secure and resilient nation with the capabilities required across the whole community to prevent, protect against, mitigate, respond to, and recover from the threats and hazards that pose the greatest risk." In particular, the EMPG funds support the salary and fringe benefits costs for 13 OEMC staff directly responsible for developing, planning, exercising, and implementing emergency plans.

53. Alameda County is the lead agency for the Alameda County Operational Area, as designated by CalOES for purposes of assigning responsibility and authority within geographic areas for emergency management coordination and communication. The Alameda County Sheriff's Office of Emergency Services is the lead operational area agency and manages and distributes EMPG funds within the Alameda County Operational Area. Alameda County has used this funding to increase operational capacity by, for example, developing a multi-jurisdictional plan to ensure all partners can use a unified mass notification system, designing and conducting multi-jurisdictional alert and warning exercises, updating the County's Tsunami Response Plan, purchasing emergency response equipment, and training personnel from local jurisdictions, county agencies, and neighboring counties.

54. EMPG grant performance periods also often remain open for two or more years, meaning that an award in one fiscal year usually allows receiving Plaintiffs to continue to support program activities beyond the fiscal year in which the funding is awarded.

55.     In its FY 2025 EMPG Notice of Funding Opportunity (NOFO) published on July 28, 2025, FEMA announced that it allocated Massachusetts $6,377,029, New York $13,478,822, Illinois $9,486,374, Connecticut $4,446,318, Minnesota $5,627,851, Colorado $5,719,526, Maryland $5,890,070, California $24,392,241, and Tennessee $6,428,115; directed applicants to apply for funding by August 11, 2025; and stated that the award date would be no later than September 30, 2025.[2] The NOFO states that recipients of EMPG funding "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award," which include the Challenged DHS Conditions.

56.     Alameda County, Baltimore, Chicago, Denver, Hennepin County, Minneapolis, Nashville, and Ramsey's SAAs timely applied to FEMA for FY 2025 EMPG funding. Many Plaintiffs have timely applied or expect to timely apply to their SAAs for a share of their State's EMPG funding, or have applied or will timely apply for pass-through funding from a state subrecipient.

57.     By September 30, 2025, FEMA had awarded FY 2025 EMPG funding to Illinois, New York, Massachusetts, Connecticut, Colorado, Maryland, Minnesota, California, and Tennessee. The FY 2025 EMPG awards incorporate the FY 2025 EMPG NOFO, so the awards incorporate the Challenged DHS Conditions.

58.      These funds are the subject of pending litigation. *See Illinois v. Noem*, No. 25-cv-00495 (D.R.I.).

**b.  Homeland Security Grant Program (HSGP)**

59.     FEMA's Homeland Security Grant Program (HSGP) is made up of several discrete

---

[2] FEMA, NOFO: FY 2025 Emergency Management Performance Grant Program (Jul. 28, 2025), https://www.fema.gov/grants/preparedness/emergency-management-performance/fy-25-nofo [archived at https://perma.cc/L2ZD-C7GD].

subprograms, including two through which Plaintiffs have historically received grant funding and expect to apply for and receive grant funding in the current fiscal year: the State Homeland Security Program (HSGP-SHSP) and the Urban Area Security Initiative (HSGP-UASI) grant program.

60.     FEMA issues a single consolidated NOFO for all of the programs that comprise the Homeland Security Grant Program.

61.     In its FY 2025 HSGP NOFO published on July 28, 2025 and updated on August 1, 2025, FEMA announced that it allocated a total of $1.008 billion in HSGP funding, including $373.5 million in HSGP-SHSP funding and $553.5 million in HSGP-UASI funding. Of those amounts:

    a.   FEMA allocated to Illinois $10,419,556 in HSGP-SHSP funding and a total of $16,838,838 in HSGP-UASI funding, all of which FEMA allocated to the Chicago-Naperville-Elgin, IL-IN-WI Funded Urban Area;

    b.   FEMA allocated to Massachusetts $5,390,887 in HSGP-SHSP funding and a total of $16,838,838 in HSGP-UASI funding, all of which FEMA allocated to the Boston-Cambridge-Newton, MA-NH Funded Urban Area;

    c.   FEMA allocated to Maryland $4,990,556 in HSGP-SHSP funding and a total of $7,709,724 in HSGP-UASI funding, all of which FEMA allocated to the Baltimore-Columbia-Towson, MD Funded Urban Area;

    d.   FEMA allocated to Minnesota $4,362,750 in HSGP-SHSP funding and a total of $9,526,217 in HSGP-UASI funding, all of which FEMA allocated to the Minneapolis-Saint Paul-Bloomington, MN-WI Funded Urban Area;

    e.   FEMA allocated to Connecticut $4,362,750 in HSGP-SHSP funding;

    f.   FEMA allocated to New York $38,200,874 in HSGP-SHSP funding and a total of

$92,180,364 in HSGP-UASI funding, all of which FEMA allocated to the New York-White Plains, NY Funded Urban Area;

g.   FEMA allocated to Colorado $4,362,750 in HSGP-SHSP funding and a total of $9,836,656 in HSGP-UASI funding, $6,909,902 of which FEMA allocated to the Denver-Aurora-Lakewood, CO Funded Urban Area;

h.   FEMA allocated $4,362,750 in HSGP-SHSP funding to Tennessee. FEMA also allocated $4,150,624 in HSGP-UASI funding to the Nashville-Davidson—Murfreesboro—Franklin, TN Funded Urban Area; and

i.   FEMA allocated $55,863,486 in HSGP-SHSP funding to California, and also allocated $32,451,685 in HSGP-UASI funding to the San Francisco-San Jose-Oakland, CA Funded Urban Area, which includes Alameda County.

62.   The FEMA NOFO directed applicants to apply for funding by August 15, 2025.[3]

63.   The NOFO states that recipients of Homeland Security Grant Program funding, including under the HSGP-SHSP and HSGP-UASI programs, "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award," which include the Challenged DHS Conditions.

64.   Plaintiffs' respective SSAs timely applied to FEMA for FY 2025 HSGP funding.

65.   By September 30, 2025, FEMA had issued grant awards for HSGP funding to Illinois, New York State, Massachusetts, Connecticut, Colorado, Maryland, Minnesota, Tennessee, and California. The FY 2025 HSGP awards incorporate the FY 2025 HSGP NOFO, so the awards incorporate the Challenged DHS Conditions.

---

[3] FEMA, NOFO: FY 2025 Homeland Security Grant Program (Jul. 28, 2025, rev. Aug. 1, 2025), https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo [archived at https://perma.cc/9793-JHYE].

66. These funds are the subject of pending litigation. *See Illinois v. Noem*, No. 25-cv-00495 (D.R.I).

### i. State Homeland Security Program (SHSP) Grant Program

67. Within the Homeland Security Grant Program, State Homeland Security Program (HSGP-SHSP) grants exist to provide federal funding to States—and, through them, to local governments—to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

68. HSGP-SHSP funds have been available to States—and, through them, to local governments—since the first version of the program was created by the USA PATRIOT Act in 2001. Congress codified the program at 6 U.S.C. §§ 603, 605-09.

69. Congress has directed FEMA to allocate HSGP-SHSP funds pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats. *Id.* § 608(a)(1). Recipients may then use HSGP-SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id.* § 609(a).

70. Because HSGP-SHSP grants are formula grants based on a statutory risk formula, not competitive grants, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

71. Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for HSGP-SHSP grants. *Id.* § 605(e)(1)(A)(v).

72. Congress appropriates, and FEMA distributes, hundreds of millions of dollars per

year in HSGP-SHSP grants to the States. For instance, in each of the three fiscal years prior to FY 2025, FEMA awarded well over $200 million to New York, and over $100 million to New York City. Plaintiffs' States then subgrant substantial HSGP-SHSP grant funding to local governments, including Plaintiffs. FEMA has awarded California millions of dollars in HSGP-SHSP funding, and CalOES has allocated approximately $1.5 million to the Alameda County Operational Area in the last three fiscal years. Alameda County receives and uses some of that money, but it passes the majority of it on to local emergency response departments in the Alameda County Operational Area, including Alameda County Fire Department, to support disaster assistance and emergency response capacity.

73.    Plaintiffs Alameda County, Alameda County Fire Department, Baltimore, Nashville, and NYC have received or been awarded, or anticipate receiving or being awarded, FY 2025 HSGP-SHSP pass-through funding. Numerous Plaintiffs also anticipate applying for future HSGP-SHSP pass-through funding.

74.    Alameda County, Alameda County Fire Department, Baltimore, Nashville, and NYC use these funds for myriad counterterrorism and emergency response purposes, including, but not limited to, funding special operations command teams as well as mutual aid networks of police departments, fire departments, emergency services, and public works departments, in order to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

75.    HSGP-SHSP funds allow Alameda County, Alameda County Fire Department, Baltimore, Nashville, and NYC to advance counterterrorism and emergency management purposes in ways they otherwise could not.

76.    For example, Baltimore's Office of Emergency Management uses HSGP-SHSP funding to support the salaries of four employees; for surveillance of special events or high-risk

areas; for equipment for the Baltimore Police Department Bomb Squad and Special Operations Team; for training supplies for the Community Emergency Response Team program; for community preparedness promotional materials; for staff training and development; for response supplies and equipment for the Hazmat/Chemical, Biological, Radiological, Nuclear and Explosives/Search and Rescue Teams; for protective barriers to increase safety at community events and high-profile areas; and for Emergency Operations Center supplies and upgrades.

77.     Nashville has used the HSGP-SHSP funding for equipment—such as an emergency shelter system, a generator, and portable lighting—and training for its rapid response system. Nashville plans to use future funds on ballistic helmets for active aggressor response and water-rescue training.

78.     Because each HSGP-SHSP grant typically remains open for three years, an award in one fiscal year usually allows grantees and subgrantees to continue to support program activities in subsequent years. For instance, many Plaintiffs are currently relying on funding from the HSGP-SHSP awards for federal FY 2021 through 2024.

### ii.   Urban Areas Security Initiative (UASI)

79.     Within the Homeland Security Grant Program, Urban Areas Security Initiative (HSGP-UASI or UASI) grants serve a similar purpose to HSGP-SHSP grants. They are used to ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

80.     UASI funds have been available to States—and, through them, local government entities serving high-risk urban areas—since an initial version of the program was created by an appropriations statute in 2003. *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146. The program is codified at 6 U.S.C. §§ 603-04, 606-09.

81. Each year, FEMA must conduct a risk assessment based on a list of factors specified by statute to determine the relative threat, vulnerability, and consequences that "eligible metropolitan areas"—meaning the top one hundred most populous metropolitan statistical areas in the United States—would face from an act of terrorism. *Id.* §§ 601(5), 604(b)(2)(A)(i), 608(a)(1). Based on that risk assessment, FEMA must designate a list of high-risk urban areas that may submit applications for UASI grants. *Id.* § 604(b)(3). FEMA must also rely on the same set of factors—including population density and whether the given metropolitan area was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas that apply for grants. *Id.* § 608(a).

82. Put another way, UASI grants are grants based on a risk assessment formula that Congress has directed FEMA to refine, establish, and use to allocate UASI funding. Each State is entitled to a specific allocation—based on FEMA's risk assessment and tied to the FEMA-designated high-risk urban area or areas in that State—whenever a notice of funding opportunity is posted.

83. Recipients of UASI grant funding must use the funds for permitted purposes, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id.* § 609(a).

84. States that receive UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds. *Id.* § 604(d)(2)(A). Any funds retained by the State must be expended on items, services, or activities that benefit the high-risk urban area or areas. *Id.*

85. States collectively receive hundreds of millions of dollars per year in UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities they pass these funds to use UASI funds for a myriad of counterterrorism and emergency

response purposes, including support for urban Fusion Centers, SWAT teams, canine units, and bomb squads.

86.     UASI funds allow States and local government entities to advance counterterrorism and emergency response purposes in ways they otherwise could not.

87.     For example, Chicago uses UASI funds to create, develop, and sustain the Chicago Police Department's anti-terrorism capacity. This includes supporting and sustaining the equipment and training needs of the Chicago-Naperville-Elgin, IL-IN-WI Funded Urban Area's Fusion Center, the Chicago Crime Prevention and Information Center, and various specialized units within the Chicago Police Department's Bureau of Counterterrorism and Special Operations (SWAT, the Canine Unit, the Bomb Squad, the Detail Section); addressing capability gaps for dealing with chemical, biological, radiological, nuclear, and explosives weapons and mass casualty incidents, including by replacing and sustaining Chicago's stock of respirators; and improving and upgrading CPD's technology infrastructure.

88.     The Minneapolis Emergency Management Department has used UASI funds to pay salaries for the department's employees who keep Minneapolis prepared for emergencies such as terrorism, extreme weather events, and hazardous materials incidents. Minneapolis further uses UASI funding to purchase software used in the city's emergency operations center during an incident. Hennepin County uses UASI funding to pay for salaries and benefits of employees of the County's Department of Emergency Management, software and technology for the County's Emergency Operation Center, as well as the purchase of equipment like shin guards, helmets, license plate readers, and protective units for law enforcement agencies in the County.

89.     In Boston, the UASI grant provides funding to enhance regional preparedness and capabilities within Boston and the surrounding region. The UASI grant helps address the unique

equipment, planning, exercise, training, and operational needs of the region. These resources help the surrounding communities build enhanced and sustainable regional capacity to prevent, protect against, respond to, and recover from threats or acts of terrorism and natural disaster, including chemical, biological, radiological, nuclear, and explosive incidents. Additionally, UASI funding supports critical training initiatives such as full-scale exercises. These programs simulate real-world emergencies, enhancing tactical operations interagency coordination, and community resilience. They prepare first responders for scenarios ranging from active shooter incidents to natural disasters.

90.     Nashville has used UASI funding to purchase equipment, including a robot that can enter dangerous areas and detect hazardous materials and explosives, as well as handheld spectrometers and atmospheric monitors that protect against chemical and biological threats. The funding is also used for training on structural collapse.

91.     FEMA distributes UASI funding to the States and also determines what portion of each State's UASI funding must be allocated to particular urban areas within that State.

  a.  FEMA allocated to Colorado $4,362,750 in SHSP funding and a total of $9,836,656 in HSGP-UASI funding, $6,909,902 of which FEMA allocated to the Denver-Aurora-Lakewood, CO Funded Urban Area.

  b.  In Massachusetts, UASI funds go to the Boston-Cambridge-Newton, MA-NH Funded Urban Area (also known as the Metro Boston Homeland Security Region).

  c.  In Illinois, all UASI funds go to the Chicago-Naperville-Elgin, IL-IN-W Funded Urban Area. Chicago consistently ranks among the top jurisdictions where the threat of terrorism is considered high. Indeed, before this year, Chicago received the second highest allocation in UASI funding year to year since 2013. The

Chicago-Naperville-Elgin, IL-IN-WI Funded Urban Area has two agencies who are subgrantees of Illinois' UASI award, Plaintiff City of Chicago and Cook County. The City of Chicago acts as the lead agency and participates in and receives the Urban Area Risk Profile for the Chicago-Naperville-Elgin, IL-IN-WI Funded Urban Area.

d. For Minnesota, the Minneapolis-St. Paul-Bloomington, MN-WI Funded Urban Area is the sole recipient of UASI funds and includes Minneapolis, Saint Paul, Hennepin County, and Ramsey County.

e. In Tennessee, the Nashville-Davidson—Murfreesboro—Franklin, TN Funded Urban Area is the sole recipient of UASI funds for the state.

f. California has multiple Funded Urban Areas. The Bay Area Urban Area Security Initiative covers the San Francisco-San Jose-Oakland Funded Urban Area. The Alameda County Entities are all within the San Francisco-San Jose-Oakland Funded Urban Area and participate in the Bay Area Urban Area Security Initiative. CalOES's Grants Management Memorandum 2025-08 states that, of the amount of UASI funding that FEMA's HSGP NOFO stated was allocated to California, CalOES would allocate $26,837,543 in UASI funds to the Bay Area Urban Area Security Initiative.

92. Plaintiffs Boston, Baltimore, Denver, Saint Paul, Chicago, Minneapolis, NYC, Ramsey, Hennepin County, Nashville, Alameda County, and the Alameda County Fire Department have timely applied or intend to apply to their respective SAAs or urban area working groups for FY 2025 allocations of the HSGP-UASI funding dedicated to their respective urban area.

### iii. **World Cup Grants**

93.     In October 2025, FEMA issued Notices of Funding Opportunities for two grants programs intended to "enhance security and preparedness for the 2026 FIFA World Cup events in the United States." The two grants are the FIFA World Cup Grant Program (FWCGP) and the Counter-Unmanned Aircraft Systems Grant Program (C-UAS).

94.     Both grant programs were authorized under the Homeland Security Act of 2002, 6 U.S.C. § 605, the same statute that authorizes the State Homeland Security Grant Programs. *See* Pub. L. No. 119-21, § 90005(a)(1)(A)–(B), 139 Stat. 72, 359–60 (2025).

95.     The FIFA World Cup Grant Program will provide $625 million to the nine states that are home to the eleven U.S. cities hosting the 2026 FIFA World Cup to pay for security and other costs associated with hosting the event. Pub. L. No. 119-21, § 90005(a)(1)(B), 139 Stat. 72, 360. Each of the eleven host cities has a Host City Committee responsible for coordinating with its designated SAA to apply for the FIFA World Cup Grant Program. After award the funds will pass from the SAA to the Host City Committee to local government units.

96.     Plaintiffs Boston and NYC are host cities for the 2026 FIFA World Cup and, with their SAAs and/or Host City Committees, have applied for funding from the World Cup Grant Program. NYC applied for a grant in the amount of $10.963,216 for various public safety needs, including increased security measures for World Cup events; enhanced security equipment; and emergency preparedness and response measures.

97.     The anticipated award date for the World Cup Grant Program is sometime in January 2026. Plaintiffs anticipate using the funds to, for example, purchase supplies and equipment for emergency personnel; host trainings on rapid response and threat prevention; cover overtime pay, lodging, meals, and transportation for security and first responders; enhance city-

wide public safety and surveillance technology; and finance increased administrative and operational activities.

98.    Boston and NYC anticipate that the Challenged Conditions will be incorporated into the World Cup Grant award because the NOFO explicitly states that recipients must comply with the FY 2025 Department of Homeland Security Standard Terms and Conditions, v. 3 (Apr. 18, 2025) ("Standard DHS Terms"), except for the immigration conditions that are enjoined by *Illinois et al. v. FEMA et al.*, No. 25-206-WES (D.R.I. Sep. 24, 2025). Per the Standard DHS Terms, the Challenged Conditions are applicable to subrecipients.[4]

99.    The Counter Unmanned Aircraft Systems (C-UAS) Grant Program will provide $500 million in funding to enhance state and local capabilities to detect and disengage unmanned aircraft systems that pose a threat to public safety, particularly at high-profile events. Pub. L. No. 119-21, § 90005(a)(1)(A), 139 Stat. 72, 360. The funding is available to the states and jurisdictions hosting the 2025 FIFA World Cup and the national America 250 events.[5]

100.    The NOFO states that SAAs apply for the C-UAS funds and then make sub-awards to local government entities.

101.    Boston and NYC are eligible for funds from the C-UAS Grant Program because they are hosting World Cup games or events and have already submitted, or will be submitting, applications to SAAs for C-UAS subawards. NYC, through the New York City Police Department, applied for a C-UAS grant of $8.061,377.60 for equipment to detect, track, and identify threats to public and critical infrastructure posed by unmanned aircraft systems.

---

[4] FEMA, NOFO: FIFA World Cup Grant Program (November 12, 2025),
https://www.fema.gov/fact-sheet/notice-funding-opportunity-nofo-fifa-world-cup.
[5] FEMA, NOFO: Counter-Unmanned Aircraft Systems (C-UAS) Grant Program (November 12, 2025), https://www.fema.gov/fact-sheet/notice-funding-opportunity-nofo-counter-unmanned-aircraft-systems-c-uas-grant-program.

102.    On December 30, 2025, FEMA announced that it had made preliminary awards to states for the C-UAS Grant Program. Massachusetts and New York both received awards.

103.    Boston and NYC anticipate that the Challenged Conditions will be incorporated into the C-UAS grant award because the NOFO states that recipients must comply with the Standard DHS Terms, except for the immigration conditions that are enjoined by *Illinois et al. v. FEMA et al.*, No. 25-206-WES (D.R.I. Sep. 24, 2025), and the Challenged Conditions are applicable to subrecipients.

### c.    Hazard Mitigation Assistance Program (HMA)

104.    The Stafford Act provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a).

105.    The Hazard Mitigation Grant Program (HMGP) and Flood Mitigation Assistance (FMA) are part of FEMA's Hazard Mitigation Assistance program. The Hazard Mitigation Assistance program provides funding for eligible long-term solutions that reduce the impact of disasters in the future. HMGP provides federal funding to state, local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration in ways that reduce or mitigate future disaster losses. The FMA program provides funding to support state, local, tribal, and territorial governments in reducing or eliminating the risk of repetitive flood damage to buildings and structures insured under the National Flood Insurance Program (NFIP).

106.    Eligible risk reduction projects include, but are not limited to, retrofitting facilities to make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters;

27

installing permanent barriers to prevent floodwater from entering homes or businesses; building safe rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural losses; and developing or improving warning systems.

107. HMA funding and funding applications do not necessarily operate neatly on a predicable, fiscal-year basis. Instead, HMA funding often follows the occurrence of disasters, emergencies, and other events and Presidential declarations. States can apply for HMA funding from FEMA after the President declares a major disaster. The amount of HMA funds available to a State in connection with a declared disaster is a function of the level of disaster assistance provided. The State also administers a process to identify and select local project plans for FEMA approval and funding. In this process, local jurisdictions submit their applications to the State, which selects projects to then submit to FEMA for approval within 15 months of the date of disaster declaration. See generally 44 C.F.R. §§ 206.430-440. Some approved mitigation projects can span several years, since many contain structural renovation components.

108. Plaintiff New York City has applied for HMA pass-through funding to support two hazard mitigation projects, which total approximately $3.5 million in HMGP or FMA funding. The first application, titled Cool Corridors: Protecting New Yorkers From Extreme Heat, was for $2,803,815. This project aims to address extreme heat, which is the leading cause of mortality from extreme weather in NYC. The second application, titled DOT Flood Risk Assessment Scoping Project, was for $759,658.43. This application was for a scoping project to assess flood risk at DOT owned facilities, prioritize them based on vulnerability, and develop mitigation solutions for future funding opportunities.

109. While New York City has not received the aforementioned HMA awards to date, Plaintiffs anticipate that DHS would incorporate the Challenged DHS Conditions into the award,

as it has for all other grants.

110.     The Alameda County Flood Control District has received approximately $10.5 million in HMA funds as passthrough funding from CalOES from 2022 to 2026. Those funds have been allocated for projects to improve flood protections around a canal that is located upstream and downstream of a Union Pacific Railroad crossing. FEMA has not yet distributed approximately $9.6 million of the funds. The Alameda County Flood Control District anticipates applying for additional HMA funds in the future.

111.     Hennepin County has previously received HMA pass-through awards for lightning and water level detection sensors in response to flooding disasters in 2019.

112.     Plaintiffs may apply to other HMA grant programs in the future, in instances in which HMA funding is activated by the President declaring a disaster. For any such awards, Plaintiffs anticipate that DHS would incorporate the Challenged DHS Conditions, as it has for all other grants discussed in this Amended Complaint.

### d. Disaster Relief Public Assistance Grants

113.     The Stafford Act also authorizes federal funding to local governments to help communities to pay for emergency response measures after a presidentially-declared disaster. *See* 42 U.S.C. §§ 5170a, 5170b, 5172–73, 5185–86. States are the direct recipients for these Public Assistance grants, but the money regularly flows to local governments as subrecipients. *See* 44 C.F.R. §§ 206.201–206.208.

114.     Congress specifically lists the actions a president may take in response to a major disaster, including directing any federal agency to utilize its resources for support, coordinating disaster relief, providing technical and advisor assistance, assisting in the distribution of supplies, assisting inspections for building damage compliance, and providing accelerated federal assistance and support where necessary to save lives, prevent human suffering, and mitigate severe damage.

*See* 42 U.S.C. § 5170a.

115.     Disaster Relief grants issued under the Stafford Act, including the Public Assistance Program grants, are paid out from the Disaster Relief Fund, an appropriation from which FEMA can direct, coordinate, manage, and fund eligible resources and recover efforts associated with domestic major disasters and emergencies pursuant to the Stafford Act. Congress appropriated $29 billion to the Disaster Relief Fund in the American Relief Act of 2025.

116.     Public Assistance funds are critical for local governments as they recover from major disasters, funding activities ranging from debris removal, search and rescue, construction of temporary facilities for medical care and shelter, and infrastructure repair. Local governments can also receive funding after the declaration of an emergency, short of a major disaster. *See* 42 U.S.C. § 5192(a).

117.     Alameda County has received Public Assistance grants as a subrecipient through CalOES. For example, Alameda County received funds related to Presidential Disaster Declaration number FEMA 4683-DR-CA to support debris removal and emergency repairs following flooding, landslides, and mudslides caused by severe winter storms in December 2022 and January 2023. Alameda County has received approximately $2.77 million so far and anticipates receiving approximately $5.24 million more for eligible response and recovery work related to those storms. Alameda County has also received approximately $460,000 related to Presidential Disaster Declaration number FEMA 4699-DR-CA to support debris removal and emergency protective measures in response to damage caused by severe winter storms and straight-line winds between February 2023 and July 2023.

118.     Nashville has received several Public Assistance grants as pass-throughs from the TEMA.  For example, Nashville received funds in relation to Presidential Disaster Declaration

number FEMA-4601-DR-TN for severe storms, tornadoes, and flooding from March 25 to April 3, 2021. The federal cost share amount obligated to Nashville to date is approximately $5.4 million.

119. Presidential Disaster Declaration number FEMA-4878-DR-TN was issued in response to severe storms in the Nashville area from April 2 to April 24, 2025. Nashville has applied for and expects to receive related pass-through Public Assistance grant funding from TEMA.

120. Plaintiffs have applied for and received Public Assistance funds when they have suffered an eligible major disaster or emergency and anticipate that DHS will incorporate the Challenged DHS Conditions into Public Assistance awards as they have with all other grants discussed in this Amended Complaint.

### e. Transit Security Grant Program (TSGP)

121. The Transit Security Grant Program (TSGP) provides funding to transit agencies "for security improvements," 6 U.S.C. § 1135(a)(1), and more specifically to protect critical transportation infrastructure and the travelling public from terrorism as well as to increase infrastructure resilience in our nation's public transportation systems.

122. Eligible public transportation agencies—including those operating ferries, intra-city bus systems, and all forms of passenger rail—may apply for TSGP funds, *id*. § 1135(a)(2), and DHS must "select the recipients of grants based solely on risk," *id*. § 1135(c)(2).

123. For example, Chicago receives TSGP funding on a pass-through basis through the Chicago Transit Authority (CTA). Similarly, NYC receives TSGP funding directly and on a pass-through basis through the Metropolitan Transportation Authority (MTA).

124. Plaintiff NYC receives TSGP funding on a pass-through basis through the Metropolitan Transit Authority (MTA).

125.    In its FY 2025 TSGP NOFO, FEMA announced that it had targeted an allocation of $7,611,350 in TSGP funding to the CTA. The TSGP NOFO directed applicants to apply for funding by August 15, 2025, and stated that the award date would be no later than September 30, 2025.[6]

126.    FEMA determined its target allocations, including for CTA, based on daily unlinked passenger trips for transit systems in high-risk urban areas historically eligible for UASI funding.[7]

127.    Chicago, through CTA, timely applied to FEMA for funding under the TSGP. In its application, Chicago stated that the Chicago Police Department would use the TSGP funds to sustain 47 positions and to support the equipment purchases, training, and other components of TSGP-funded programs designed to protect Chicago's highest risk, highest consequence public transportation infrastructure from acts of terrorism. These programs help protect Chicago's public transportation infrastructure from attacks involving weapons of convenience such as bladed weapons, vehicles, fire and/or readily available household chemicals, as well as weapons of mass destruction, and other emergent threats. Chicago further stated that the TSGP award would go towards protecting crowded places, including high passenger density trains, underground and elevated passenger platforms, stations in Chicago's business district, and subway lines passing under the Chicago River.

128.    On September 26, 2025, FEMA awarded CTA $15,701,113 in TSGP funding, some of which will be allocated to Chicago.

129.    Similarly, NYC anticipated that it would receive approximately $12 million as a

---

[6]     FEMA Transit Security Grant Program FY 2025 NOFO, https://www.fema.gov/grants/preparedness/transit-security/fy-25-nofo [archived at https://perma.cc/G3LA-2369].
[7] *Id.* at § 2(A)(2).

subaward from the MTA for FY 2025. The MTA's TSGP allocation has been the subject of litigation in *New York State v. Noem*, No. 25-cv-08106 (S.D.N.Y.). NYPD uses TSGP funds to support an array of programs to support the transit system's operational security capability and capacity, including providing active shooter trainings and deploying specialized teams (described below) within the transit system every day.

130.    The FY 2025 TSGP awards incorporate the FY 2025 TSGP NOFO, so the awards incorporate the Challenged DHS Conditions.

131.    Multiple Plaintiffs also expect to apply for TSGP funds in the next Fiscal Year.

### f.    Staffing for Adequate Fire and Emergency Response (SAFER) Program

132.    Congress established the Staffing for Adequate Fire and Emergency Response (SAFER) Program to provide funding directly to local fire departments (among other entities) to help them increase or maintain the number of trained, front-line firefighters available to serve their communities.

133.    The goal of SAFER grants is to enhance local fire departments' abilities to comply with staffing, response, and operational standards established by the National Fire Protection Association, including assisting fire departments with "attain[ing] 24-hour staffing to provide adequate protection from fire and fire-related hazards."   15 U.S.C. § 2229a(a)(1)(A). SAFER grants are "awarded on a competitive basis through a neutral peer review process."   *Id*. § 2229a(a)(1)(G).

134.    The current NOFO for the SAFER Program, which is from FY 2024 but which governs awards that FEMA made through September 30, 2025, states that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in effect at

the time the award is issued."[8]

135.    Plaintiffs Denver and Saint Paul have received or been awarded, or anticipate receiving or being awarded, SAFER funding pursuant to the FY 2024 NOFO. Plaintiffs understand that the SAFER grants awarded in FY 2025 incorporate the Challenged DHS Conditions. Numerous Plaintiffs expect to apply for SAFER funding in the next Fiscal Year.

136.    For instance, Saint Paul timely applied for $2,972,367 in SAFER grant funding to fund paramedic training and firefighter training for the Saint Paul Fire Department. Denver timely applied for $581,000 in SAFER grant funding to better support Denver Fire's EMS Training Team, including by hiring three additional agency trainers and one lieutenant for the EMS training team, along with funds to cover the costs of supplies and a vehicle.

### g.    Assistance to Firefighters Grant Program (AFGP)

137.    Congress's primary goal in creating the Assistance to Firefighters Grant Program (AFGP) was to ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards. Eligible fire departments can apply for AFGP funding, 15 U.S.C. § 2229(b)(1)(A), (c), (e), which is awarded on a competitive basis, in consultation with the chief executives of the States in which the recipients are located, with the amount of grant funding capped based on statutory standards related to population size, *id*. § 2229(c)(1), (2).

138.    The Alameda County Fire Department received approximately $1.1 million in FY 2023 AFGP funds and used the money to purchase fitness equipment, provide injury prevention training and behavioral health training, and support services like critical incident stress debriefing,

---

[8] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf [archived at https://perma.cc/K9HR-5TYM].

individual counseling sessions, and family support training. The Alameda County Fire Department has applied for additional AFGP funding and anticipates applying for AFGP funding in the future to cover training fees, supplies, and other support for its firefighters.

139.    FEMA awards AFGP grants on a rolling basis. The current NOFO for the AFGP program, which is from FY 2024 but which governs awards that FEMA made through September 30, 2025, states that recipients of AFGP funds must "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award."[9]

140.    Baltimore, Saint Paul, Chicago, and Minneapolis have received or been awarded, or anticipate receiving or being awarded, AFGP funding pursuant to the FY 2024 NOFO. Numerous Plaintiffs anticipate applying for AFGP funding in the next Fiscal Year.

141.    For example, Chicago applied for $2,532,006 in AFGP funding to equip the Chicago Fire Department with necessary tools and expertise, including critically needed personal protective equipment and training to safeguard Chicago against evolving threats.

142.    As another example, Minneapolis applied in 2024 for an AFGP grant in the amount of approximately $157,000 to fund replacement of the Minneapolis Fire Department's automated external defibrillators. These defibrillators are portable electronic devices that automatically diagnose the life-threatening cardiac arrhythmias of ventricular fibrillation and pulseless ventricular tachycardia and are able to treat them through the application of electricity that stops the arrhythmia, allowing the heart to re-establish an effective rhythm.

143.    By September 30, 2025, FEMA had awarded AFGP funding pursuant to the FY 2024 NOFO in the amounts of $2,201,744.34 to Chicago, $2,687,779.43 to Baltimore, and

---

[9] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program, https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92-f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf [archived at https://perma.cc/A2KE-3D4M].

$679,543.63 to Saint Paul. The AFGP award agreements include the Challenged DHS Conditions.

### h. Fire Prevention and Safety (FP&S) Grants

144. Congress created Fire Prevention and Safety (FP&S) Grants to "assist[] fire prevention programs and support[] firefighter health and safety research and development." 15 U.S.C. § 2229(d)(1). Eligible fire departments can apply for funding, which is awarded on a competitive basis. *Id.* § 2229(d)(1)(A), (e). Funding may be used to, among other things, support public education campaigns, enforce fire codes, and promote compliance with fire safety standards. *Id.* § 2229(d)(3).

145. FEMA awards FP&S grants on a rolling basis. The current NOFO for the FP&S program, which is from FY 2024 but governs awards that FEMA made through September 30, 2025, states that recipients of FP&S funds must "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award."[10]

146. Plaintiffs Baltimore, Minneapolis, Nashville, and Saint Paul have applied for FY 2024 FP&S funding. Baltimore has received and accepted an FY 2025 award, and Minneapolis's, Nashville's, and Saint Paul's applications remain pending.

147. Plaintiffs anticipate that any FP&S Funds awarded in FY 2025 would incorporate the Challenged DHS Conditions via incorporation of the respective NOFO (which incorporates the "DHS Standard Terms and Conditions in effect as of the date of the federal award"). For example, Baltimore's FY 2025 FP&S Award incorporates the FY 2022 NOFO, which incorporates the "DHS Standard Terms and Conditions in effect as of the date of the federal award."

148. Minneapolis timely applied for $43,000 in FP&S grant funding for community risk

---

[10] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Fire Prevention and Safety (FP&S) Grant Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_fps-nofo_fy24.pdf [archived at https://perma.cc/JK8K-S656].

reduction equipment in the form of a fire extinguisher training system for community training.

149.    Saint Paul timely applied for $92,857 in FP&S grant funding for supplies for Project Safe Haven, a program for residents to improve the fire safety of their homes. This includes purchasing smoke alarms, carbon monoxide alarms, and stove top fire stops.

150.    Nashville timely applied for $953,619.04 in FP&S funding to provide salaries for two fire/arson investigators to conduct investigations into fire incidents, including structural and vehicle fires that have no cause determinations. The funding would be used to purchase a fire safety trailer, which mimics real-life scenarios of common fire-related threats. Nashville would use the trailer to educate the community, including schoolchildren, about fire prevention and safety through fire simulation. Nashville's application remains pending.

### i.    Port Security Grant Program (PSGP)

151.    The Port Security Grant Program (PSGP) provides federal funding to state, local, territorial, and private-sector partners to help protect critical port infrastructure from terrorism and other emergencies, enhance maritime domain awareness, improve port-wide maritime security risk management, and maintain or reestablish maritime security mitigation protocols that enhance port recovery and resiliency capabilities.

152.    PSGP funds have been available to eligible entities since the program was created by the Maritime Transportation Security Act of 2002. The program is codified at 46 U.S.C. § 70107.

153.    Eligible entities such as port authorities and local government agencies may apply for funding, which is awarded on a competitive basis. *Id*. § 70107(g). Funding can be used for planning, operational activities, equipment and capital projects, training and awareness campaigns, and maintenance and sustainment.

154.    Boston, Baltimore, Saint Paul, New Haven, and NYC have received or been awarded, or anticipate receiving or being awarded, FY 2025 PSGP funding. Alameda County and Chicago applied for FY 2025 PSGP funding, but have not heard back. Both entities intend to apply for PSGP funding in the future.

155.    Nashville, which sits on the Cumberland River, has previously been awarded PSGP funds to acquire a multi-hazard rapid maritime response boat and anticipates drawing down on the funds this fiscal year. Alameda County Fire Department has received PSPG funding in previous years. Both Nashville and Alameda County Fire Department anticipate applying for future PSPG funds.

156.    The Boston Police Department will use PSGP funds to support the Harbor Patrol Unit with the purchase and replacement of critical equipment and to train and equip all Harbor Patrol Unit officers with Basic Ice Rescue Training. Baltimore anticipates using PSGP grant funds to cover attendance by Baltimore City Fire Department Personnel at training courses at the Maryland Fire and Rescue Institute, the Port of Virginia Marine Command School, and the Port of Hampton Roads. Saint Paul anticipates using PSGP grant funds to support the Saint Paul Police Department's purchase of rescue boats. And New York uses PSGP funds through the New York City Department of Transportation, which anticipated using the funds for Cybersecurity assessment, enhancement and planning to protect critical transportation infrastructure from acts of terrorism and cyber attacks, and to comply with the US Coast Guard's Final Rule on Cybersecurity in the Marine Transportation System.

157.    FEMA's FY 2025 PSGP NOFO directed applicants to apply for funding by August 15, 2025, and stated that the award date would be no later than September 30, 2025.[11] The

---

[11] FEMA, FY 2025 PSGP NOFO (Aug. 13, 2025), https://files.simpler.grants.gov/opportunities/b90b5e63-27e6-497c-9872-0e2a89a4dac7/attachments/69c6d261-1758-4906-924d-

NOFO states that recipients of PSGP funding "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award."

158.    By September 30, 2025, FEMA had awarded FY 2025 PSGP grant funding in the amount of $717,926 to Boston, $25,000 to Saint Paul, $170,175 to NYC, $93,597 to New Haven, and $537,120 to Baltimore. The PSGP award agreement includes the Challenged DHS Conditions.

### j. **Securing the Cities (STC)**

159.    Congress established the Securing the Cities (STC) program to "enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C. § 596b(a).

160.    The STC program supports "State, local, Tribal, and territorial governments in designing and implementing, or enhancing existing, architectures for coordinated and integrated detection and interdiction of nuclear or other radiological materials that are out of regulatory control." *Id*. § 596b(b)(1).

161.    Originally launched as a pilot program, the STC program was codified by Congress as part of the Countering Weapons of Mass Destruction Act of 2018. 6 U.S.C. § 596b.[12]

162.    DHS has for years entered into cooperative agreements that award funds to 13 local governments—including Plaintiffs Chicago, Boston, Denver, and NYC[13]— in urban regions that

---

fabbddf77b30/FY_2025_PSGP_NOFO_08_06_25_508-ed.pdf [archived at https://perma.cc/RY5R-8TP5]

[12] STC recipients enter into "cooperative agreements" with DHS. Unlike grant agreements, cooperative agreements are used when the federal agency will be "substantial[ly] involve[d]" in "carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305. For ease of reference, Plaintiffs describe their STC agreements as grant agreements herein.

[13] Boston, Chicago, and Denver are plaintiffs in unrelated pending litigation challenging the DHS Defendants' unlawful freezing of STC funds and prohibition on certain equipment purchases. *See City of Chicago et al. v. DHS*, No. 25-cv-5462 (N.D. Ill.).

DHS deems to be at an elevated risk of sustaining terrorist attacks.

163.     Chicago, Boston, Denver, and NYC have used Securing the Cities funds to buy, and train employees to use, equipment designed to detect nuclear and other radiological materials that could be used to commit terrorist attacks. Plaintiffs employ the equipment and personnel funded by Securing the Cities to conduct security sweeps at athletic events, concerts, parades, political rallies, and the like.

164.     For example, the Chicago Fire Department has used STC funds to buy equipment designed to detect nuclear and other radiological materials—equipment that is critical to protecting public safety. CFD has likewise used STC funds to create and implement a program that trains employees to use detection equipment and respond to terrorist attacks; pay the salaries of full-time CFD employees responsible for managing the program; and conduct sweeps and provide other services at pre-planned special events, such as the 2024 Democratic and Republican National Conventions.

165.     The Boston Police Department uses STC funding to purchase radiation detection equipment, including personal detection equipment and nuclear and radiological detection equipment for vehicles and vessels. The funds are also used to conduct annual trainings throughout the New England region in coordination with state and local law enforcement, and special trainings leading up to large public events, such as the Boston Marathon, First Night (New Year's Eve), and the Boston Pops 4th of July Fireworks Spectacular.

166.     By September 30, 2025, DHS's Countering Weapons of Mass Destruction Office awarded carryover-only grant funding to Chicago in the amount of $3,175,000, Boston in the amount of $2,838,640.41, Denver in the amount of $1,899,805.86, and NYC in the amount of $14,399,136.59. The carryover awards include the Challenged DHS Conditions.

167.   None of the statutes authorizing the grant programs described in paragraphs 42 to 166 above give DHS the authority to impose the Challenged DHS Conditions.

## III.   DHS Introduces and Imposes New Terms and Conditions for Federal Funding That Are Unrelated to Emergency Management but Advance the Administration's Political Agenda

### a.   The Executive Branch's Efforts to Impose Its Political Agenda Through Federal Grant Funding

168.   Since his first day in office, President Trump has issued executive orders that have initiated, and directed federal agencies to participate in, a coordinated effort to impose his political agenda on state and local governments and other grantees across the country. That effort has included actions to recast American civil rights laws as prohibiting policies that the President and federal agencies have generally and non-specifically described as "promot[ing]" or "advanc[ing]" what his orders have described as "diversity, equity, and inclusion" (DEI), "diversity, equity, inclusion, and accessibility" (DEIA), and "gender ideology,"[14] even though many such policies

---

[14] *See, e.g.*, Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking") (requiring federal officials to ensure discretionary grants "demonstrably advance the President's policy priorities" and prohibiting them from awarding discretionary grants that "fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic" or "promote anti-American values"); Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling") (asserting that "schools indoctrinate their children in radical, anti-American ideologies" but should instead "instill a patriotic admiration for our incredible Nation and the values for which we stand," and requiring development of an "Ending Indoctrination Strategy" to eradicate federal support for "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology," as defined); Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity") (criticizing, without substantively defining, DEI and DEIA policies as "undermin[ing] national unity" and embodying "dangerous, demeaning, and immoral race- and sex-based preferences"); Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing") (directing all federal agency heads to terminate "all . . . 'equity-related' grants or contracts[] and all DEI or DEIA performance requirements for employees, contractors, or grantees," without substantively defining DEI or DEIA); Exec. Order No. 14168 of Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government") (directing that "Federal funds shall not be used to promote gender ideology," as defined to include the recognition of "self-assessed gender identity" and the distinction between sex and gender); Exec. Order No. 14148 of Jan. 20, 2025, 90 Fed. Reg. 8,237 ("Initial Rescission of Harmful Executive Orders and Actions") (revoking President Biden

are lawful under existing federal laws and regulations.

169.  For example, President Trump issued an executive order that directs agency heads to include the Discrimination Condition in every grant award. *See* Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) ("DEI Order"). The DEI Order requires the Director of the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles, under whatever name," from federal grants for the stated purpose of, among other reasons, "comply[ing] with civil-rights laws." *Id.* § 3(c)(ii) (emphasis added). It also directs the OMB Director to "[t]erminate all" programs related to "diversity," "equity," "equitable decision-making," or "advancing equity," as "appropriate," without regard to whether the programs violate federal law. *Id.* § 3(c)(iii).

170.  In a memorandum dated February 5, 2025, Attorney General Pamela Bondi informed Department of Justice employees that the DEI Order "mak[es] clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws.'"

171.  More recently, in a July 29, 2025 memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" (the "Discrimination Guidance Memo"), Attorney General Bondi promoted the Administration's skewed view of DEI and DEIA programs by purporting to provide "guidance" concerning various practices that would be viewed as constituting unlawful discrimination. For instance, despite court decisions holding exactly to the contrary, the Discrimination Guidance Memo states that "allow[ing] males, including those self-identifying as 'women,' to access single-sex spaces designed for females . . . undermine[s] the privacy, safety, and equal opportunity of women and girls." The Memo directs federal funding

---

executive orders relating to, among other topics, diversity, equity, gender identity, and sexual orientation).

recipients to "affirm sex-based boundaries rooted in biological differences" in order to "ensure compliance with federal law."[15]

172.    Thereafter, in a notice that FEMA distributed widely by email on September 3, 2025, FEMA "advise[d] recipients and subrecipients to review and adhere to the Attorney General's" Discrimination Guidance Memo.

173.    More broadly, the President has used executive orders as a forum to direct Administration officials to take steps to embed his political agenda into the federal government's grant agreements, service agreements, and other contracts across subject-matter areas and around the country. In the first nine months of his current Term, President Trump has already issued more than 200 executive orders, many of them purporting to leverage federal contracts and grants to achieve political ends, including related to the subject matters of the Discrimination Condition in the Challenged DHS Conditions.

### b. Defendants Adopt and Incorporate the Challenged DHS Conditions into the Agency's Standard Terms and Conditions for FY 2025

174.    Consistent with the agenda and directions laid out in the President's executive orders thus far, DHS revised the standard terms and conditions applicable to FY 2025 grants, cooperative agreements, fixed amount awards, and other types of federal financial assistance. These revisions have attempted to implement the current federal Administration's efforts to compel grantees to abandon policies and programs that encourage diversity, equity, inclusion, and accessibility despite clear statutory and decisional law that many such programs are lawful, as well

---

[15] Att'y Gen'l, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl [archived at https://perma.cc/UG5N-TJ25]; *see also* Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU]; Att'y Gen'l, Endling Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl [archived at https://perma.cc/B4JZ-PQXZ].

as to cease other activities that do not match the Administration's political agenda.

175. Specifically, DHS had adopted and issued a document it called "FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025,"[16] which is referred to herein as the "Standard DHS Terms" and is attached hereto as Exhibit A.[17]

176. As relevant here, the Standard DHS Terms contain two sets of conditions that did not exist in any version of the DHS Terms and Conditions issued before January 20, 2025: the Discrimination Condition described in paragraph 177, and the Executive Order Condition described in paragraph 178 (together, the Challenged DHS Conditions).

177. *The Discrimination Condition*. The terms referred to herein as the "Discrimination Condition" are comprised of all of Section C.XVII of the Standard DHS Terms, entitled "Anti-Discrimination," except for Subsections C.XVII(1)(e) and C.XVII(2)(a)(iii) of that Section. Specifically, the following conditions are collectively referred to herein as the "Discrimination Condition":

> Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).[18]

---

[16] DHS, FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025, https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [archived at https://perma.cc/NTU7-D6ES].

[17] In early August 2025, DHS modified the Discrimination Condition in its Terms and Conditions to remove a definition of the term "discriminatory prohibited boycott" that had referred solely to "commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business." *Compare* Par. 177 *with* https://web.archive.org/web/20250708201331/https://www.dhs.gov/sites/default/files/2025-04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [archived at https://perma.cc/F4KL-LXLA], at Section C.XVII(1)(d) (Version 3 as DHS had uploaded it in April 2025); A. Rubin, *DHS denies tying FEMA funds to Israel stance*, Axios (Aug. 4, 2025), https://www.axios.com/2025/08/04/trump-dhs-fema-relief-israel-boycotts [archived at https://perma.cc/2RGQ-7NY3]. DHS did not document this change and withdrew from public access the version of the Terms and Conditions that had contained the definition.

[18] There is no section 372 in title 31 of the United States Code. Plaintiffs understand DHS to intend this

(1) Definitions. As used in this clause –

    (a) DEI means "diversity, equity, and inclusion."

    (b) DEIA means "diversity, equity, inclusion, and accessibility."

    (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

    (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

    (e) [*immigration-related provision omitted*]

(2) Grant award certification.

    (a) By accepting the grant award, recipients are certifying that:

        (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

        (ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

        (iii) [*immigration-related provision omitted*]

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

178. *The Executive Order Condition*. Section C.XXXI of the Standard DHS Terms, entitled "Presidential Executive Orders" and referred to herein as the "Executive Order Condition," provides: "Recipients must comply with the requirements of Presidential Executive Orders related

---

provision to refer to 31 U.S.C. § 3729(b)(4), which defines the term "material" for purposes of the False Claims Act.

to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *See* Ex. A at 9.

179. Separate from the Challenged DHS Conditions, DHS's standard terms and conditions have long required recipients of grant funding to comply with specified civil rights and antidiscrimination laws while performing activities under the grant at issue. These provisions are referred to collectively herein as the "Civil Rights Conditions" and are as follows:

a. Section C.III, entitled "Age Discrimination Act of 1975," requires recipients to "comply with the requirements of the Age Discrimination Act of 1975, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq*.)."

b. Section C.IV, entitled "Americans with Disabilities Act of 1990," states that "Recipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213)."

c. Section C.VII, entitled "Civil Rights Act of 1964 – Title VI," requires recipients to "comply with the requirements of Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq*.)," including "DHS implementing regulations for the Act [that] are found at 6 C.F.R. Part 21" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 7."

d. Section C.VIII, entitled "Civil Rights Act of 1968," requires recipients to "comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq*.), . . . as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100," including with respect to "new multifamily housing with four or more dwelling units" as described in "24

C.F.R. Part 100, Subpart D."

e. Section C.XIV, entitled "Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX," requires recipients to "comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq*.)," including "DHS implementing regulations [that] are codified at 6 C.F.R. Part 17" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 19."

f. Section C.XVI, entitled "Equal Treatment of Faith-Based Organizations," states: "It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries. Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs."

g. Section C.XXIV, entitled "Limited English Proficiency (Civil Rights Act of 1964, Title VI)," states: "Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help-department-

supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov."

h. Section C.XXXIII, entitled "Rehabilitation Act of 1973," states: "Recipients must comply with the requirements of Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794)."

**c. Defendants Adopt, Attach, and Impose Additional Requirements that Repeat or Implement the Challenged DHS Conditions.**

180.    Plaintiffs' challenge to the Challenged DHS Conditions is intended to reach all documents or other requirements of any kind that Defendants have adopted, attached, or otherwise imposed, whatever their location, to the extent they purport to impose the same or materially similar obligations as the Challenged DHS Conditions and also to the extent that Defendants would leverage them to repeat, advance, or implement the Challenged DHS Conditions with respect to DHS funding. This includes, but is not limited to, the DEI Disclosure Requirement described in paragraph 184 below and the FEMA Hazard Mitigation Assistance Program and Policy Guide described in paragraph 185 below.

181.    On or about August 20, 2025, Defendants adopted and published the FEMA Preparedness Grants Manual, FM-207-23-001 (the "Grants Manual"). The Grants Manual includes a variety of requirements that are made binding on grantees, including subrecipients, of FEMA's preparedness grant programs by the plain terms of the Grants Manual itself, and also by the NOFOs for each grant program, which FEMA incorporates by reference into grant awards and which in turn state that grantees must comply with the Grants Manual.

182.    The Grants Manual states that several of its sections "received new or refreshed content for Fiscal Year (FY) 2025, mainly to align with updated standard language included across FEMA's FY 2025 NOFOs."

183.    The Grants Manual states that grant recipients "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award" (Section 4) and reiterates the Executive Order Condition verbatim (Section 4.1).

184.    In another section, the Grants Manual requires grantees to disclose certain information about subrecipients with every reimbursement request the grantee submits. FEMA may withhold requested payments if the grantee fails to disclose the required information. One such required disclosure (the "DEI Disclosure Requirement") is "whether the subrecipient has any diversity, equity, and inclusion practices."  The DEI Disclosure Requirement appears to implement the Discrimination Condition and facilitate FEMA's enforcement of that Condition.

185.    Other DHS documents likewise contain provisions that could be construed to advance or implement the Challenged DHS Conditions. For example, the FEMA Hazard Mitigation Assistance Program and Policy Guide states that it "outline[s] the policy and procedure requirements" related to HMA and other hazard mitigation grant programs. The Guide states that "[h]azard mitigation activities must adhere to all relevant statutes, regulations and requirements," including, expressly, all "applicable federal . . . laws[,] implementing regulations[,] and executive orders."[19]

### d. Defendants Unlawfully Impose the Challenged DHS Conditions and Other Requirements that Adopt, Attach, Impose, and/or Implement those Conditions.

### i.    Defendants Attach the Challenged DHS Conditions.

186.    Defendants have attached the Challenged DHS Conditions to all of their grant awards, thereby conditioning disbursement of grant funding to all direct grantees and subgrantees

---

[19] FEMA, *FEMA Hazard Mitigation Assistance Program and Policy Guide*, Version 2.1, FEA No. FP-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, at v, 555-557 (Jan. 20, 2025), available at https://www.fema.gov/sites/default/files/documents/fema_hma-guide-v2.1_2025.pdf (last accessed Sept. 30, 2025).

on their agreement to those conditions. Defendants' application of the Discrimination Condition and the Executive Order Condition across the board, to all grants, is consistent with the plain language of the Standard DHS Terms themselves, which state that they apply to all federal awards issued during FY 2025 unless a specific provision says otherwise.

187. Defendants have subjected all costs charged to all of FEMA's Preparedness Grants, including HSGP-SHSP, HSGP-UASI, TSGP, PSGP, and EMPG, to the DEI Disclosure Requirement.

### ii. Defendants Lack Authority to Impose the Challenged DHS Conditions.

188. Defendants' adoption of an across-the-board policy to impose—and actual imposition of—the Challenged DHS Conditions is *ultra vires*, arbitrary and capricious, contrary to law and the Constitution, and in excess of even Congress's legislative power to impose conditions on federal funding.

189. No statute confers upon any of the Defendants the power to require grantees and subgrantees to agree to any of the Challenged DHS Conditions in order to obtain the federal funds at issue. Indeed, many of the authorizing statutes expressly forbid the Executive Branch from withholding the grant funding at issue. *See, e.g.*, 6 U.S.C. § 605(e)(1)(A)(v) (FEMA administrator "shall ensure" that each State receive a minimum allocation of SHSP funds); *id.* § 762(d) (FEMA administrator "shall first apportion" a baseline amount of each year's apportionment of EMPG funds to States and "shall apportion" the remainder of such amounts on a population-share basis). The Challenged DHS Conditions thus disregard Congress's carefully designed statutory schemes for each grant program. Nor does Article II of the Constitution grant the Executive Branch any power of its own to impose spending conditions unilaterally, because that is a legislative power reserved to Congress under Article I.

190. To make matters worse, the Challenged DHS Conditions purport to regulate Plaintiffs' conduct outside of Defendants' federally funded programs. For example, the Discrimination Condition requires grantees to certify that they do not "operate *any* programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." (Emphasis added). The federal government has conceded that a similar condition implemented by another agency requires a grantee to "certify that it does not operate *any* program that promotes DEI, irrespective of whether the program is federally funded." *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025) (emphasis added). Congress did not authorize Defendants to regulate conduct that is unrelated to Defendants' federal grants.

191. In short, Defendants have no authority whatsoever to adopt the Challenged DHS Conditions or attach those conditions to Plaintiffs' grant and subgrant funding. Yet that is precisely what they have done.

### e. The Challenged DHS Conditions Are Ambiguous, Based on Incorrect Views of the Law, and May Require Grantees to Violate the Constitution

#### i. The Challenged DHS Conditions Are Ambiguous

192. The Challenged DHS Conditions are ambiguous and could be read to demand that grantees violate the Constitution itself.

193. *First*, the Discrimination Condition is vague and ambiguous because it fails to make clear what conduct is prohibited and fails to specify clear standards for enforcement by the Secretary of Homeland Security or her designee.

194. The Discrimination Condition is also vague and ambiguous because it does not define the terms "DEI" and "DEIA" (other than by listing the words that each letter in each acronym represents); the term "operate" with respect to "program"; the terms "advance" and "promote" with respect to DEI, DEIA, and discriminatory equity ideology; or the term

"discriminatory prohibited boycott."

195.    The terms DEI and DEIA are expansive and could be understood to include conduct and speech that are lawful under the First Amendment and settled and longstanding understandings of civil rights law. And the term "prohibited discriminatory boycott" is entirely undefined.

196.    As written, the DEI condition is unclear, and it is not fair or lawful to require Plaintiffs to certify to a vague condition.  The vagueness and ambiguity of the Discrimination Condition leaves Plaintiffs vulnerable to different interpretations from the federal government. This is perilous because the federal government appears intent on enforcing its views of DEI on grant recipients through False Claims Act enforcement and funding suspensions and terminations.

197.    That the Discrimination Condition purports to prohibit "programs that advance or promote DEI, DEIA, or discriminatory equity ideology *in violation of Federal anti-discrimination laws*" (emphasis added), only adds to this ambiguity. For example, it is possible to read the Condition as stating, contrary to prevailing law, that all such programs violate Federal anti-discrimination laws—particularly in light of the federal Administration's actions, including the DEI order and Attorney General Bondi's memoranda described above. But the Supreme Court has made clear that not all discussions of how race affects a person's life, "be it through discrimination, inspiration, or otherwise," are unlawful. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230–31 (2023).

198.    Indeed, the Discrimination Condition provides that DHS "reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient" operates impermissible DEI programs—seemingly regardless of whether the Secretary's views comport with authoritative

judicial pronouncements.

199. The presence of the separate Civil Rights Conditions further suggests that the Discrimination Condition could be read to prohibit all programs that "advance or promote DEI, DEIA, or discriminatory equity ideology"; there should be no need to include the Discrimination Condition if programs that "advance or promote DEI, DEIA, or discriminatory equity ideology" also violate the Civil Rights Conditions.

200. Similarly, the Executive Order Condition seemingly demands that grantees 'comply' with an executive order asserting the authoritativeness of the President's and the Attorney General's pronouncements on questions of law. *See* Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448 ("Ensuring Accountability for All Agencies"). That Executive Order, in turn, could be read to include the Attorney General's Discrimination Guidance Memo, even though that memo is in some important ways at odds with judicial interpretation.

201. The Executive Branch's insistence on unlawfully re-interpreting discrimination law makes it challenging for grantees to understand the conditions with which they are agreeing to comply. As a result, seemingly benign requirements, such as complying with Title VI of the Civil Rights Act of 1964, are treacherous: Plaintiffs cannot take comfort in agreeing to abide by well-settled federal law. Instead, Defendants may seek to require Plaintiffs to adhere to the President and Attorney General's interpretations of Title VI, which are both untethered to judicial interpretations and lacking in authority. This is true for all of the Civil Rights Conditions.

202. To remedy that particular harm, any relief related to the Discrimination and Executive Order Conditions must also clarify that the references to statutes in the Civil Rights Conditions mean those statutes as enacted by Congress and interpreted by the judiciary, such that it would not be a breach of those conditions for a grantee to take actions that comply with the law

as interpreted by the courts, even if those actions run counter to the Executive's view of those laws.

203.    *Second*, the Executive Order Condition is vague and ambiguous because it fails to define or provide meaningful contours on the scope of the term "related to grants."

204.    The Condition is also vague and ambiguous because, as discussed below in paragraph 212, executive orders do not apply by their terms to federal grant recipients. Even if executive orders could be said to directly regulate grantee behavior, the Executive Order Condition compounds ambiguities atop ambiguities because the executive orders themselves are replete with broad and ambiguous terms and instructions—such as what it means to "demonstrably advance the President's policy priorities" or to "promote," "encourage," or "facilitate" "racial preferences," "denial . . . of the sex binary . . . or the notion that sex is a chosen or mutable characteristic," or "initiatives that compromise public safety or promote anti-American values";[20] to "instill a patriotic admiration for our incredible Nation and the values for which we stand" or to engage in "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology";[21] to advocate or advance "immoral race- and sex-based preferences";[22] to conduct activities that are "equity-related" or contain "DEI or DEIA performance requirements";[23] or "to promote gender ideology."[24]

205.    The scope and meaning of the Executive Order Condition is also incapable of being

---

[20] Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking").

[21] Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling").

[22] Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity").

[23] Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing").

[24] Exec. Order No. 14168 dated Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government").

ascertained to the extent it purports to obtain grantees' acquiescence in advance to conditions that may come into existence in the future, if and to the extent the President subsequently issues or amends executive orders related to grants.[25]

206.     It is exceedingly likely that additional grant-related executive orders will issue. President Trump has already signed well over twice as many executive orders in the first eight months of the current presidential Term than any President in the last seventy years has issued in any one full calendar year.

### ii.     The Challenged DHS Conditions Are Based on Incorrect Views of the Law

207.     As noted above with respect to the Discrimination Condition and Executive Order Condition, the Executive Branch attempts to rewrite federal anti-discrimination law rather than apply the law as it has long been understood and interpreted by the courts.

208.     For example, Attorney General Bondi's Discrimination Guidance Memo states that organizations must "affirm sex-based boundaries rooted in biological differences," even though the Administration's insistence on "the sex binary" and its refusal to recognize the reality of gender identity is inconsistent with governing law. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 662, 669 (2020) ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms[.] … [D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.").

209.     Moreover, neither the text of Title VI nor any other federal anti-discrimination statute supports the federal Administration's insistence that it is unlawful to accord any concern

---

[25] Those future conditions would also violate the spending power for the additional, independent reason that they would be a surprise and would be imposed post-acceptance.

and attention to diversity, equity, or inclusion, let alone that the federal government can bar recipients of federal funding from doing so.

210.    The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.

211.    Indeed, existing case law firmly rejects the Executive Branch's unmoored assertions regarding nondiscrimination law with respect to DEI, and instead holds that neither the Constitution nor federal antidiscrimination laws prohibit affinity groups and DEI trainings and initiatives, whether by governmental or nongovernmental entities. *E.g.*, *Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 939-40 (W.D. Wash. 2025) (although "D.E.I. initiatives" and conversations about race, sex, and other matters "may prompt discomfort or spark debate, they do not necessarily violate anti-discrimination laws. Multiple courts in recent years have reached the same conclusion … Quite the opposite, many courts have held that anti-discrimination trainings play a vital role in preventing workplace discrimination…. D.E.I. and anti-discrimination trainings are not per se unlawful.") (collecting cases).

212.    The Executive Order Condition is similarly misguided because executive orders express general policy and are addressed to the Executive Branch; they do not by their terms apply to, or impose any requirements on, federal grant recipients.

213.    Nonetheless, several executive orders that could be described as "related to grants" have broad and ambiguous language that could be read to impose conditions materially similar to the Discrimination Condition. Those include the executive orders cited in paragraphs 168–69 and 173 above.

214.    One Executive Order could be read as requiring grantees and subgrantees to agree that the Discrimination Condition is material for purposes of the False Claims Act. *See* Exec. Order

No. 14173 of Jan. 21, 2025, § 3(b)(iv)(A), 90 Fed. Reg. 8,633, 8,634.

215.    Another could be read as purporting to force grantees and subgrantees to accede to the legal interpretations of President Trump and the Attorney General, even when those interpretations contravene settled law. Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448 ("Ensuring Accountability for All Agencies") ("The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties.").

### iii.    The Challenged DHS Conditions May Require Grantees to Violate the Constitution

216.    The Discrimination Condition and Executive Order Condition could require grantees to unconstitutionally police speech and First Amendment activity of the subgrantees. This is not an unsupported concern. In late September 2025, FEMA widely distributed an email announcement bulletin that federal funding recipients will be prohibited from "empower[ing] radical organizations with unseemly ties that don't serve the interest of the American people," no phrase of which is further defined.[26]

217.    The same week, the President issued a National Security Presidential Memorandum directing Defendant Noem and other federal officials to develop a "comprehensive strategy" to "disband and uproot networks, entities, and organizations" that are identified by "indicia" including "extremism on migration, race, and gender" and "hostility towards those who hold traditional American views on family, religion, and morality." None of those phrases is defined or

---

[26]    FEMA Bulletin for Week of September 23, 2025, https://content.govdelivery.com/accounts/USDHSFEMA/bulletins/3f4027a [archived at https://perma.cc/4T29-FYEE].

clarified.[27]

218.    These communications show the federal Administration's attempts to stifle grantees' speech. They likewise show the Administrations' goal of requiring grantees to police the speech of affiliated third parties or the speech and activities occurring in grantee-owned but otherwise public property and spaces.

## IV.    Plaintiffs Must Either Agree to Unlawful Conditions or Forego Funding Critical to Protecting People and Property

219.    Defendants now insist that Plaintiffs are not entitled to these critical funds unless they acquiesce to the federal Administration's domestic political agenda. There is no legal basis for Defendants' adoption of the Challenged DHS Conditions, nor is there any lawful basis for the Defendants to attach those conditions to Plaintiffs' grants.

220.    Nonetheless, the sweeping imposition of the Challenged DHS Conditions on the receipt of federal funds now imperils tens of millions of dollars in DHS and FEMA grant funding to Plaintiffs—and billions to local governments across the country. Plaintiffs have received these grants and subgrants for many years—often annually—and rely on such funding for their emergency preparedness and anti-terrorism and security programs.

221.    Congress intended and directed that the funds be spent to fund disaster preparedness, mitigation, and recovery for State and local governments.

222.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by heightened risk of False Claims Act claims, or forgoing the

---

[27] National Security Presidential Memorandum No. 7/NSPM-7, at § 1 (Sept. 25, 2025), 90 Fed. Reg. XXXX, XXXX.

benefit of hundreds of millions of dollars in grant funds that fund crucial local planning, preparation, mitigation, deployment, and recovery activities essential to keeping their residents safe and saving lives.

223.    The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services anticipated to be covered by the grants. Because of the lag between the start of many Plaintiffs' fiscal years in July and the federal fiscal year in October, and due to the annual and routine granting of these awards to Plaintiffs, Plaintiffs built their FY 2025 fiscal year budgets anticipating receiving funding from federal grants administered by DHS, including FEMA.

224.    Ongoing budgetary uncertainty will require many Plaintiffs to reconsider their staffing, including by considering layoffs of employees across departments. Such losses would drain Plaintiffs of employees with decades of accumulated knowledge and experience crucial to effectively and efficiently serving their residents.

225.    The losses would also substantially reduce the ability of Plaintiffs to provide critical basic public services due to their depleted workforces. Should Plaintiffs experience a new natural disaster or terrorist event, they will be in the untenable position of needing to provide immediate, costly emergency response and disaster relief with uncertainty about whether any FEMA reimbursement will ever come.

226.    Even if Plaintiffs ultimately obtain funding, the interim uncertainty and resulting loss of employees will impose irreparable harms, including the need to rehire employees who had to obtain new jobs. *Cf. AFGE v. Trump*, 784 F. Supp. 3d 1316, 1356 (N.D. Cal.) ("widespread termination of salaries and benefits for individuals, families, and communities" would cause "irreparable harm" because "agencies will not easily return to their prior level of operations," even

59

if ordered by a court to rehire), *stayed on other grounds sub nom.*, *Trump v. AFGE*, 606 U.S. ---, 145 S. Ct. 2635 (2025).

227.    The impact of this uncertainty has a domino effect on public safety and community preparedness across Plaintiffs' entire regions because of the deeply interconnected framework within which emergency management is carried out.

228.    For example, Denver's Office of Emergency Management (OEM) is a regional leader in emergency preparedness. OEM hosts trainings for its regional partners and also applies for and administers federal emergency preparedness programs on behalf of its regional partners. If Denver were forced to choose to forego DHS and FEMA funding, the impact of losing these funds would spill over to other jurisdictions in the Denver Metropolitan Statistical Area and undermine emergency preparedness for over two million people.

229.    Similarly, New York City's Police Department (NYPD) is the direct recipient of STC funds and lead partner for the region's STC program. In this role, NYPD enhances regional capabilities to detect and interdict illicit radiological materials by coordinating with over 300 partners and sub-partners in the greater New York City metropolitan area. Without this funding, the City and its partners would be significantly compromised in their ability to detect and defend against a radiological and/or nuclear attack.

230.    At the start of 2025, Hennepin County employed 15.5 full time employees in its Emergency Management Department. Of these, five were funded by 50% EMPG grants and the required 50% county match. Another five and a half employee salaries were fully funded by UASI grants. Therefore 68% of the county emergency management staff were either fully or partially funded with DHS/FEMA funding. The uncertainty around the availability and timing of these funds is causing staff turnover and making it harder for Hennepin County to fill the critical roles

in its Emergency Management Department.

231. Plaintiffs are especially at risk of harm because Defendants have intentionally crafted the conditions to expose grantees to liability under the False Claims Act based on actions that are lawful under the judiciary's authoritative interpretation of federal antidiscrimination law. It is invariably harmful for any entity to face unwarranted threats of criminal investigation or prosecution or lawsuits that could have such significant economic consequences. That is all the more true here, where the threat is tangible, concrete, and imminent, and where the federal Administration itself is proactively moving to substantially increase the risks and stakes.

232. DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential liability under the False Claims Act as a "weapon" it will deploy, and has "strongly encouraged" private parties to bring civil suits.

233. Todd Blanche, the Deputy Attorney General, called the False Claims Act the DOJ's "primary weapon" in this fight. He announced on May 19, 2025 that the Department of Justice (DOJ) would set up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws"— or, more accurately, the Administration's reimagining thereof. The announcement asserts that the False Claims Act "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal

funding recipients." DOJ also "strongly encourages" private lawsuits under the Federal Claims Act.[28]

234.    The DOJ reaffirmed this threat on June 11, when Assistant Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[29]

235.    The False Claims Act imposes substantial civil liability on "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). As noted, both the federal government and any private citizen may sue a recipient of federal funds for False Claims Act violations. *Id.* § 3730. If found liable, a funding recipient faces potential treble damages. The same conduct may also give rise to criminal liability, including up to five years imprisonment. 18 U.S.C. § 287.

236.    The Discrimination Condition expressly cites the False Claims Act, stating that recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372[9](b)(4)"—that is, for purposes of the False Claims Act.

237.    The Discrimination Condition also states that if DHS concludes that a grantee violated a grant condition, "all amounts" previously received by the grantee "will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law."

---

[28]    Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU].

[29]    Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl [archived at https://perma.cc/QL7T-33TH].

238.    As noted above, the federal Administration has also threatened civil and criminal penalties against funding recipients based on allegedly false certifications about DEI practices.

239.    The federal Administration has already initiated investigations into Plaintiffs and others for allegedly unlawful DEI practices. For example, in May 2025, the Department of Justice's Civil Rights Division sent a letter to Chicago Mayor Brandon Johnson announcing that the Department of Justice "is opening an investigation to determine whether the City of Chicago, Illinois, is engaged in a pattern or practice of discrimination based on race, in violation of Title VII." The letter explained that the investigation "is based on" Mayor Johnson's alleged remarks highlighting the number of Black officials in the Mayor's administration.[30]

240.    In October 2025, White House Office of Management and Budget Director Russ Vought announced that "$18 billion in New York City infrastructure projects have been put on hold to ensure funding is not flowing based on unconstitutional DEI principles."[31] The U.S. Department of Transportation has likewise withheld more than $2 billion in funding from the Chicago Transit Authority while the Administration investigates whether the Authority has violated anti-discrimination laws, citing allegations that the Authority "has regularly touted its DBE [Disadvantaged Business Enterprise] goals as a key part of its equity mission."[32]

---

[30] Letter from Harmeet K. Dhillon to The Honorable Brandon Johnson, May 19, 2025, https://www.justice.gov/crt/media/1400811/dl?inline.
[31] Russ Vought (@russvought), Twitter (Oct. 1, 2025, 8:54 a.m.), https://x.com/russvought/status/1973386129320665329.
[32] Press Release, U.S. Dep't of Transp., U.S. Department of Transportation Statement on Review of Chicago's Discriminatory, Unconstitutional Processes (Oct. 3, 2025), www.transportation.gov/briefing-room/us-department-transportation-statement-review-chicagos-discriminatory.

## CAUSES OF ACTION

### Count 1 - Separation of Powers
### Violation

### *All Challenged Conditions; Against All Defendants*

241.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

242.    The Constitution vests Congress—not the Executive—with "[a]ll" of the federal government's "legislative Powers," which include the power to spend and appropriate federal funds. U.S. Const. art. 1, § 1; *id.* § 8, cl. 1 (spending power); *id.* § 9, cl. 7 (Appropriations Clause).

243.    "The authority to pass laws and the power of the purse rest in the legislative not the executive branch." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020); *see also id.* at 887 (executive agencies "cannot pursue the policy objectives of the executive branch through the power of purse").

244.    Accordingly, absent an express delegation, only Congress is entitled to attach conditions to federal funds. While the executive branch has "significant powers . . . the power to wield the purse to alter behavior rests squarely with the legislative branch." *City of Chicago*, 961 F.3d at 892; *see also id.* ("'[W]hen Congress confers decision making authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.'" *Barr*, 961 F.3d at 892 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis in original) (cleaned up)).

245.    The separation of the legislative, executive, and judicial powers among the three branches is a central and core tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers"); *West Virginia v. EPA*, 597 U.S. 697,

737 (2022) (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'" (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)).

246.    Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its constitutional power when it "takes measures incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

247.    In leveraging its spending power under the Constitution, Congress has not conditioned the provision of funding for DHS and FEMA grant programs on compliance with a prohibition on all forms of DEI policies and initiatives, refusal to recognize transgender people, or any of the other terms, provisions, or principles that the Challenged DHS Conditions could be read to include. Nor has Congress delegated to Defendants the authority to attach any of the Challenged DHS Conditions unilaterally.

248.    Congress likewise did not authorize Defendants to condition federal funding on recipients' conduct under programs that Defendants do not operate (e.g., non-federally funded programs).

249.    By imposing the Challenged DHS Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without constitutional authorization from Congress and in the absence of statutory authority to do so.

250.    For these reasons, Defendants' conditioning of Plaintiffs' DHS grants on compliance with the Challenged DHS Conditions and enforcement through the DEI Disclosure Requirement violates the constitutional separation of powers.

251.    Defendants' violations have caused harm and will continue to cause harm to

Plaintiffs for which no remedy other than an injunction is adequate.

## Count 2 – *Ultra Vires* Agency Action Not
## Authorized by Congress

### *All Challenged Conditions; Against All Defendants*

252.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

253.    An executive agency "has no power to act … unless and until Congress confers power upon it." *Louisiana Public Service Comm'n*, 476 U.S. 355, 374 (1986).

254.    Defendants' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly … what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

255.    Defendants lack the statutory authority to impose the Challenged DHS Conditions. No provision of DHS's authorizing statutes gives the DHS the power to impose these terms, and the statutes authorizing Defendants to administer specific grant programs also preclude their imposition.

256.    In imposing the Challenged DHS Conditions, Defendants exceed the statutory authority granted to DHS by Congress. The Challenged DHS Conditions are therefore ultra vires executive agency actions.

257.    The Challenged DHS Conditions will cause harm to Plaintiffs and their residents, not in the least by forcing Plaintiffs to choose between accepting the Challenged DHS Conditions or forgoing critical funding.

258.    Federal Courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326–27 (2015). The Supreme Court allows equitable relief against federal officials who act

66

"beyond those limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 377 U.S. 682, 689 (1949).

### Count 3 – Spending Power Violation

### *All Challenged Conditions; Against All Defendants*

259.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

260.    Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Challenged DHS Conditions violate at least three of the Constitution's "general restrictions" on the spending power.

261.    First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

262.    Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207, 208; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

263.     Third, under the "independent constitutional bar," the spending power "may not be used to induce [grantees] to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

264.     Even if Congress had delegated authority to Defendants or the Executive to condition DHS grant funding on recipients' agreement to terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration, or mandating compliance with current and future executive orders, the Challenged DHS Conditions would nonetheless be unlawful and unenforceable because, in contravention of the spending power, they are ambiguous, purport to bind grantees to post-acceptance and retroactive conditions, are not germane to the purposes of the statutes that authorize DHS's and FEMA's grant programs, and may require recipients to engage in actions that are themselves unconstitutional. Each of these flaws applies to each of the Challenged DHS Conditions.

### i.  Ambiguity

265.     The Challenged DHS Conditions are ambiguous, and preclude any reasonable grantee, including Plaintiffs, from understanding their scope and meaning. The DEI Disclosure Requirement is ambiguous for many of the same reasons. *See* paragraphs 192–206 above.

### ii.  Germaneness

266.     None of the Challenged DHS Conditions nor the DEI Disclosure Requirement are germane to the purposes of the grant programs at issue here, the statutes that authorize those grant programs, or the federal interest in the projects funded by the grant programs, which pertain to disaster preparedness, mitigation, and recovery at the regional and local level.

267.     The lack of any reasonable relationship between the grants at issue and the Challenged DHS Conditions and DEI Disclosure Requirement is further underscored by the

facially unlimited reach of the conditions, most which apply to *all* activities and actions of each grantee and subgrantee and are not limited to the programs funded by the grants.

268.     That the Challenged DHS Conditions apply well beyond the activities funded by the grant programs also demonstrates that the Challenged DHS Conditions independently exceed the government's spending power because, on their face, the "conditions . . . seek to leverage funding to regulate speech outside the contours of the program itself" and "outside the scope of the federally funded program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215-16 (2013).

### iii. Independent Constitutional Bar

269.     The Challenged DHS Conditions and DEI Disclosure Requirement threaten to require Plaintiffs and other recipients of DHS federal funding to violate the First Amendment by selecting contractual counterparties and policing speech by members of the public in public spaces based on the viewpoints expressed by potential counterparties and members of the public. *See* paragraphs 216–18 above.

270.     Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 4 – Administrative Procedure Act Violation – The Challenged Conditions are Arbitrary and Capricious

#### *All Challenged Conditions; Against DHS and FEMA*

271.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

272.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A).

273.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

274.    Defendants' adoption of the Discrimination Condition in the Standard DHS Terms and Conditions is a final agency action. Defendants' adoption of the Executive Order Condition in the Standard DHS Terms is a final agency action. Defendants' adoption of the Grant Manual is a final agency action. Separately, and in addition, Defendants' incorporation of each of the Challenged DHS Conditions in the Standard DHS Terms, and the DEI Disclosure Requirement, into each grant program, grant award, and grant agreement, is a final agency action.

275.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

276.    Defendants have provided no reasoned explanation or basis for their decision to impose the Challenged DHS Conditions on funds that Congress has appropriated for grant programs that have no reasonable connection to or nexus with those issues.

277.    Defendants have provided no reasoned explanation or basis for withholding funds Congress appropriated for disbursement.

278.    Defendants have ignored essential aspects of the "problem" they purport to address by taking the final agency actions described above, including by failing to (a) assess the extent to which the Challenged DHS Conditions and are lawful and consistent with statutes and the Constitution, (b) consider Plaintiffs' reasonable and inevitable reliance on now at-risk funds, and (c) consider the potential impacts on safety and emergency management of withholding the funding appropriated by Congress.

279.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that each and all of the final agency actions described in paragraph 274 violate the APA because they are arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; and to temporarily restrain, and preliminarily and permanently enjoin, Defendants from imposing the Challenged DHS Conditions and DEI Disclosure Requirement without complying with the APA.

280.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 5 – Administrative Procedure Act Violation – The Challenged Conditions Are Contrary to the Constitution

#### *All Challenged Conditions; Against DHS and FEMA*

281.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

282.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

283.    As described above, the Challenged DHS Conditions violate bedrock constitutional provisions and principles including the separation of powers between the President and Congress

and the President and the Judiciary, as well as the spending power.

284.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that each and all of the final agency actions described in paragraph 274 violate the APA because they are contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; provide preliminary relief under 5 U.S.C. § 705; and temporarily restrain, and preliminarily and permanently enjoin, Defendants from imposing the Challenged DHS Conditions and DEI Disclosure Requirement without complying with the APA.

285.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 6 – Administrative Procedure Act – The Challenged Conditions Are In Excess of Statutory Authority

#### *All Challenged Conditions; Against All Defendants*

286.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

287.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

288.    Defendants may exercise only authority granted to them by statute or the Constitution.

289.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds. The Challenged DHS Conditions are not authorized by any statute under which any of the grant programs at issue exist, nor under any other statute.

290.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that that each and all of the final agency actions described in paragraph 274 violate the APA because they are in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the Challenged DHS Conditions and the DEI Disclosure Requirement without complying with the APA.

291.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.    A declaration that the Discrimination Condition and the Executive Order Condition are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

2.    A declaration that Defendants' attachment or incorporation of the Discrimination Condition, the Executive Order Condition, and the DEI Disclosure Requirement to Plaintiffs' grant funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.    An order temporarily restraining, and preliminarily and permanently enjoining, Defendants from attaching, incorporating, imposing, or enforcing:

   a.    the Discrimination Condition, the Executive Order Condition, the DEI Disclosure Requirement, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs, and any funds awarded to or received by Plaintiffs, whether directly or indirectly;

   b.    the Civil Rights Conditions, to the extent that Defendants construe any of the Civil Rights Conditions to require anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the Judiciary.

5.      An order pursuant to 5 U.S.C. § 705 that postpones the effective date of any action by any Defendants to adopt, issue, or enforce the Discrimination Condition, Executive Order Condition, and DEI Disclosure Requirement pending conclusion of this litigation; declares the Challenged DHS Conditions and DEI Disclosure Requirement void and unenforceable, with respect to any application, award, agreement, or other document executed by Plaintiffs; and declares that the Civil Rights Conditions require only compliance with the statutes cited therein as those statutes have been enacted by Congress and interpreted by the Judiciary;

6.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to:

      a.      adopt, issue, or implement the Discrimination Condition, the Executive Order Condition, or the DEI Disclosure Requirement;

      b.      require, attach, incorporate, implement, or enforce the Discrimination Condition, Executive Order Condition, or DEI Disclosure Requirement with respect to any grant application, agreement or subagreement, or other document, transaction, or activity, executed by Plaintiffs, or funding received by Plaintiffs;

      c.      construe the Civil Rights Conditions to require anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the Judiciary.

7.      Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

8.    An award to Plaintiffs of their reasonable attorneys' fees, costs, and other expenses;

and;

9.    Any other and further relief that this Court may deem just and proper.


Dated: January 21, 2025                    Respectfully submitted,


                                           MARY B. RICHARDSON-LOWRY
                                           Corporation Counsel of the City of Chicago

                                           By: /s/ Stephen Kane
                                           Stephen Kane (IL Bar No. 6272490)
                                           Rebecca Hirsch  (IL Bar No. 6279592)
                                           Chelsey Metcalf  (IL Bar No. 6337233)
                                           Rachel Zemke (IL Bar No. 6324891)
                                           John Kauffman (IL Bar No. 6353229)
                                           City of Chicago Department of Law
                                           121 North LaSalle Street, Room 600
                                           Chicago, Illinois 60602
                                           Tel: (313) 744-9484
                                           stephen.kane@cityofchicago.org
                                           rebecca.hirsch2@cityofchicago.org
                                           chelsey.metcalf@cityofchicago.org
                                           rachel.zemke@cityofchicago.org
                                           john.kauffman@cityofchicago.org

                                           *Attorneys for Plaintiff City of Chicago*

MICHAEL FIRESTONE
Corporation Counsel, City of Boston

By: /s/ Samuel B. Dinning
SAMUEL B. DINNING, MA BBO 704304**
Chief of Staff & Policy
TERESA K. ANDERSON, MA BBO 669985**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4034
E-Mail: samuel.dinning@boston.gov
teresa.anderson@pd.boston.gov

*Attorneys for Plaintiff City of Boston*

MICHIKO (MIKO) ANDO BROWN
City Attorney, City and County of Denver

By: /s/ *Matthew J. Mulbarger*
Matthew J. Mulbarger (CO Bar No. 51918)**
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202
Tel: 720-913-8050
matthew.mulbarger@denvergov.org
*Attorney for Plaintiff City and County of Denver*


EBONY M. THOMPSON
Baltimore City Solicitor

By: /s/ *Sara Gross*
Sara Gross (MD 0412140305)**
Chief, Affirmative Litigation Division
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Telephone: (410) 396-3947
E-Mail: sara.gross@baltimorecity.gov

*Attorneys for Plaintiff*
*Mayor & City Council of Baltimore*


LYNDSEY OLSON
Saint Paul City Attorney

By: /s/ *Kelsey McElveen*
KELSEY MCELVEEN **
Assistant City Attorney
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone:     (651) 266-8710
Facsimile:      (651) 298-5619
E-Mail:          Kelsey.McElveen@ci.stpaul.mn.us
*Attorney for Plaintiff City of Saint Paul*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

By: /s/ _Doris Bernhardt_____
Doris Bernhardt (NY Bar No. 4449385)**
Hope Lu (NY Bar No. 5606934)**
100 Church Street
New York, NY 10007
Tel: (212) 356-1000

*Attorneys for Plaintiff City of New York*
*CITY OF NEW YORK*

KRISTYN ANDERSON
Minneapolis City Attorney

By: /s/ *Kristyn Anderson*
Kristyn Anderson, MN Lic. 0267752**
City Attorney
Sara J. Lathrop, MN Lic. 0310232**
Munazza Humayun, MN Lic. 0390788**
Heather P. Robertson, MN Lic. 0390470**
Assistant City Attorneys
350 South Fifth Street
Minneapolis MN 55415
612-299-2716
612-431-1826
612-299-2742
612-431-2468
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
munazza.humayun@minneapolismn.gov
heather.robertson@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*

By: /s/ *Bradley Cousins*
Bradley Cousins, MN Bar #0400463 **
Assistant Ramsey County Attorney
Stacey D'Andrea, MN Bar #0388320 **
Assistant Ramsey County Attorney
Jada Lewis, MN Bar #0391287 **
Assistant Ramsey County Attorney
Ramsey County Attorney's Office
360 Wabasha St. N., Suite 100
Saint Paul, MN 55102
Telephone: 651-266-3081 (Cousins)
651-266-3051 (D'Andrea)
651-266-3149 (Lewis)
E-mail: Bradley.cousins@co.ramsey.mn.us
Stacey.dandrea@co.ramsey.mn.us
Jada.lewis@co.ramsey.mn.us

*Attorneys for Plaintiff Ramsey County*

ROD WILLIAMS
Acting Corporation Counsel for the City of New Haven

By: /s/ *Michael P. Bowler*
Michael P. Bowler, CT Bar  #407379**
City of New Haven
Office of the Corporation Counsel
165 Church Street, 4th Floor
New Haven, CT 06510
475-331-3244
mbowler@newhavenct.gov

*Attorney for Plaintiff City of New Haven*

By: /s/ *Toby Merrill*
Toby Merrill (MA Bar #601071)**
Litigation Director, Public Rights Project
Sai Mohan (CA Bar #350675)**
Erin Monju (DC Bar #90036952)**
490 43rd St., Unit # 115
Oakland, CA 94609
707-297-3837
Toby@publicrightsproject.org
Sai@publicrightsproject.org
Erin@publicrightsproject.org

*Counsel for all Plaintiffs*

MARY F. MORIARTY
Hennepin County Attorney

  /s Brittany K. McCormick_____
Rebecca L.S. Holschuh (MN Bar No. 0392251)*
Brittany K. McCormick (MN Bar No. 0395175)*
Assistant County Attorneys
300 South Sixth Street
Minneapolis, MN 55487
(612) 348-4797
Rebecca.Holschuh@hennepin.us
Brittany.McCormick@hennepin.us

*Attorneys for Plaintiff County of Hennepin*

DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
WALLACE W. DIETZ (TN BAR NO. 9949)*
DIRECTOR OF LAW

/s/ John K. Whitaker_____
JOHN K. WHITAKER (TN BAR NO. 039207)
   SENIOR COUNSEL
ABBY GREER (TN BAR NO. 041470)*
   ASSISTANT METROPOLITAN ATTORNEY
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Attorneys for Plaintiff Metropolitan Government of Nashville and Davidson County*

DONNA R. ZIEGLER
County Counsel, County of Alameda

By: Jason M. Allen___
DONNA R. ZIEGLER, CA Bar No. 142415*
County Counsel
K. SCOTT DICKEY, CA Bar No. 184251*
Assistant County Counsel
JASON M. ALLEN, CA Bar No. 284432*
Senior Deputy County Counsel
Office of County Counsel, County of Alameda
1221 Oak Street, Suite 450

Oakland, California 94612
Telephone:     (510) 272-6700
donna.ziegler@acgov.org
scott.dickey@acgov.org
jason.allen@acgov.org

*Attorneys for Plaintiffs County of Alameda, Alameda County Flood Control & Water Conservation District, and the Alameda County Fire Department*

\* Application forthcoming for admission pro hac vice
\*\* Admitted pro hac vice